# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA

[*This form is for prisoners to sue for civil rights violations. NEATLY print in ink (or type) your answers.*]

FILED
04/08/2024 ISP
U.S. DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
Chanda J. Berta, Clerk of Court

Lee Travis Griffin
[*You are the* **PLAINTIFF**, *print your full name on this line.*]

v.

RON NEAL, *et al.*,
[*The* **DEFENDANT** *is who you are suing.*]

Case Number 3:24-cv-66
[*For a new case in this court, leave blank. the court will assign a case number.*]

[*The top of this page is the caption. Everything you file in this case must have the same caption. Once you know your case number, it is VERY IMPORTANT that you include it on everything you send to the court for this case. DO NOT send more than one copy of anything to the court.*]

## PRISONER COMPLAINT

| # | Defendants Name and Job Title | Work Address |
|---|---|---|
| 1 | RON NEAL, in his individual and official capacity as Warden of ISP | 1 Park Row<br>Michigan City, Indiana 46360 |
| 2 | CHRISTINA REAGLE, in her individual and official capacity as Commissioner of the IDOC | 302 W. Washington St., Room E-334<br>Indianapolis, Indiana 46202 |
| 3 | JACQUELINE MAYES, in her individual capacity and official capacity as IDOC employee | 1 Park Row<br>Michigan City, Indiana 46360 |

[*If you are suing more defendants, attach an additional page. Number each defendant. Put the name, job title, and work address of each defendant in a separate box as shown here.*]

1. How many defendants are you suing? 13

2. What is the name and address of your prison or jail? IDOC Indiana State Prison, 1 Park Row, Michigan City, Indiana 46360.

3. Did the event you are suing about happen there? X Yes. ◯ No, it happened at: ____________

4. On what date did this event occur? Approximately January 14th, 2023

| # | Defendants Name and Job Title | Work Address |
|---|---|---|
| 4 | DR. CHICO, in her individual and official capacity as Centurion employee | 1 Park Row. Michigan City, Indiana 46360 |
| 5 | LT. KOEN[1], in his individual and official capacity as IDOC employee | 1 Park Row. Michigan City, Indiana 46360 |
| 6 | OFC. CROCKETT, in his individual and official capacity as IDOC employee | 1 Park Row. Michigan City, Indiana 46360 |
| 7 | LT. SMITH, in her individual and official capacity as IDOC employee | 1 Park Row. Michigan City, Indiana 46360 |
| 8 | SGT. WALTON, in her individual and official capacity as IDOC employee | 1 Park Row. Michigan City, Indiana 46360 |
| 9 | OFC. CROSS, in his individual and official capacity as IDOC employee | 1 Park Row. Michigan City, Indiana 46360 |
| 10 | DAWN BUSS, in her individual and official capacity as ISP assistant warden | 1 Park Row. Michigan City, Indiana 46360 |
| 11 | DOUGLAS WARDLOW, in his individual and official capacity as ISP major | 1 Park Row. Michigan City, Indiana 46360 |
| 12 | JANE/JOHN DOE 1, in her/his individual and official capacity as ISP safety hazard manager | 1 Park Row. Michigan City, Indiana 46360 |
| 13 | JANE/JOHN DOE 1, in her/his individual and official capacity as ISP supervisor of fire training | 1 Park Row. Michigan City, Indiana 46360 |

[1] Lt. Koen was misidentified in my original complaint as Lt. Cain.

## CLAIMS and FACTS

1. That, on approximately January 14th, 2023, I was housed on the north side of A cellhouse ("ACH") at the IDOC Indiana State Prison ("ISP").
2. That, on approximately January 14th, 2023, cell A252 erupted in flames.
3. That, there was a man locked inside of cell A252 while it was on fire.
4. That, the man trapped inside of A252 desperately screamed that his cell was on fire and for OFC. CROSS, LT. SMITH, OFC. CROCKETT, and SGT. WALTON to help him—to no avail.
5. That, ACH is most quiet during count time,[1] when everyone is locked in their cell.
6. That, because it was count time when the fire erupted ACH was really quiet.
7. That, I and other prisoners on the north side of ACH also screamed that cell A252 was on fire and for OFC. CROSS, OFC. CROCKETT, LT. SMITH, and SGT. WALTON to help the man trapped therein—some prisoners were also banging on their metal property boxes seeking to gain the attention of OFC. CROSS, OFC. CROCKETT, LT. SMITH, and SGT. WALTON.
8. That, the entire time we were screaming for help, the man in A252 was screaming for his life.
9. That, I heard the screams of the man in A252 go from a loud desperate outcry for help to a silent plea and realization that he was going to die from being burned alive.
10. That, after what seemed like an eternity—approximately 20-30 minutes—SGT. WALTON, LT. SMITH, OFC. CROSS and OFC. CROCKETT finally responded, but came untrained and

[1] Although it was "count time", OFC. CROSS, OFC. CROCKETT, LT. SMITH, and SGT. WALTON had already completed their count of the prisoners in ACH and were only sitting in the ACH office awaiting count to clear throughout the rest of the facility—not conducting official duties elsewhere in ACH.

unprepared to protect the health and safety of the man trapped inside of cell A252 while it was on fire, or to protect my health and safety from the smoke inhalation resulting therefrom.

11. That, SGT. WALTON, LT. SMITH, OFC. CROSS and OFC. CROCKETT, knew they were responding to an in-cell fire—both, from visually seeing the smoke and audibly from ACH prisoners screaming "fire in 252"—yet did not respond with a fire extinguisher.

12. That, OFC. CROSS, OFC. CROCKETT, SGT. WALTON, and LT. SMITH heard or should have heard myself and other prisoners yelling for help, but did not respond until after cell A252, and the man trapped inside, had been on fire for approximately 20-30 minutes.

13. That, OFC. CROSS, OFC. CROCKETT, SGT. WALTON, and LT. SMITH ignored my pleas for help as I inhaled toxic fumes, which consequently and proximately caused me to repeatedly black out, uncontrollably vomited, and suffer burns to my eyes, nasal cavities, and throat.

14. That, all I could do to help myself was lay on the floor of my cell.

15. That, I heard SGT. WALTON, LT. SMITH, OFC. CROSS and OFC. CROCKETT yelling that cell A252 was on fire and for someone to grab the fire extinguisher out of the officer's station.

16. That, I did not hear SGT. WALTON, LT. SMITH, OFC. CROSS and OFC. CROCKETT identify the type of fire that was burning inside of cell A252 or the type of fire extinguisher that was needed to quail the fire in cell A252.

17. That, I heard OFC. CROSS and OFC. CROCKETT yelling that the door to cell A252 was too hot and that it was stuck and could not be manually opened—the only way it could be opened.

18. That, SGT. WALTON was screaming in an incoherent panic as the man in cell A252 burned to death, and as I inhaled dangerous amounts of smoke that caused me to: (i) vomit uncontrollably, (ii) repeatedly lose consciousness, (iii) sporadically suffer the complete inability to breathe, (iv) endure painful burning sensation throughout my nose, sinuses, and my throat, and (v) temporary and random loss of my sight from my eyes being burned by the smoke.

19. That, the entire time OFC. CROSS, OFC. CROCKETT, SGT. WALTON, and LT. SMITH were incompetently responding to the raging fire in cell A252, the man therein was burning to death and I was suffering life threatening injuries from the smoke inhalation therefrom.

20. That, OFC. CROCKETT ran back to the officer's station and retrieved a fire extinguisher.

21. That, when OFC. CROCKETT arrived at cell A252 with the fire extinguisher he learned that said fire extinguisher was already completely empty.

22. That, I yelled for OFC. CROSS, OFC. CROCKETT, SGT. WALTON, and LT. SMITH to rescue me from my smoke-filled cell because I thought I was going to die and I knew my life was in danger from the smoke I was forced to inhale.

23. That, OFC. CROCKETT and OFC. CROSS were unable to rescue the man trapped inside of cell A252 due to ACH not being stocked with properly working fire extinguishers, and cell A252's door warping, expanding, and/or deforming under the immense heat of the fire.

24. That, REAGLE, NEAL, WARDLOW, BUSS, JANE/JOHN DOE 1 ("JD1"), and JANE/JOHN DOE 2 ("JD2") knew of or should have known that the fire extinguishers in ACH were not in working order—whether empty or otherwise.

25. That, REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2 knew of or should have known that the door and/or locking mechanism on the cells at ISP warped, expanded, and/or deformed under heat, as a result of the more than 100 fires that have occurred in the past and the reports therefrom.

26. That, REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2 knew that if a fire were to erupt inside of a cell there existed a high likelihood that the heat from the fire would deform and warp the cell's locking device, thereby leading to a substantial risk of injury and/or death due to the inability of ISP staff to access said cell, prisoner, and fire in a timely manner; REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2 ignored this risk.

27. That, OFC. CROSS, OFC. CROCKETT, SGT. WALTON, and LT. SMITH, respectively, yelled that no one was getting out of their cell–my pleas to be rescued from the life threatening smoke inhalation were disregarded.

28. That, one of the officers yelled for prisoners to use their Covid mask to cover their face.

29. That, the fire burned for so long and generated so much smoke that, the entire north side of ACH was engulfed in toxic smoke that smelled of paint and burning flesh.

30. That, OFC. CROSS, OFC. CROCKETT, SGT. WALTON, and LT. SMITH did not follow IDOC policy or protocol for evacuating prisoners during a fire.

31. That, after approximately 1 hour, LT. SMITH, LT. KOEN, SGT. WALTON, OFC. CROSS and OFC. CROCKETT were authorized by someone to begin letting me and other prisoners out of our cells.

32. That, when I was running to outside, I noticed that prisoners appeared to be moving in and out of consciousness, presumably from the smoke inhalation because I too lost consciousness several times from inhaling said smoke.

33. That, LT. KOEN and MAYES were directing prisoners from ACH to recreation.

34. That, on my way outside I informed LT. KOEN and MAYES that I was suffering substantial and severe effects from the smoke inhalation (*e.g.*, sporatic loss of consciousness, temporary and reoccurring blindness, difficulty breathing, severe headaches, dizziness, pain when inhaling, and painful coughing).

35. That, LT. KOEN and MAYES told me to "just go to rec".

36. That, LT. KOEN and MAYES did not provide me with medical assistance, nor did they inform medical staff that I needed assistance.

37. That, when I finally got outside MAYES was making everyone go to the recreation yard.

38. That, I asked MAYES for medical attention and I told her that I could not breathe and that I had lost consciousness multiple times, as a result of the smoke inhalation.

39. That, MAYES told me that she was not a doctor and for everyone to "just go to the rec yard and chill out".

40. That, as I walked into the recreation yard, I could hear MAYES yelling to other prisoners that she was not medical and for everyone to stop asking her for medical assistance and to "just go to rec".

41. That, I was forced to sit in the recreation building for hours without any medical attention or treatment while having extreme difficulty breathing, moving in and out of

consciousness, shaking uncontrollably, allthewhile my eyes, nose, and chest burned as if literally on fire.

42. That, after approximately 3 hours of sitting in the recreation building, MAYES and other ISP staff members began to count us (ACH prisoners).

43. That, during said count, I again requested medical attention because I could not breathe, was feeling light headed, and had lost consciousness.

44. That, MAYES disregarded my serious medical need and told me that she was doing count; MAYES did not then, or later, get me medical attention.

45. That, I again while *en route* to being locked in my cell, told OFC. CROSS, OFC. CROCKETT, SGT. WALTON, LT. KOEN, MAYES, and LT. SMITH that I needed medical attention because I was suffering from and had suffered substantial and severe effects from the smoke inhalation (*e.g.*, sporatic loss of consciousness, temporary and reoccurring blindness, difficulty breathing, severe headaches, dizziness, pain when inhaling, and painful coughing).

46. That, I was told to lock in and they would get to my medical issue later; I was never seen by medical.

47. That, the thick smoke still lingered in my cell, and the smell of burnt human flesh and paint triggered me to violently cough and labored breathing; I also felt light headed—like a panic attack.

48. That, after some hours I was forced back into my cell by LT. SMITH, LT. KOEN, SGT. WALTON, MAYES, OFC. CROSS, OFC. CROCKETT, and other unknown ISP staff, still without any medical treatment.

49. That, after I was made to go back into ACH and locked in my cell, DR. CHICO walked down the range saying "mental health check".

50. That, I asked DR. CHICO for medical assistance because I was suffering substantial and severe effects from the smoke inhalation (*e.g.*, sporatic loss of consciousness, temporary and reoccurring blindness, difficulty breathing, severe headaches, dizziness, burning pain when inhaling, and painful coughing).

51. That, in response DR. CHICO informed me that she was mental health and that it was not her job to offer medical/health care; DR. CHICO did not seek medical staff, treatment, or attention for me, rather left me locked in my cell suffering.

52. That, I was locked in my cell for the night and subsequently placed on group lock down; not once was I seen by medical for the injuries I suffered from smoke inhalation.

53. That, even though I made several request to ISP staff for a healthcare form, none was ever provided to me.

54. That, based on how I was being ignored, I assumed ISP staff was seeking to cover-up their malfeasance in responding to the fire in cell A252 and the man's death therefrom—something that commonly occurs in a prison setting—so I stopped asking them for medical assistance for fear of retaliation.

55. That, OFC. CROSS, OFC. CROCKETT, SGT. WALTON, and LT. SMITH, respectively, informed me that they were not medical staff and disregarded my plea for medical assistance; nor did they seek medical staff, treatment, or attention for me, rather left me locked in my cell suffering.

56. That, SGT. WALTON, after I made her aware that I was suffering the aforementioned effects from the smoke inhalation and required immediate medical assistance, as the sergeant in ACH and an employee of IDOC, charged with my safekeeping, had the wherewithal and obligation to see to it that I received immediate medical attention; SGT. WALTON did not act.

57. That, MAYES, after I made her aware that I was suffering the aforementioned effects from the smoke inhalation and required immediate medical assistance, as an employee of IDOC, charged with my safekeeping, had the wherewithal and obligation to see to it that I received immediate medical attention; MAYES did not act.

58. That, OFC. CROSS, after I made him aware that I was suffering the aforementioned effects from the smoke inhalation and required immediate medical assistance, as an officer working in ACH and an employee of IDOC, charged with my safekeeping, had the wherewithal and obligation to see to it that I received immediate medical attention; OFC. CROSS did not act.

59. That, OFC. CROCKETT, after I made him aware that I was suffering the aforementioned effects from the smoke inhalation and required immediate medical assistance, as an officer working in ACH and an employee of IDOC, charged with my safekeeping, had the wherewithal and obligation to see to it that I received immediate medical attention; OFC. CROCKETT did not act.

60. That, LT. SMITH, after I made her aware that I was suffering the aforementioned effects from the smoke inhalation and required immediate medical assistance, as the ACH lieutenant and an employee of IDOC, charged with my safekeeping, had the wherewithal

and obligation to see to it that I received immediate medical attention; LT. SMITH did not act.

61. That, LT. KOEN, after I made him aware that I was suffering the aforementioned effects from the smoke inhalation and required immediate medical assistance, as an ISP lieutenant and an employee of IDOC, charged with my safekeeping, had the wherewithal and obligation to see to it that I received immediate medical attention; LT. KOEN did not act.

62. That, DR. CHICO, after I made her aware that I was suffering the aforementioned effects from the smoke inhalation and required immediate medical assistance, as a healthcare professional for ISP and employee of IDOC, charged with my safekeeping, had the wherewithal and obligation to see to it that I received immediate medical attention; DR. CHICO did not act.

63. That, DR. CHICO, via IDOC MCF medical provider, voluntarily assumed the obligation to fulfill an essential State function: To timely provide reasonable health care to me—a prisoner of the State of Indiana. Thus, DR. CHICO acted under color of state law.

64. That, to this day, I randomly experience (i) shortness of breath, (ii) burning sensations within my sinus cavities when I breathe, (iii) night terrors of the man from A252 screaming for his life, (iv) lower back pains from crouching in my cell trying to get away from the smoke, (v) sharp chest pains that feel like my lungs are on fire, (vi) reoccurring sensation of smelling burnt paint and human flesh, (vii) painful reoccurring headaches, and (viii) I am unable to run the distances or enjoy the quality of life I had before being forced to inhale the toxic smoke from in-cell fire that occurred on approximately January 14th, 2023; I was

not experiencing these symptoms prior to said fire.

65. That, because I did not receive prompt medical attention after I made multiple pleas, *ad nauseum*, for help from OFC. CROSS, OFC. CROCKETT, LT. KOEN, MAYES, SGT. WALTON, DR. CHICO, and LT. SMITH, I have been regularly suffering the aforementioned experiences, ¶ 64.

66. That, I am no longer able to sleep at night, and am forced to sleep during the day when people are out because I feel less safe when I am locked inside of my cell and have to depend on prison officials' response to a life or death situation, particularly an unexpected in-cell fire.

67. That, in the past 10 years numerous prisoners have been injured, seriously injured, or killed in in-cell fires, yet REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2, have not taken reasonable action to protect me or other prisoners from substantial risk of injury and/or death posed in the event of a fire (*e.g.*, installing emergency call buttons in each cell, installing a fire suppressant system in each cell, properly training staff to respond to in-cell fires, ensuring that each cell house is properly equipped with working fire extinguishers, running routine fire drills and evacuation plans, replacing the manual locking mechanisms with emergency release latches, keeping sawdust or other fire-smothering material within immediate access of prisoners or ISP staff); REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2 ignored this risk.

68. That, cells, and the men trapped inside of them, at ISP have caught fire multiple times over the past few years—most times with prisoners suffering injury or dying therefrom.

69. That, REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2, being well aware that the safety protocols are deficient and pose a substantial risk, continues to house prisoners in cell at ISP with reckless disregard for the substantial risk of injury or death from the circumstances of fires and ISP staff's shortcomings in responding thereto, and the adjacent threats they present to me, and other prisoners housed at ISP, from smoke inhalation.

70. That, REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2 did not ensure that OFC. CROSS, OFC. CROCKETT, SGT. WALTON, and LT. SMITH were properly trained to respond to fires or follow IDOC protocol and policy for evacuation in cases thereof.

71. That, REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2 were previously warned multiple times, via ISP dorm rep meeting and prisoner complaints, in response to previous fires, that the fire extinguishers in the ISP cellhouses were inadequate, unavailable, empty, or defective.

72. That, REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2 were previously warned multiple times, via ISP dorm rep meeting and prisoner complaints, in response to previous fires, that ISP staff was not properly trained on types of fires and/or which respective types of fire extinguisher were required to put said fires out, or the dangers of smoke inhalation.

73. That, REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2 were previously warned multiple times, via ISP dorm rep meeting and prisoner complaints, in response to previous fires, that the prisoner-fire fighters were of little use when they too were locked in cells during peak hours of in-cell fires, and not housed in every cellhouse; no prisoner-firefighters are housed in ACH.

74. That, REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2 ignored previous incidents where said fire extinguishers did not work, were unavailable, or were empty.

75. That, REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2, for years, continue to maintain a custom and practice of painting over old paint, instead of properly sanding down and/or stripping the old paint off of the walls first; this practice resulted in countless layers of paint being caked on the walls in the cells in ACH, while knowing this practice presents a substantial risk of injury and/or death (because the paint fuels the fires).

76. That, the countless layers of paint effectively turned the walls in the cells at ISP into fuel for the flames.

77. That, the base layer of paint on the walls in the cells in ACH contain toxic products and by-product.

78. That, this custom and practice, ¶ 75, combined with: (i) ISP staff's lack of training in responding to fires, and (ii) the lack of a fire suppressant system and emergency call buttons within the cells, effectively turned the cells in ISP/ACH into ready-made deathtraps.

79. That, REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2 continue to improperly supervise or train IDOC staff on how to respond to fires—or entirely fail to train them at all.

80. That, none of the cells in ACH are equipped with a fire suppressant system.

81. That, REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2 have been well aware that the cells in ISP/ACH are not equipped with a fire suppressant system, yet continue to house prisoners in ISP/ACH.

82. That, none of the cells in ISP/ACH are equipped with emergency call buttons.

83. That, REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2 have been well aware that the cells in ISP/ACH are not equipped with emergency call buttons, yet continue to house prisoners in ISP/ACH.

84. That, REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2 have been well aware for years that their failure to equip cells in ACH with emergency call buttons and fire suppressant systems exposed myself—and any other prisoner being held in said cells—to a substantial risk of a serious physical injury, up to and including death; REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2 ignored this risk.

85. That, REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2 maintained and continue to maintain a custom and practice of not performing fire drills or training IDOC/ISP staff on how to conduct the same.

86. That, REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2, for years, have ignored substantial risk of injury and/or death to ISP/ACH population by: (i) failing to perform fire-code compliant fire drills, (ii) not properly training staff to properly respond to fires, (iii) not properly training staff to properly identify types of fire, (iv), not properly training staff on how to check that fire extinguishers are in proper locations and are in proper working order and full, and (v) not properly equipping cells in ACH with emergency call buttons or fire suppressant systems, all the while knowing the pervasiveness of in-cell fires and threats thereof/therefrom.

87. That, the only mechanical means of detecting smoke in ACH is smoke sensors located above the fifth range—some five stories in the air.

88. That, these sensors are ineffective for quickly detecting smoke from in-cell fires.

89. That, aside from the open cell bars, the cells in ACH do not have ventilation.

90. That, there is a vent in the wall by the toilet in my cell, but no air circulates through it; said vent merely pulls air into it—like a vacuum.

91. That, the vacuum effect coming from said vent sucked in the toxic and deadly smoke at a higher rate than if the vent were not present.

92. That, REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2 were made aware of the substantial risk of injury and/or death created by the vacuum effect of said vent during a fire, during ISP dorm rep meetings over the years after other fires had occurred thereby exposing said risk; REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2 took no action to mitigate the dangers of said vacuum effect.

93. That, in ACH, the majority of the +300 cells must be manually unlocked using at least two different keys and two different officers because the cells have a two-part locking mechanism that requires a metal bar to be rolled before a cell door can be opened, and some cells require different keys than others.

94. That, the majority of cells in ACH are unable to be remotely unlocked or opened.

95. That, REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2 are well aware that it is impracticable and highly unlikely that prisoners in ACH could be safely and timely evacuated before suffering substantial injury from smoke inhalation resulting from a fire, yet REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2 continue to house ISP prisoners in ACH knowing this substantial risk of injury and/or death exist.

96. That, REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2 know from past in-cell fires and complaints and litigation therefor/therefrom that, cells at ISP routinely burst into flames,

(*e.g.*, short circuit in electrical outlets), yet took no reasonable action to ensure my safety, and maintained an atmosphere of deliberate indifference that continues to place me and other ISP prisoners at risk of substantial injury and/or death.

97. That, REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2 are knowingly and unreasonably operating ISP in violation of Indiana Fire Code, thereby putting my health, safety, and life at risk.

98. That, REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2 are aware of an abundant number of common and widespread safety hazards at ISP and in ACH—one particularly glaring safety hazard is the widespread, persistent issues with fires, electrical outlets sparking, staff not being adequately or properly trained to identify and/or respond to fires, prisoners suffering smoke inhalation from not being promptly evacuated during fires, lack of emergency call or fire suppressant systems with the cells, ISP staff's refusal to perform fire drills, ISP staff's inability to remotely open more than 60% of the cells in ACH, lack of prisoner-firefighters in every cellhouse, and the vacuum effect of the vents in the cells pulling smoke into the cells during fires.

99. That, REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2 were aware of these hazards from past and present complaints and litigation, past fires, morning meetings, and ISP dorm rep meetings.

100. That, REAGLE, NEAL, WARDLOW, BUSS, JD1, and JD2 have not taken reasonable or proper actions to correct any of these persistent issues at ISP prior to or after the fire in cell A252, *e.g.*, fire code and fire policy requires ISP staff to perform eight [8] fire drills a year in ACH. However in the past year there has been three [3] fires drills—one of which was actually a

chow line that after we were released for chow ACH staff proclaimed that it was **also** a fire drill.

101. That, on approximately January 14th, 2023, the entire ACH submitted emergency grievances complaining about our treatment by ISP staff subsequent to the fire in cell A252; the emergency grievance I filled out was a copied template with just my name on it; because I was locked in my cell I put said grievance in my door for pickup.

102. That, to date, I have not received a response to my Emergency Grievance.

103. That, in the month of June 2023, a prisoner—also filing suit for similar allegations—gave me a pre-filled out Notice of Tort Claim, alleging essentially the same claims herein only with a claim for negligence and negligent infliction of emotional distress, and *respondeat superior*.[2]

104. That, the prisoner instructed me to read, verify, sign, and properly mail said notice of tort claim to the appropriate authorities; I did this in June 2023.

105. That, to date, I have not received a response to my June 2023 Notice of Tort Claim.

---

[2] I have sued the applicable Defendants in their official capacities as to assert my state tort claims against their respective employers.

When did this event happen?

◯ Before I was confined.

◯ While I was confined awaiting trial.

X After I was convicted while confined serving the sentence.

◯ Other: ______

5. Have you ever sued anyone for this exact same event?

X No.

◯ Yes, attached is a copy of the final judgment OR an additional sheet listing the court, case number, file date, judgment date, and result of the previous case(s).

6. Could you have used a prison grievance system to complain about this event?

◯ No, this event is not grievable at this prison or jail.

X Yes, I filed a grievance ~~and attached is a copy of the response from the final step.~~

X Yes, this event was grievable, but after I filed my emergency grievance I did not receive acknowledgment or response thereto; thus it was made unavailable.

7. If you win this case, what do you want the court to order the defendant(s) to do?

[*NOTE: A case filed on this form will not overturn your conviction or change your release date.*]

(1) Enter a declaratory judgment that the Defendants' acts and omissions violated the U.S. Constitution and amounts to negligence and negligent infliction of emotional distress under state law.

(2) Enter an order awarding me compensatory damages of $1,000,000 against each respective Defendant;

(3) Enter an order awarding me punitive damages;

(4) Enter an order barring the Defendants, in their official capacities, from retaliating against me for this or any lawsuit against the IDOC or IDOC staff, including without limitation, retaliation via bogus conduct reports, retaliatory transfers, harassment, and/or intimidation; and

(5) Any and all other relief the Court deems just.

[*Initial Each Statement*]

LG I will pre-pay the filing fee OR file a prisoner motion to proceed in forma pauperis.

LG I will keep a copy of this complaint for my records.

LG I will promptly notify the court of any change of address.

LG I WILL NOT send more than one copy of any filing to the court.

LG I WILL NOT send summons, USM-285, or waiver forms to the clerk.

LG I declare **under penalty of perjury** that the statements in this complaint are true.

I placed this complaint in the prison mail system on 04/ 8 /2024 at 8:00 (am)/pm.

[*Do not fill in this date and time until you give the complaint to prison officials to send to the court.*]

[signature] 233943

Signature Prisoner Number

[*DO NOT write in the margins or on the back of any pages. Attach additional pages if necessary.*]