**In the Matter Of:**

*LEETRAVIS GRIFFIN*

*-v-*

*RON NEAL, ET AL.*

---

**LeeTravis Delshawn Griffin**

*June 10, 2025*

StewartRichardson
DEPOSITION SERVICES

800.869.0873 | www.StewartRichardson.com

REPORTING DRIVEN BY EXCELLENCE – *Since 1975*

INDIANAPOLIS | CARMEL | EVANSVILLE | FORT WAYNE | SOUTH BEND | CHESTERTON

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| LEETRAVIS GRIFFIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| -v- | ) | 3:24-cv-00066-PPS-JEM |
| | ) | |
| RON NEAL, et al., | ) | |
| | ) | |
| Defendant. | ) | |

The deposition upon oral examination of LEETRAVIS DELSHAWN GRIFFIN, a witness produced and sworn before me, Julie-Samantha Smith, Court Reporter and Notary Public in and for the County of LaPorte, State of Indiana, taken on behalf of the State Defendants at Indiana State Prison, 1 Park Row, Michigan City, Indiana, on Tuesday, June 10, 2025, at 9:20 a.m., pursuant to the applicable rules.

STEWART RICHARDSON & ASSOCIATES
Registered Professional Reporters
(800) 869-0873

APPEARANCES

FOR THE PLAINTIFF:

LEETRAVIS GRIFFIN, Pro Se
DOC# 233943
Indiana State Prison
1 Park Row
Michigan City, Indiana 46360

FOR THE STATE DEFENDANTS:

GUSTAVO A. JIMENEZ, ESQ.
ALEXANDER T. MYERS, ESQ.
OFFICE OF THE ATTORNEY GENERAL
302 West Washington Street
Indiana Government Center - South, 5th Floor
Indianapolis, Indiana 46204-2770
(317) 232-6201
gustavo.jimenez@atg.in.gov
alexander.myers@atg.in.gov

FOR THE DEFENDANT DR. CHICO:

PATRICK McCARNEY, ESQ.
RILEY BENNETT EGLOFF, LLP
500 North Meridian Street - Suite 550
Indianapolis, Indiana 46204
(317) 636-8000
pmccarney@rbelaw.com

ALSO PRESENT:

Kaitlin Pollak, Indiana State Prison

INDEX OF EXAMINATION


| EXAMINATION | PAGE |
|---|---|
| BY MR. JIMENEZ: | 4 |
| BY MR. McCARNEY: | 100 |
| BY MR. JIMENEZ: | 118 |


INDEX OF DEFENDANT'S EXHIBITS


| Num. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Tort Claim | 92 |
| Exhibit 2 | Plaintiff'S Response to State Defendants' First Set of Interrogatories to Plaintiff | 92 |
| Exhibit 3 | (Didn't use after marking) | -- |
| Exhibit 4 | Letter dated June 6, 2025 | 92 |

LEETRAVIS DELSHAWN GRIFFIN,

called as a witness by the State Defendants, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. JIMENEZ:

Q. Good morning, Mr. Griffin. Can you please state your full legal name for the record.
A. LeeTravis Delshawn Griffin.
Q. So, Mr. Griffin, you and I have met before, but just to reintroduce myself to you, my name is Gustavo Jimenez. I'm an attorney with the Attorney General's Office, and I represent the state defendants in this case.
Do you understand who I am and who I represent?
A. Yes, I do.
Q. Okay. Could you state your full DOC number, please?
A. 233943.
Q. All right. So, Mr. Griffin, as you know, we previously deposed you in this case related to the exhaustion defense, so I'm just going to go through the same rules that we went through last time, just to make sure we're on the same page. But we're

taking your deposition this morning as part of the merits now for your case that you filed in federal court. As you know, a deposition is a discovery tool. I will ask you a number of questions, and I expect you to answer those questions to the best of your knowledge and expect that you provide -- that you will provide truthful and accurate testimony; do you understand that?
A. Yes, I do.
Q. You were just placed under oath by our court reporter. Do you understand that as part of that oath, that's what -- as part of that oath you're expected to tell the truth and be honest and truthful and provide complete testimony related to your allegations?
A. I do.
Q. All right. As part of the deposition this morning we have a court reporter who's typing everything down. So as you know, we want to make sure that we create a clean transcript of everything that is said here today, so for those reasons I'm going to ask that you please let me finish my question before you answer. And then likewise, I will let you finish your answer before I ask my next question, just to make sure that we get everything

down and we have a clean transcript of everything that is said here today; does that make sense?
A. Yes, it does.
Q. All right. If at any point in time you don't understand a question that I ask you, just let me know. I'm happy to rephrase my question or ask it differently if something doesn't make sense, so please let me know if that's the case. Okay?
A. Okay.
Q. We will be here for -- I don't know how long we'll be here, but it'll be at least two hours or so, so if at any point in time you need to take a break, if you need to run to the restroom or anything, just let me know and we'll go off the record. The only thing I'll ask of you is that you answer whatever question is before you before we go on that break; does that make sense?
A. Yes, it does.
Q. All right. Because, again, we have our court reporter, it's important that you answer every question verbally, which you've been doing great so far. If I catch you nodding your head, or if I catch you giving me a nonverbal response, such as an uh-huh or uh-uh, I will prompt you to give me a verbal answer to the question, just to make sure,

again, that we have a clean transcript; does that make sense?
A. Yes.
Q. All right. Do you understand that answers such as: I don't know, or I don't remember, can also be false?
A. I don't -- that you're telling me, I'll take you at your word. I've never -- usually if I'm answering a question, I know the answer. If I don't, then simply state: I don't -- I don't know or whatever, and if it amounts to it being false, I don't know how to address that, you know.
Q. And that's -- what I'm trying to get at is basically if you do know an answer to a question and then you answer: I don't know or I don't remember, that would be false if you do know what the answer is; does that make sense?
A. Yes, yes, yes.
Q. So I'm going to ask you just a couple preliminary questions. Are you currently on any medications?
A. I am not.
Q. Are you under the influence of any alcohol?
A. I am not.
Q. Are you under the influence of any drugs?
A. I am not.

Q. Is there any reason that you can think of that would prohibit you from giving truthful and accurate testimony this morning?
A. Not a one.
Q. All right. Is there any reason that you can think of that would prohibit you from recalling the events related to your lawsuit?
A. The distance of time that has occurred between now and then, but other than that, I -- it's hard to explain yes or no to that because depending on the question, it could be less identifiable in the mind, as far as, like, the traumatic experience, but other than that, I cannot -- like not anything that -- like mental disability or something that would prevent me from remembering whatever is asked of me.
Q. Okay. I got it. And, Mr. Griffin, did you review any documents in preparation for today's deposition?
A. Just the one in front of me, which is my claim.
Q. All right. And just for the record, the document that you have in front of you has a document stamp -- or file stamp version at the top for this case, so 3:24-cv-66-PPS-JEM, and then it's Document 12-2. Is that the full document,

Mr. Griffin, or --
A. Just -- sorry. Just missing the cover page.
Q. Okay. And that's the complaint?
A. Yes. Yes, sir.
Q. Okay. And you also have a folder in front of you. What else did you bring with you?
A. It's a blank piece of paper that has -- it is the name of the defendants, as well as pages that I attribute to those defendants.
Q. Pages from where?
A. The complaint.
Q. Okay. Got it. Anything else you have in front of you?
A. No, just other blank pieces of paper.
Q. Okay. Got it. All right. Did you speak with anyone in preparation for today's deposition?
A. I did.
Q. Who did you speak to?
A. Other inmates concerning what this is -- what this would consist of, because I never done a deposition that consists of this type of issue, opposed from the one on the grievance policy.
Q. Got it. So can you give me some of the names of some of those individuals you spoke to?
A. Just random individuals at the law library that

could help me better understand. I don't know their given names. They work in the law library.
Q. So law clerks that work in the law library?
A. Yes, sir.
Q. How many did you speak to?
A. One or two of them.
Q. And you don't know their names at all or what --
A. No. No, sir.
Q. Sorry. What about their nicknames?
A. No, I don't really recall their names. I just was in there and asked them: Hey -- yesterday actually -- what do you think this is going to -- what type of questions do you think they'll ask, you know. What is the framework of this type of deposition.
Q. Did you -- okay. Did you speak with -- I'm just going to name a couple individuals. So do you know that at this point in these cases there are five cases that are proceeding on the merits?
A. To my knowledge I know of one other. I don't know all of the rest of them.
Q. Who is the other -- what's the other case that you know of?
A. I believe his name is -- I don't actually know his last name. We call him D. He lives on the same

exact range as me, probably like five doors down.
Q. Okay. All right. So let me ask it this way: Did you speak to anyone whose name you do know --
A. I did not.
Q. -- about the deposition?
Do you have any nicknames or do you go by any nicknames?
A. Just Lee.
Q. Okay. And how old are you?
A. Thirty-one.
Q. What's your highest level of education?
A. Completed the tenth grade, but I have a GED.
Q. Did you get your GED while incarcerated?
A. I did.
Q. How long ago was that?
A. Quite a while. I completed it September or October of '14, 2014.
Q. How long have you been incarcerated?
A. Since December of 2012.
Q. All right. Did you live in Indiana before you were incarcerated?
A. I have only lived in Indiana.
Q. Got it. Where in Indiana?
A. South Bend.
Q. What did you do for a living before you were

incarcerated?
A. Never had a place of employment before prison.
Q. How long have you been at the Indiana State Prison?
A. I have only been in one prison, this prison.
Q. Since when?
A. December 2013.
Q. What are you currently serving time for?
A. Burglary, robbery, and felony murder.
Q. Do you know what your earliest possible release date is?
A. 2069.
Q. Do you have any convictions -- have you ever had any convictions for perjury?
A. I have never been convicted of any other crime other than the ones I stated, nor have I ever been charged with any other crime other than the ones I stated.
Q. Okay. Got it. All right. So we're currently at the Indiana State Prison, correct?
A. Yes, sir.
Q. And where at ISP are you currently housed in?
A. A cell house.
Q. What is your specific cell number?
A. 358.
Q. So I take it, based off of the number, you're on

the third range?
A. Yes, sir.
Q. How many cells into the range is 358?
A. Twenty-three, I believe.
Q. What side of A cell house is 358 in?
A. The north side.
Q. Okay. Am I correct that the north side of A cell house is five ranges?
A. Both sides have five ranges.
Q. Okay. Is A cell house general population?
A. Yes, sir.
Q. Is cell 358 a single-man or do you have a cellmate?
A. It is a single-man cell.
Q. How long have you been in cell 358?
A. Since, I believe, June of 2021.
Q. Okay. So the fire that we're going to get to and talk about occurred in January of 2023, so in January of 2023 you would have also been in A cell house, cell 358?
A. Yes, sir.
Q. All right. Do you currently work at -- within the prison?
A. I do not.
Q. Did you work back in January of 2023?
A. I did not.

Q. All right. Have you ever filed any other lawsuits besides this one related to your time incarcerated here at ISP?
A. One.
Q. What was -- is that one ongoing or has it been resolved?
A. It has been resolved to a point.
Q. What do you mean?
A. Because it was requested for transfer to the Supreme Court quite a while ago.
Q. Was it in state or federal court?
A. State.
Q. Just very briefly, what were those claims?
A. I believe, because it's been a while since I worked on it, it was negligence.
Q. So as you know, as it relates to this lawsuit -- so you filed this lawsuit in federal court, right?
A. Yes, sir.
Q. And as part of you filing it in federal court the court screened your complaint and it allowed certain claims in against certain defendants; do you understand that?
A. Yes.
Q. So based off this screening order, you're proceeding on an Eighth Amendment deliberant

indifference claim related to medical care against the defendants Cross, Smith, Crockett, Walton, Cain, Mayes, and then Dr. Chico; do you understand that?
A. Can you repeat that?
Q. So you're proceeding on an Eighth Amendment deliberant indifference claim related to medical against defendants Cross, Smith, Crockett, Walton, Cain, Mayes, and Dr. Chico; do you understand that?
A. Yes. Yes.
Q. And then you're also proceeding on another Eighth Amendment claim related to the alleged risk of harm related to the fire against defendants Reagle, Neal, Buss, Wardlow, Taylor, and Beecher; do you understand that?
A. I do.
Q. All right. So let's talk a little bit about January 14th of 2023. So this would have been the date of the fire that occurred in A cell house, right?
A. Yes.
Q. So on that particular day, can you walk me through just what you recall just from the time that you woke up to the time that you were made aware that there was something going on in -- related to the

fire, and then we'll get into more specific.
A. I believe to the best of my knowledge, woke up, went to breakfast. I don't recall if I went to rec or not, but I know we had 7:00 o'clock rec. And that would consist of what occurred from wake-up to probably, like, 9:15. And right after that was count time.
Q. Okay. And just for the record, what is count time?
A. Count time is when all inmates are to secure. A correctional officer makes his or her rounds and takes a count of the inmates on the ranges they're assigned to for a total of the cell house.
Q. Okay. So you said there was 7:00 o'clock rec; that would have been 7:00 a.m.?
A. Yes, sir.
Q. And then if I already asked you this, forgive me, but how long had you been in A cell house on January of 2023?
A. Approximately -- I apologize -- it would be -- I can't calculate that at this point, but from June of 2021 to that date. I can't -- it's hard for me to calculate it right now.
Q. You're fine. So based off of your other answers, too, would it be correct that you been in A cell house from June of 2021 to present date?

A. Wait a minute. Wait a minute. In A cell house?
Q. No, sorry, in cell 358.
A. Yes, sir, that would be -- that would have been, yeah, June to -- June 2021 to 2023. I can't calculate. It's probably like a year and a half, give or take.
Q. And so from January of 2023 to present date you have still been in cell 358?
A. Yes, sir.
Q. Okay. Back in January of 2023, did you also -- did you have any cellmates?
A. No. To my knowledge, this prison, for those type of cells in the A cell house, B cell house, and C cell house has never had cellmates.
Q. Got it. Okay. And then just to talk a little bit about the cells in A cell house. I have seen in your -- in the complaint and obviously through discovery that cells in A cell house, do they have call buttons?
A. They do not.
Q. Okay. The cells in A cell house, do they -- are they -- do they have, like, a metal door or are they bars?
A. Bars.
Q. Okay. With respect to the locking mechanism, do

you know if the cells on the 300 range, so where 358 is, can those cells be manually opened or do they have to be -- or can they be electronically opened?

A. They can be electronically opened.

Q. Okay. So what is your understanding of the locking mechanisms and how staff can open the cells on the 300 range?

A. On the 300 range they can use a key or they have to go to the front of the range to release the locking mechanism electronically.

Q. Okay. And the cells on the second-floor range, do you know how those can be opened?

A. Yes, only one way. They have to -- well, it's a two-part way, but it's only one way. You either use the key first at the door, then go unroll the bar that releases the door. Or you roll the bar first that releases the door and then come unlock the door. But it is just one action, though.

Q. And is that -- what you just described, is that for both the 300 and the 200 range?

A. No, only on the -- the only electronic doors is -- in A cell house is on the north side, three range, four range, and five range. Two on the north side and one on the north side, and all the ranges on

the south side are manually unlocked.
Q. Okay. And that's the way it is right now?
A. Yes, sir.
Q. Was that the way that it was also back in January of 2023, to your understanding?
A. Yes, sir.
Q. Okay. So I want to talk now a little bit about the individual that was in -- the individual that passed from the fire. Do you know who that person was?
A. Yes, I was familiar with him.
Q. Okay. And do you know his name?
A. Yes Mike.
Q. Michael Smith?
A. I didn't know him as Michael Smith. That's what I learned, maybe like a month or two after it occurred, but I knew him only as Mike.
Q. Okay. He was in A cell house, cell 252?
A. Yes, sir.
Q. And that would have been on the second-floor range?
A. Yes, sir.
Q. And the cell 252, that would have been the range right below yours, correct?
A. Yes, sir.
Q. On the north side?

A. Yes, sir.
Q. Were you friends with Mr. Smith?
A. Close -- I would say, like, distant associates. I wouldn't say friends, though.
Q. What was the first part of your answer?
A. Distant associates.
Q. What does that mean?
A. Like, we were friendly, but I wouldn't call us friends or even, like, close associates.
Q. Okay. And your understanding is that there was a fire in his cell 252?
A. Yes, sir.
Q. Do you know what the -- how the fire started?
A. I do not.
Q. Has anyone ever discussed with you the -- any potential causes for the fire?
A. No, they did not.
Q. Have you read the fire marshal's report?
A. I've -- I've read it, but if you ask me to recall it, I wouldn't be able to.
Q. Okay. Just to be clear, did you receive our discovery documents that we sent to you?
A. Yes, sir. Yes, sir.
Q. Have you ever started a fire in a cell house?
A. I have not.

Q. Are you aware that there are inmates who start fires within A cell house, or in the prison in general?
A. Well, in the prison, but usually people who are in general population don't do those things.
Q. Okay. But you're aware that sometimes prisoners do start fires on their own?
A. I can see that point. I've never witnessed anybody starting a fire, but I wouldn't deny that it happens.
Q. Okay. All right. So let's talk a little bit about the defendants in this case before we get to more of the specifics of January 14th. So obviously you sued a number of staff members from the Indiana State Prison, and so I'll focus, obviously, my questioning on them and then I'll let Dr. Chico's attorney ask you questions about Dr. Chico.
But just with respect to the state defendants in this case, so one of the individuals you named as a defendant is Warden Neal, right?
A. Yes.
Q. And he's the warden here at the state prison?
A. Yes.
Q. And he also was the warden back in January of 2023?
A. Yes.

Q. And then the other individual you named was Dawn Buss and she is the deputy warden here at the state prison, correct?
A. Yes.
Q. And she was also one of the deputy wardens back in January of 2023?
A. Yes, sir.
Q. All right. Then you also named Christina Reagle, who was the former commissioner for the Indiana Department of Corrections, correct?
A. She was the current, I believe. To my knowledge she was current and still is. You said former.
Q. Right.
A. Yeah, I was not aware of any former title. I thought she was current.
Q. Okay. So it is your understanding that about back in January of 2023 Christina Reagle was the commissioner for the DOC?
A. Yes.
Q. Okay. And then you also named Douglas Wardlow, and he is a correctional major here at ISP?
A. Yes.
Q. And he was also a correctional major back in January of 2023?
A. Yes.

Q. And you also named Deborah Taylor -- let me back up just a little bit. Have you ever met Warden Neal?
A. Yes.
Q. Have you ever met Dawn Buss?
A. Yes.
Q. Have you ever met Christina Reagle?
A. Yes.
Q. In person?
A. Yes.
Q. Okay. Have you ever met Douglas Wardlow?
A. Yes.
Q. In person as well?
A. Yes.
Q. Okay. And he was a -- Douglas Wardlow was a correctional major in January of 2023?
A. Yes.
Q. All right. Then you named Deborah Taylor. Deborah Taylor is -- it's your understanding that she is the safety hazard manager at ISP?
A. We learned that through discovery, not by knowledge, like, prior to.
Q. Okay. Got it. So do you know if she was the safety hazard manager back in January of 2023?
A. That, again, was learned through discovery. I didn't know that at the time, but to the best of my

knowledge today she was.
Q. Okay. Have you ever met Deborah Taylor in person?
A. I have not.
Q. Okay. Then you named Gordon Beecher; have you met him in person?
A. I have not.
Q. Okay. Do you know what his title is?
A. I believe fire safety supervisor or something of that nature, but I am unsure sitting here at this moment.
Q. Okay. Do you know where he works out of?
A. I do not.
Q. You also named Kevin Cross, and he was a correctional officer in January of 2023, correct?
A. Yes.
Q. Have you met Mr. Cross in person?
A. I have.
Q. You named Darnel Crockett; he was also a correctional officer in January of 2023, correct?
A. Yes.
Q. Have you ever met Mr. Crockett in person?
A. I have.
Q. And Mr. Crockett used to work in A cell house?
A. Yes.
Q. Does Mr. Cross still work in A cell house?

A. They -- I believe they moved him about a month ago.
Q. And then Jeanine Walton is another defendant, and she was a correctional sergeant in January of 2023?
A. Yes.
Q. And have you ever met Ms. Walton?
A. Yes.
Q. Then -- and Mr. Cross, Mr. Crockett, and Ms. Walton, they were all working in A cell house on January 14th, 2023?
A. Yes.
Q. You also named Nadine Smith, and she's a correctional lieutenant, correct?
A. Yes.
Q. Have you ever met her?
A. Yes.
Q. Then you named Dennis Cain; have you ever met him?
A. Yes.
Q. And he's also a correctional lieutenant?
A. Yes.
Q. And then you named Jacqueline Mayes; have you ever met Ms. Mayes?
A. Yes.
Q. And she is a correctional caseworker?
A. Yes.
Q. Okay. All right. Generally, in A cell house, what

would you describe the noise level of a cell house on just a typical morning?
A. I'd say -- depending on the -- it will differ. Honestly, it will differ. If you say -- if you have 7:00 o'clock rec or 11:00 o'clock rec or 3:00 o'clock rec, the day progresses different. You got 7:00 o'clock rec, they'll -- it'll be loud up until maybe -- I won't say loud. It will be -- loud is correct. It'll be medium to loud throughout that morning until maybe, like, 9:00, 9:45, which -- because people getting off they energy or whatever.
It may be quiet to medium noise level at about 10:00 to 11:00, and it then might ramp up again because that's when early lines are called and people are back in motion.
Q. You said early lines?
A. Early lines.
(Observers Enter.)
Q. What is that?
A. It is when -- every hour they call a line that allows inmates to move throughout the prison, and early lines is the 11:00 o'clock hour basically.
Q. Okay. And what is -- is your understanding that the correctional officers are walking through the ranges every 30 minutes?

A. No.
Q. So what is your understanding of how often the walkthroughs or checks are done?
A. Every hour.
MR. McCARNEY: Gustavo, sorry to interrupt. We had some people come in when Mr. Griffin was answering. Should we put that on the record?
MR. JIMENEZ: Yeah. So just for the record, we are waiting on a court reporter to come back and so we have another deputy attorney general, Brandon Arnold, and then one of Dr. Chico's attorneys, Katie Osborn, and then Pam James with ISP, who walked into the room within that last couple questions.
Q. Okay. So, Mr. Griffin, in A cell house, do inmates have TVs in their cells?
A. Yes.
Q. So inmates can, on any given day, just be watching TV?
A. Yes.
Q. Inmates can also be, like, just talking to each other --
A. Yes.
Q. -- socially?
Are the inmates in A cell house allowed to

just kind of roam through the cell house or do they stay within their cells?
A. Well, it depends. If you have a job you may be out your cell, but typically if you're not on a pass, it's not rec, it's not a time that food is being served, inmates are in their cells.
Q. And the locks -- and the doors are locked during that time when inmates are in their cells?
A. Yes, sir.
Q. Okay. So now let's dive into the actual incident and the fire itself. Based off of the reports and some the documentation, would you agree with me that the fire started sometime close to 11:00 a.m. in the morning?
A. That would be correct from documentation. That is not correct from the point of view from inmates in the cell house.
Q. Okay. So let's -- I'll ask you a couple follow-ups on that, but why don't you tell us now how you first became aware that there was something going on, so, you know, what were you doing at that time, just give me your story as to what happened, what you remember, how you became aware of the fire, all that. Go ahead.
A. I was -- I was probably watching TV or -- I can't

recall exactly what I was doing, but I was alert, you know. In a natural state of mind, just busy in my cell and begin to smell something that smelled like smoke. It went from me smelling smoke, to Mike saying he had a fire in his cell. And it progressed from there.
Q. So you heard Mr. Smith actually saying: There's a fire in my cell?
A. Yes, sir.
Q. And where was your cell on the third-floor range, where was it in relation to Mr. Smith's cell on the second-floor range?
A. From 52 to 58, I am one floor up, three cells down.
Q. And from where your cell is, cell 358, are you able to see anything on the second floor?
A. Not at all. Not like -- it's a walk that's placed above each range, so there's -- it's impossible.
Q. Okay. Can you see anything that's in the range above you?
A. No.
Q. From where you're at in 358, are you able to see what's going on, like, down the range either to your left or to your right?
A. Yes.
Q. And that's just through being close up to the bars

and just kind of looking out, seeing what's going on?
A. Yes, sir.
Q. Okay. So once you hear Mr. Smith yelling that there's a fire in his cell, what happens next?
A. Well, I'm in my cell, so I can only give you play-by-play of what I'm hearing basically.
Q. And that's what I want. I want to know every detail of what you heard, what you saw. So let's start with what you heard at that time.
A. Well, there was a period of time between him saying that he had a fire in his cell to when someone came to assess the situation. And by then more people were yelling that he had fire in his cell, smoke begins to pillow -- billow up from where his cell is, to obviously throughout the cell house.
And from there people were yelling: Get him out of his cell. Get him out of his cell. Then it took -- like I said, some more time passed. I believe that's when you can hear multiple officers down there, but once again I can't see anything past that point, but after that I'm not really focused on any of that other stuff. I'm trying to figure out how to -- because the smoke and fire and stuff is getting worse.

And by then you can -- from where I'm at you can literally see flames coming up the side of the floor.
Q. So you saw some flames coming up --
A. Yes.
Q. -- from where you were at?
A. Yes, sir.
Q. Did you see smoke from where you were at?
A. Yeah, the smoke had already -- that's something like -- from my cell, I can see directly in front of my neighbor and maybe, like, a cell and a half down. So by then I could already -- I'd already seen smoke by the time he was saying he had a fire in his cell.
But like I said, that was some time in the -- prior to me being able to see fire coming up.
Q. Okay. And so from where -- so from where you're at in your cell, as you describe it, you don't know -- at the time you were not aware of which staff members had come to the second-floor range close to Mr. Smith's cell, correct?
A. They -- people were saying that Sergeant Walton was down there, but I -- it's hard for me to give you what other people say because I'm not -- if you look at my claim, I include all of them because I'm

not -- they were all in there, as opposed to me going off what other inmates were saying.
Q. I understand that. And that's what I'm trying to make sure that we're clear on. I want to make sure I know what you saw.
A. Yeah.
Q. And what you heard --
A. Understood.
Q. -- right.
And so obviously we have documents, we have reports of who showed up, who was there. So we can, you know -- we can obviously trace that, talk to the staff members and get, you know, their experience on how they responded. But I want to know what you, like, were able to physically see and what you knew at the time. Does that make sense?
A. Yes, sir.
Q. So from where you're at, you don't know who is responding, in terms of which staff members are coming up, correct?
A. Not just -- when it comes to responding to the fire, that is not something I can see.
Q. Okay. And so you mentioned that people were saying that Sergeant Walton had gone up?

A. Yes.
Q. Do you remember -- so were people yelling that at the time?
A. Not -- not come to the fire. Like, not up the stairs and to his cell. She came down the range on the flag, which is the first range.
Q. Okay. And that's what you were hearing?
A. Yes.
Q. Okay. And obviously now having the benefit of reviewing documentation, do you know now that initially it was -- do you know now who initially responded to the fire, who went up the second-floor range?
A. If you asking me to recall right now what I read, I do not. But I know that it detailed who came in in succession, who helped with the fire; you know what I'm saying. I can -- if you'd ask me: Hey, the document's right there, can you find where it gave, like, a line of who went and who didn't, who -- you know, I would be able to find that, but I can't recall it at this moment right here.
Q. Okay. So then once you -- once you see the flames and you saw the smoke, you see the flames coming up, what were you doing during that entire time?
A. Eventually -- first, it took some time before -- I

wasn't conscious of what to do before -- I had to take concern into my -- my life into my own hands, went and started getting stuff to -- turn my fan on, try to keep the smoke out of my cell.

Put a -- they were -- they told -- it's hard for me -- I don't like recounting what other people say, because I've already shouted out that I need to -- we need to be evacuated or whatever. And individuals told me that Sergeant Walton said nobody was leaving their cells. And that one of the officers is either Sergeant Walton or Sergeant Cain, I don't recall which one they said, but I know it's one of those names, to put your COVID masks on.

Q. Okay. So let's break that down a little bit. The allegation that Sergeant Walton allegedly said that no one was leaving their cells, so that's something that you heard from some other inmates?

A. Yes.

Q. Did you hear that yourself?

A. I don't recall hearing that.

Q. Okay. And then do you know which inmate said -- said that Sergeant Walton allegedly said that?

A. No, it was right then. It was right then in the moment.

Q. Okay. So then you also said that someone else said it was either Walton or Cain, that they -- either one of them gave instructions about putting on COVID masks?
A. Yes, sir.
Q. That's what you heard from other individuals?
A. No, that was actually said right then. Well, it was some -- it was from other inmates, but it was spoken right there: They said put your COVID mask on. Put your COVID mask on.
Q. Did you hear that?
A. That's what inmates was saying. I didn't hear anybody say that, though.
Q. Got it. That's what I wanted to make sure I was clear on. So you said you had your fan on. Were you also yelling out or screaming out anything?
A. Yes, in the beginning. But once the fire got too big, I'm not focused on none of that. I'm now trying to figure out how to protect myself.
Q. Okay. And besides turning on the fan, what else did you do to try to protect yourself?
A. There is nothing else to do.
Q. And your cell door was locked at the time?
A. Yes.
Q. Did you hear Mr. Smith say anything about how the

fire started?
A. No.
Q. Okay. And you mentioned you were screaming at the beginning, and I want to make sure I'm clear: What were you screaming initially?
A. That there's a fire.
Q. Do you remember who your next-door neighbors were at the time?
A. The same guy that's in 360. I only know him as Art. He was there already. He's been in that cell for quite a while. I have no idea who was in the cell in 56.
Q. Okay. Besides yelling, did you do anything else to notify anyone that there was a fire?
A. There's nothing else you can do.
Q. Okay. And then with respect to Mr. Smith, besides hearing that there was -- he was saying there was a fire in his cell, did you hear him say anything else?
A. No, just that there was a fire and he needed help.
Q. Did he say: I need help?
A. Yes.
Q. Okay. Because of where you're at on the third-floor range, are you able to see what equipment any staff members came up with when they

first went to the second-floor range?
A. No.
Q. Do you have any clocks or any type of watch in your cell?
A. Yes.
Q. What do you have?
A. The TV guide has a clock on it.
Q. All right. Are you able to definitively say how long it took for staff members to respond to the fire?
A. No, that's why in my complaint I give an approximation. I -- due to the traumatic experience, I can't be sure exactly how long it took.
(Brandon Arnold, Katie Osborn, and Pam James left.)
Q. Were you alert the whole time that the incident was happening and fire was happening?
A. No.
Q. You weren't alert?
A. Not the whole time.
Q. Elaborate -- can you elaborate a little bit more? What do you mean by that?
A. I lost consciousness. The smoke was bad.
Q. When did you lose consciousness?

A. I don't know exactly when, but I know that I -- while in my cell, I began vomiting and I passed out.
Q. Okay. Did you vomit before or after you saw the flames?
A. No, it wasn't -- it was after. It was after because when -- when I first seen the flames, the cell house wasn't full of smoke yet.
Q. So -- sorry. So you started vomiting after you saw the flames?
A. Yes, sir.
Q. Did you pass out before or after you saw the flames?
A. After. After.
Q. Okay. What about -- when you say that you passed out, would you consider that the same as losing consciousness?
A. Of course.
Q. Okay. All right. So I want to show you your complaint because I want to go over just a couple of allegations. I'm not going to mark this as an exhibit, but just for purposes of being on the same page here. So showing you docket number eight in this case, and that's the document I just put in front of you, Mr. Griffin --

A. Yes, sir.
Q. -- so go to page -- just a couple questions, actually, that I thought of: When you're hearing inmates yelling, right, so the cell house got louder from those yells?
A. Yes.
Q. And as you're hearing these inmates yell, are the inmates doing anything else to try to sort of notify the staff that there's something going on?
A. They banging stuff against the bars. They -- well, that's -- I think that's the only things that I remember, is yelling and banging stuff on the bars. That's pretty much the only thing that was -- we had in our tools.
Q. So you said you passed out. At what point in time did you regain consciousness then?
A. I mean, it was brief, but it was long enough for me to realize that space was missing. Like, I wouldn't say more than five minutes later, but that would be an approximate number, if that long.
Q. When you lost consciousness, did you lose consciousness while you were standing; were you sitting somewhere?
A. I was on my bed.
Q. Okay. So you just lost consciousness on your bed?

A. (Indicates.)
Q. Is that a yes?
A. Yes, sir.
Q. Okay. And then when you said that you were vomiting, where were you -- did you vomit any specific area?
A. My toilet; it's right there beside my bed.
Q. Okay. During the -- while you're still in your cell, did you speak with Sergeant -- did you speak with Officer Cross at all?
A. I did not.
Q. Okay. While you are inside your cell, did you speak with Officer Crockett at all?
A. I did not.
Q. While you are in your cell, did you speak with Sergeant Walton at all?
A. Well, at the time that they said that she was down there, I yelled that -- I was yelling with everyone else, so if -- I'd say technically I did, but I didn't actually -- because she two floors down, so I wouldn't have been able to see her to say that I know definitively that I spoke to her right then.
Q. Okay. So just to be clear, when you're yelling, you're not necessarily talking to anyone, you're just sort of yelling?

A. No, no, that's -- to clarify, I'm yelling in general. When they say that she's down there, that's when I believe I'm communicating with someone. If I am or not, that isn't something that, like I said, I definitively say I was talking to her. Inmates told me she was down there, that's how -- when they were communicating about -- that they seen her coming down the range on the flag. That's when I believe that I'm communicating with her.
Q. Okay. And so what -- when you believe that you're communicating with her, you're yelling?
A. Yes, sir.
Q. And what specifically are you yelling at that time?
A. That we need help up here. Not any specific thing, like any concerns or whatever, just that we need help. They set a fire up here. We need to be evacuated.
Q. Did you speak with -- okay. So from where -- at some point you were evacuated, correct?
A. Yes.
Q. So from the time that you initially first realized that there's smoke, you know, when you first realized: Hey, something is going on, to the point that you're evacuated. Okay. So while you're

still in your cell.
A. Yes, sir.
Q. Did you speak to Sergeant Walton at all during that time, like a direct conversation with Sergeant Walton?
A. No, she never came to 300. I don't know how I would have communicated with her, other than what I just explained to you.
Q. Okay. And then while you're in your cell, okay, right up to the point that you're -- right before you get evacuated, did you have any conversations with Officer Cross?
A. No.
Q. What about with Officer Crockett?
A. No.
Q. What about with Nadine Smith?
A. No.
Q. And I already asked about Walton, correct?
A. Yes.
Q. And you said you did not have any direct conversation with her?
A. I did not.
Q. Okay. And from where you're at on the third-floor range, are you able to see any part of the flag, or no?

A. Just probably like -- a large portion of where the stairs is because it's an open space, but, like, right in front of my cell, maybe, like, a foot extended from the wall.
Q. Got it.
A. But not the entire thing.
Q. Okay. And A cell house also has an officer -- like an officer station?
A. Yes, sir.
Q. And the officer station is on the same side -- or on the north side of A cell house, too?
A. Yes, sir.
Q. Okay. Are you able to see inside of the officer station from where you're at?
A. I am not.
Q. Have you ever been inside the officer station?
A. No, but you can -- when you walk past it, you -- it's open. It's just fenced in.
Q. Okay. Does the officer station, from what you can see, does it have monitors or, like, TV or computer screens?
A. Yes, sir.
Q. And is your understanding that those computer screens allow staff to sort of monitor and survey the surveillance cameras?

A. I know for a fact they do.
Q. Okay. All right. So I want to talk a little bit more about some of the allegations you made in your complaint. So you characterize the smoke as toxic, like toxic fumes?
A. Yes.
Q. Okay. Is that a correct characterization --
A. Yes, sir.
Q. -- of the smoke?
A. Yes, sir.
Q. And what makes you say that the smoke had, like, toxic fumes within it?
A. Because it was different colors, like some of it was grayish black, some of it was white. It smelled like -- like plastic. Some of it smelled like paper. It was pretty bad. It was -- an indistinct scent. That's what led me to believe it was, like, a toxic smoke type of scent.
Q. Have you ever been around any other, like, smoke in that type of -- similar to this situation from January 14, 2023?
A. Multiple times.
Q. In what other instances?
A. The first one I was in just about the same proximity to the 2017 fire in B cell house. And

once in D cell house, 2020, I believe it was.
Q. Okay. So the fire from 2017, is that related to Joshua DeVine?
A. Yes, sir.
Q. And that fire in 2017, were you in B cell house at the time?
A. I was.
Q. Okay. So with respect to this fire from January 14th of 2023, you said that you passed out for a few minutes, you were vomiting. Anything else related to kind of what you were experiencing physically?
A. Lightheadedness, shortness of breath, burning of sinuses, throat burning, eyes burning, like blurriness of my sight. I say -- I wouldn't characterize it -- yeah, probably closer to blurring of my eyes, of my sight.
That's pretty much it. If you include fear or terror, you know, then I include those as well, but I wouldn't -- the question you asked me, I wouldn't assign it with that as well.
Q. Okay. So now let's talk about how you were feeling then. How were you feeling as you were in your cell prior to the evacuation knowing that there was a fire?

A. Terrified, sir.
Q. Anything else?
A. I don't know how else to feel. I am not laughing at the question. It's just that I don't know how else to answer that, you know, other than terror. I mean, I can say that I felt like I was going to die or something, but that -- helpless. But scared is about as best as I can do for you.
Q. And I'm not trying to make light of anything. I'm just trying to make sure I'm clear on -- obviously you were the one that was there, and you were the one that experienced it, so I just want to make sure I'm clear on how you were feeling and your experience.
A. Yeah, understood that.
Q. Okay. So from where you're at, you're still in the -- you're in cell 358, and the door is locked. From where you are physically, you were not able to see what measures staff took to try to put out the fire, correct?
A. I was not there -- I was not able to; only word of mouth, sir.
Q. Okay. Did you ever see Officer -- while the fire was still ongoing, did you see Officer Cross come up to the third floor?

A. No one came to the third floor.
Q. Okay. So let's talk about the evacuation itself then. Walk me through what happened once -- you know, once the fire started, getting evacuated, tell me that from your perspective and your experience.
A. To my knowledge -- I'm not 100 percent sure how to give detail, but I'll try. They opened the doors and we were moved to the gym.
Q. Okay. Do you know who opened the doors to the cells?
A. I don't recall. To my knowledge it isn't something that I can pinpoint to say this is the person that done it.
Q. Okay. Do you know who gave any directions for the evacuations to begin?
A. If -- I read it in the paperwork that y'all sent as part of the discovery, but at the time I didn't. When I -- because that isn't something that's communicated to us.
Q. Okay. So after reviewing some of the discovery, what is your understanding of who gave the directive for the evacuations to start?
A. I don't recall. I don't remember at this point.
Q. Okay. So then since you were on the third-floor

range, did the cells automatically then open and then everybody was just able to walk out and, you know, exit the range or was there a staff member that physically came, used a key to unlock the cells, and then let you all individually out one at a time?

A. To my knowledge it was automatic, but if it wasn't I wouldn't have been surprised; you know what I mean. Like, I wouldn't have -- if you told me it wasn't, I wouldn't deny that it occurred as you say. But to my knowledge I believe it was automatic.

Q. Okay. So -- and I'm asking you because I want to know, right.

A. Yes, sir. Yes, sir.

Q. So to your knowledge, if it was automatic, so someone would have been able to unlock the doors from the end of the range that would open the cells and you would be able to physically open the door and then go down the staircase and then go down the range?

A. Yes.

Q. Okay. And do you think that's what happened in this situation?

A. I believe so.

Q. Once you exit, are you -- when you're able to exit your cell, do you still see smoke coming from the second-floor range?
A. Yes, sir.
Q. And are you seeing any more fires at that time or just smoke?
A. Well, the problem is that you probably couldn't even -- I give you -- me standing -- like our distance right now, I wouldn't have been able to see you.
Q. Because of the --
A. The smoke.
Q. Okay. So as you're now exiting your cell, are you running? Are you walking as you're evacuating?
A. I characterize my movements as hastily as possible because you can't see in front of you. To run would be absurd. You don't know who's in front of you and it'd make the situation worse. But I'm moving as fast as my physical body is allowing me at that point.
Q. Okay. And other inmates on the third-floor range are also exiting their cells at the same time you are?
A. Yes, sir.
Q. Okay. So when you exit your cell, do you walk to

the right or to the left to evacuate?
A. I don't know because it -- as far as it's been, I don't recall whether we left through the front of the range or the stairs closest to my cell, which is our normal route.
Q. Okay. So then you said that you make your way down the stairs, and then you were taken to the gym?
A. Yes, sir.
Q. And so as you're -- so you head down -- so it would just be -- you go down, you pass the second-floor range. As you're passing the second-floor range are you able to see what's going on on the second floor at that time?
A. Yes.
Q. And what do you see at that time as you're walking down?
A. I'm not paying attention to what's going on, as far as -- as far as I remember, me telling you here, I'm not looking down the range to see what's going on.
Q. Okay. And then you make your way down to the first floor?
A. Yes, sir.
Q. And then you exit A cell house?
A. Yes, sir.

Q. Do you remember what door you used to exit A cell house?
A. The front door.
Q. Okay. And at the time, as you're exiting A cell house, do you speak to anyone?
A. Yes.
Q. Who do you speak to?
A. I know that I speak to at least -- I'd like to say Cross, Crockett, Smith, Walton, maybe Cain at that point, and that's -- I explain to them that -- I'm going to put it in my words, not as I'm stating it to you now. I believe I passed out. I'm lightheaded. I am dealing with shortness of breath. I need medical attention or whatever.
And I'm not certain if that's when I ran into Jacqueline Mayes as well, but they were all -- everyone that I believe I spoke to direct me to go to the gym.
Q. Okay. So where -- as you're exiting A cell house, where was Officer Cross when you spoke to him and told him that you were having shortness of breath, that you passed out, and that you needed medical?
A. I believe, to my knowledge, all of them were in front of the cell house.
Q. Were they inside or outside?

A. Outside. Outside.
Q. Okay. So you're heading out of the front door of A cell house and that's when you encounter Cross, Crockett, Smith, Walton, and Cain?
A. I believe so.
Q. So they were all together?
A. Not all in one -- like some of them over here, a few of them over here. It isn't a large space right in the front to the cell house. So as I'm leaving, I encounter every single one of them.
Q. And you spoke to every single one of them?
A. They were there. I spoke to all of them.
Q. So what I'm trying to understand is did you -- you know, did you physically go to Cross and say: Hey, I'm -- like did you physically go to him and talk to him, and then move over and went to Crockett and talked to him, and then moved and went to Smith and talked to her, or -- is that what happened?
A. No, no. I wouldn't even try to characterize it like that. No, I spoke to all of them.
Q. And that's what I'm trying to understand. Who are you -- so you walk out of A cell house, so now you're outside?
A. Yes, sir.
Q. You said staff members are standing outside.

They're not all together, but they're kind of spread apart a little; is that fair?
A. Yes, sir.
Q. And so how do you then speak to everyone when they're in, like, different --
A. Because it's not -- sorry. It's not like from the TV to outside the door. It isn't that far apart. They're all basically spread out, but close enough that I'm not so far away that -- to my understanding, I'm communicating to all of you. I need y'all help; why aren't y'all helping me. That's how I characterize my interaction with them.
Q. Okay. So are you just talking out loud then or are you -- like was there anyone that you were specifically, like, face -- let's -- let me back up.
When you were saying: I just passed out. I'm lightheaded. I have shortness of breath. I need medical. When you were saying these things, were you physically, like, facing any of either Cross, Crockett, Smith, Walton, or Cain?
A. I would be misleading you if I said that I knew exactly who I was talking to at the time, but I can -- I know that they were all in the vicinity.
Q. Okay. So were you facing anyone when you were

saying: I need medical. I have shortness of breath?
A. I know it was somebody, but this wasn't yesterday, sir. I couldn't give a definitive answer as to who it was, but I do know that I spoke to them, as I characterized it, the group of them.
Q. Were there other staff members outside as well?
A. Yeah, it was -- it was others, but I don't consider them to be people that were of note because you got firemen -- they were running the chow line at the time and people were going into rec as we were being evacuated. So there were inmates that weren't in the fire out there. It was quite a --
Q. Right. I know there was several other inmates outside, too, correct?
A. Yes, sir.
Q. Because other inmates are also evacuating the cell house at the same time you are?
A. Yes, sir.
Q. So there are -- there's not just staff members, but there's a lot of activity outside?
A. Yeah.
Q. Okay. And people are talking while you're all evacuating; is that fair?
A. Yeah.

Q. So it's pretty loud; is that fair?
A. No.
Q. It's not loud?
A. No, it's not like (demonstrating). That isn't -- that would be a mischaracterization of the scene. People are going -- pretty much going where they're being directed to. It isn't like you got 20 people here, 30 people there. People are going where they're directed to. I'm not. I'm stopping. Can y'all help me. I'm feeling pretty bad.
Q. Okay. And who is directing inmates to -- to the gym?
A. Yes.
Q. Who was directing the inmates?
A. I believe it was Jacqueline Mayes. That was the main person I remember seeing tell people where to go was Jacqueline Mayes.
Q. Okay. Anyone else?
A. I'm sure there was other people, but I can't recall at this time, sir.
Q. And where was Ms. Mayes?
A. I'd like to say maybe she started by the door, but to my knowledge further -- closer to the checkpoint that leads to the rec yard.
Q. When you say started by the door, what door?

A. A cell house.
Q. So when you were -- as you're evacuating and you're saying that you're lightheaded, had shortness of breath, that you needed medical, did you -- did any other inmates -- let me ask it a different way.
So you're saying that as you're making your way over to the gym, that you stopped and were requesting help?
A. Yes, sir.
Q. And as you're stopping, requesting help, am I understanding you correctly that you're not necessarily talking at anyone specifically, but just kind of requesting help in general?
A. No, I'm directing it to the people that's charged with helping me, but it's not a complete mischaracterization that I'm speaking out, but it's not -- it's direct. It's not indirect. Like I'm: Ah, I need some help. No, it's pretty direct to the people that's charged with safeguarding my life.
Q. And who would those people be?
A. They would be Cross, Crockett, Smith, Walton, and, I believe, Cain.
Q. Did -- and do you know if -- like did either Cross, Crockett, Smith, Walton, or Cain, did they give any

indication that they heard what you were saying?
A. I mean, I'm not going to say that they looked at me and say: All right. We're going to get you, because nobody did that. But I'd like to believe that they heard me because it wasn't like I was a mile away. I was in close proximity to all of these people.
Q. Okay. But you're not sure if they heard you or not; is that fair?
A. No, that's fair. That's fair.
Q. Okay. So the whole north side of A cell house was evacuated?
A. The whole cell house was evacuated.
Q. Okay. Do you know if the north side was evacuated first before the south side?
A. Yes.
Q. Do you know if the north side was evacuated first?
A. I do not.
Q. You went to the gym and then is the gym also, like, considered recreation?
A. Yes.
Q. Okay. And all the inmates from A cell house went to the gym?
A. Yes.
Q. And then once you were in the gym, what happened

once you were there?
A. We were there for quite some time, and then we were counted.
Q. Did you talk to any of the state defendants while you were in the gym?
A. Yes, Jacqueline Mayes.
Q. Okay. What did you speak to Jacqueline Mayes about?
A. During count I explained to her the same thing that I explained to the rest of them, that I was feeling lightheaded, that I had previously lost consciousness, and that I was feeling lightheaded and short of breath and I needed help. And she said: We counting currently.
Q. Okay. So when you said these things to Jacqueline Mayes, were you having, like, a direct conversation with her?
A. Yes.
Q. Okay. She said that they were doing counts?
A. Yes.
Q. Okay. And then anything else that she said?
A. No.
Q. Anything else that you told Jacqueline Mayes at the time?
A. No.

Q. Besides that interaction and conversation with Ms. Mayes, did you have any other conversation with Ms. Mayes while you were in the gym?
A. I did not.
Q. Okay. Did she have -- did she tell you anything else besides that count was being done?
A. No.
Q. Besides Ms. Mayes, any other staff member that you spoke to while you were in the gym?
A. I did not speak to anyone.
Q. Did you speak to any inmates while you were in the gym?
A. Yes.
Q. Who did you speak to?
A. A couple of guys from B cell house. They were currently in recreation.
Q. What did you tell the guys in B cell house?
A. There was a fire. That's the gist of it.
Q. Did you speak to any other inmates as you were walking from A cell house over to the gym?
A. I don't recall if I spoke to any inmates. It's not a five-minute walk. It's maybe a minute and a half.
Q. Okay. Did you speak to any other staff members -- did you speak with any staff, excluding the

defendants, but any other ISP staff that might have been present as you were heading from A cell house over to the gym?
A. Maybe, if my memory serves me right, there were -- what's his name, Hubbard or Dugan. I know that I may have said to one of them that there was a fire in A cell house, but that was the end of that.
Q. Do you know how long you were in the gym?
A. Maybe a couple hours.
Q. Okay. At some point you ended up going back to A cell house on that same day?
A. Yes.
Q. At what point did you -- do you know sort of, like, how the decision was made to say: Hey, all the inmates can now return back to A cell house?
A. No. Well, I know that they went -- through the discovery, I know that they went and did their job, as far as assessing what was going on in there and did all of their fire duties. But -- or post-fire duties. I don't really know who makes those, you know, clarifying -- or confirms or, you know, authorizes who's going to go where and do what, as far as that, I have no -- no reason for that to be communicated to me.
Q. And when you say they, who are you referring to?

A. Like the fire marshal and the little prisoner firefighters and stuff. I know, like I said, through discovery, that they went in there and did whatever their jobs post fire was to make it that we can go back in there. But me talking to you as to what I know, none of that is communicated to inmates.
Q. Okay. And as you're heading back to your cell, did you speak with any of the defendants? So from the time that they say: Hey, you can now return to your cell, from the time that that decision is made to the time that you head back to A cell house, did you speak to any of the defendants?
A. I don't recall at this point, but I like to believe I did, but I probably didn't.
Q. Okay. So you end up going back to your cell. And to go back up to cell 358, you have to go up the stairs, right?
A. Yes.
Q. So you would pass the second-floor range?
A. Yes.
Q. So as you're passing the second-floor range heading up, are you able to see down the range close to where cell 252 is?
A. I mean, usually. But given the fact that something

just occurred, it could have been people there. To my recollection right now, I don't recall. I probably just headed to my cell, but you would be able to see them.
Q. But you don't remember, if anything, what you saw?
A. No, sir.
Q. Okay. So then you head up, you go back to your cell. And then what happens once you get back to cell 358?
A. Pretty much nothing. Eventually Dr. Chico walks by and I tell her that I need medical attention. She said she wasn't a medical doctor, went on about her way. And that was pretty much the end of that.
Q. Once you went back to your cell and got back to cell 358, did you have any other conversations with Officer Cross that day?
A. I do not believe so.
Q. Did you have any other conversations with Officer Crockett once you got back to your cell?
A. I do not believe so.
Q. Okay. Once you got back to your cell did you have any conversations with Sergeant Walton?
A. I do not believe so.
Q. Once you got back to your cell did you have any conversations with Lieutenant Cain?

A. I do not believe so.
Q. Once you got back to your cell did you have any conversations with Ms. Mayes?
A. I do not believe so.
Q. You mention that conversation that you had -- that you state you had with Dr. Chico; did you have any other conversations with any other staff members not including the defendants?
A. Can you rephrase that?
Q. Yeah. So you mentioned that there was an interaction you had with Dr. Chico once you went back to your cell?
A. Yes.
Q. Besides Dr. Chico, did you have any other conversations with any other ISP staff?
A. No, I didn't.
Q. Okay. Did you have any other conversations with any other inmates once you got back to your cell?
A. Yeah. Yes, I did.
Q. Who do you remember speaking to?
A. Just random people over the range. It probably was people that I know, but that's how I was able to accumulate some of the facts in my complaint, by talking to other individuals during that time.
Q. Do you remember names?

A. I do not.
Q. To the best of your recollection, what were some of the conversations you all were having, just through the ranges?
A. Things concerning how they felt, how I felt, what they seen as far as the fire-prevention procedures and stuff that they believe they saw or didn't see. The conversations they may have had with different defendants and things of that nature.
Q. Okay. So just exchanging different perspectives and experiences?
A. Yes, sir.
Q. So from your experience and from your personal, firsthand knowledge from January 14, 2023 -- so obviously you now know more information given you reviewed documents, right?
A. Yes.
Q. So you've seen some discovery, gotten discovery responses, so you know more information than you knew at the time; is that fair?
A. Yes, sir.
Q. At the time, on January 14th, 2023, did you know how the fire was put out?
A. I did not.
Q. Did you submit any type of healthcare request form

after you got back to your cell?
A. No.
Q. Do you know what a healthcare request form is?
A. Yes, it is a form you -- sorry for laughing. It's what you submit for health -- treatment. I attempted to acquire them multiple times, but nobody would assist me.
Q. Okay. So just to be clear, why did you not submit healthcare request forms after you got back to your cell?
A. Because in order to get a healthcare request form, it has to be given to you by an officer. The counselors don't have them. They are only in the officers' station, or you have to have had one in your position prior to. I made multiple requests for them; nobody would provide them.
Q. Who did you request the healthcare request forms from?
A. The officers -- I requested healthcare request forms almost the entire time we were on lockdown. I can't give you definitively the name of those people, but the officers that worked that night shift and the shifts on for quite a few days.
Q. Okay. And based off of that, just to be clear, so the fire occurred in the daytime?

A. Yes, sir.
Q. During the day shift?
A. Yes, sir.
Q. And the individuals that you named, specifically Ms. Mayes, Cain, Walton, Crockett, Cross, and Smith, they all work daytime shifts?
A. Yes, sir.
Q. Or they worked daytime shifts at the time of the fire?
A. Yes, sir.
Q. Did you see medical at all on January 14th, 2023?
A. I did not.
Q. Did you see medical for any of the symptoms you described, such as the lightheadedness, the shortness of breath? Did you see medical at all after January 14th, 2023, for those symptoms?
A. No, I did not.
Q. Why not?
A. Because we were on lockdown for quite a while after. And after we came off lockdown I did see them, but it was sometime later after I felt like I was having more, I'd say, adverse effects, but it was also dealing with preexisting conditions. So I attempted to address what I believe was made worse, not those conditions. Not like the ones that I

say -- that were caused or an approximate cause of the fire.

Q. So when you say preexisting conditions, what do you mean?

A. Things that I was attempting to address prior to the fire. I have a problem with my throat. I have chest pains and stuff like -- of that nature. And those were things that I felt were made worse from the fire.

Q. Okay. So tell me a little bit more about the problem with your throat. You had this issue prior to January 14th of 2023?

A. Yes, sir.

Q. What's the issue you had with your throat?

A. There is a lump or something to the right of my trachea and it causes throat problems and things of that nature.

Q. Had you seen medical for that lump or any throat issues prior to January 14, 2023?

A. Yes.

Q. Okay. So if we review your medical records we would see that that issue had been addressed prior to January 14th of 2023?

A. Not addressed, but you see that it was there prior to.

Q. Okay. What about the chest pains that you describe? So you were experiencing chest pains prior to January 14, 2023?
A. Yes, sir.
Q. How often or for how long had you been experiencing the chest pain?
A. Quite a while.
Q. Had you seen medical for chest pains prior to January 14th?
A. Yes, sir.
Q. And so if we look at medical records there should be some notation that you were experiencing chest pains, or that you at least communicated that you were experiencing chest pains to medical?
A. Yes, sir.
Q. Have you seen your medical records?
A. Yes, sir.
Q. Okay. Any other preexisting issues that you had that you attribute were made worse after January 14th?
A. Yeah, but no. There were things that occurred, like breathing problems and stuff during COVID, because I contracted COVID, and I had breathing problems post the fire, but I wouldn't say that they were made worse because of the fire. I just

say it was just another occurrence of those type of problems.
Q. So once -- after you got back to your cell, the cell house was placed on lockdown, right?
A. Yes, sir.
Q. And just for the record, what does that mean?
A. It was a period that I now characterize as a period of investigation where no inmate was allowed to leave their cell unless it for a shower every third day.
Q. Okay. What if the inmates wanted to go to medical, could they leave their cells to go to medical?
A. Yeah, if you get an officer to take you.
Q. And then what if an inmate had a job that they were working, could they leave?
A. No. No -- under no circumstances other than medical things, such as insulin or an emergency or something of that nature, or say if you were coming to speak to me under a legal matter, something like that, other than that no one under any circumstances leaves the cell house, unless, like I said, for a shower.
Q. Okay. So you're familiar with the fact that the Indiana State Prison has an inmate firefighter squad, correct?

A. Yes, sir.
Q. And the firefighters, they're all inmates?
A. Yes, sir.
Q. And they live within the inmate population?
A. Yes, sir.
Q. Do you know where -- back on January 14th, 2023, did you know at the time where fire extinguishers were located within A cell house?
A. Yes, sir.
Q. And what -- to your knowledge, where were the fire extinguishers located?
A. I believe at the front of the range.
Q. Okay. Anywhere else?
A. Officers' station.
Q. And to your knowledge -- do you know -- or at the time, January 14, 2023, do you know what types of fire extinguishers were available in the cell house?
A. The only -- I'm not going to say knew what type fire extinguisher it was -- the fire extinguishers that there were. From -- after the fire in 2017, the warden said that he purchased different types of fire extinguishers for other fires -- other types of fires, like electrical fires or, you know, paper fires of that nature, but I didn't -- it

wasn't like I was privy to the information that they were actually purchased.

But to my knowledge there were more than one type of fire extinguisher.

Q. Okay. So after January 14, 2023, did you have any other communications with Mr. Cross about any symptoms or anything else that you experienced related to the fire?

A. No, I don't -- I don't believe I had direct communications with anyone, as far as any of them directly. I didn't feel the need to talk to any of them about any of that anymore. Once I'm off lockdown, I pretty much can communicate with medical staff or whatever if I need to.

Q. Okay. So just -- I just want to make sure I'm clear, just for the record, so I'm just going to ask you one by one.

A. Yes, sir.

Q. Officer Cross, did you have any other conversations with Officer Cross once you got back to your cell about anything related to the fire?

A. I did not.

Q. Once you got back to your cell on January 14th, did you have any other conversations with Officer Crockett related to the anything with respect to

the fire?
A. I did not.
Q. Once you got back to your cell on January 14th, did you have any other conversations with Sergeant Walton about anything related to the fire?
A. I did not.
Q. Once you got back to your cell, did you have any other conversations with Lieutenant Nadine Smith about anything related to the fire?
A. I did not.
Q. And then once you got back to your cell, did you have any other conversations with Lieutenant Cain about anything related to the fire?
A. I did not.
Q. Once you got back to your cell did you have any other conversations with Jacqueline Mayes related to the fire?
A. I did not.
Q. During the entire time -- during the entire incident, from the time you were first made aware there was a fire to the time you got back to your cell, did you see Warden Neal at all?
A. No.
Q. Did you see Dawn Buss at all?
A. No.

Q. Did you see Mr. Wardlow?
A. No.
Q. Did you see Deborah Taylor?
A. No.
Q. Did you see Gordon Beecher?
A. No.
Q. Did you see Christina Reagle?
A. No.
Q. Okay. So now let's shift, talk a little bit about some of the other defendants. I think the court characterized them as the high-ranking defendants from the screening order.
A. Yes.
Q. So that would be Buss, Wardlow, Beecher, Taylor, Neal, and Reagle?
A. Yes.
Q. Okay. So in your complaint you take issue with some of the conditions of A cell house; is that a fair characterization?
A. It is.
Q. So what are the issues that you take issue with related to fire safety within A cell house?
A. It's of poor condition. If you look at the complaint, the document you presented, document eight, the prisoner's complaint, page five, line

24, things like the fire extinguishers, they aren't kept in proper working order or inspected as regularly as they should. The doors aren't of -- they aren't a mitigating factor to fire prevention and rescue and of someone who is in danger.

You have different things that consist of not having -- other upgrades being done in the cell house, but not putting emergency call buttons in. There is no fire suppression in the cell house, as far as things that would mitigate someone being in a fire-like incident, and it's been that way for quite some time and there is -- has been no changes, as far as what I see them do.

As well as it's not just the cell house; it is also the lack of training that -- or the execution of said training, if the training was provided for the officers.

Q. Okay. So one of the things you mentioned was about fire extinguishers and them not -- the fire extinguishers not kept in proper working order?

A. Yes, sir.

Q. What makes you think the fire extinguishers are not kept in proper working order?

A. Well, contrary to what they have put forth, they aren't inspected. And that's something that we can

visibly see. They don't make sure that they are properly placed because -- I wouldn't -- I'm not going to say I have, but multiple prisoners, as well as dorm reps and mentors, have suggested -- made suggestions to where they'd be more efficiently placed, as opposed to where they're currently housed in respect to where they're needed.
Q. Okay. So you claim, as you stated, that the fire extinguishers are not checked as regularly as they should --
A. Yes, sir.
Q. -- in your opinion?
A. Yes, sir.
Q. But just to be clear, so when you're on the third floor in your cell -- I mean, you can't see what's going on on the second floor, right?
A. Yes.
Q. And you can't see what's going on on the first floor?
A. Yes.
Q. So you don't know what staff are doing with respect to any fire extinguishers there?
A. But that's not what you asked me, sir. You asked me to explain my grievances.

Q. No, I understand. And now I am asking you -- I mean, you're saying they're not regularly checked?
A. Yes, sir.
Q. And so what I'm just trying to make sure I'm clear on, I mean, you can't see what is going on below you, though, correct?
A. Yes, but I want to clarify. What you're asking me to -- your question was for me to explain my grievance about the fire extinguishers. If they were or were not working at that time, that's a separate issue. That's -- well, it's the crux of the issue, but that's a separate answer to what you put forward as your question.
If you're asking me what I take issue with, I've given you the answer to that. Now, if you're asking me were the fire extinguishers working at that time, and when they went to use them, did they work? That's a totally different answer, and I've already answered you on that, that to my knowledge they were not.
But when you asked me could I see down there, then I couldn't, sir. So if they were working, then my characterization of what took place is wrong.
Q. Okay. All right. I get what you're saying. What

I want to make sure I'm clear on, in terms of what I'm asking you is: I'm just trying to make sure I understand that you don't know every single time that the fire extinguishers are checked; is that true?
A. But I -- that is true, but I can tell you that I know the firemen and I'm in the cell house. They are not. And I speak definitively. They are not regularly checked.
Q. Okay. So what makes you say that they're not regularly checked?
A. Because the inmates do the checking, sir. They don't come over there to check the fire extinguishers.
Q. And when you say the inmates do the checking, which inmates specifically?
A. The firefighters.
Q. You also said that there have been dorm reps or, like, mentors who have conveyed that the fire extinguishers can be placed somewhere more effective; is that -- am I remembering your testimony correctly?
A. Yes, sir.
Q. Have you been present at any dorm rep meetings?
A. They show them on TV. They actually videotape

them.
Q. Okay. Have you ever been a dorm rep?
A. I have not.
Q. Okay. And what has been the suggestion for where these fire extinguishers should be placed?
A. Well, place them on the ranges, not -- when they are needed, the officers have to unlock one door, go to whatever floor they're on, grab the fire extinguishers, unlock another door to get on to the range they're needed on. That's multiple steps that take place that take away from the time that you could either be putting out this fire or saving someone's life.
Q. And you actually reminded me of something that I wanted to ask you. In the north side of A cell house, as you're going up the different ranges, right before -- so when you're going up the stairs, right before you go into a range, is there a door that you have to open to get to the range?
A. Yes. Not for us; ours are kept unlocked and they're on the side of the range. The officers access -- they can use ours as well, but their access is in the front of the range in, like, the entryway. When you enter A cell house, when you enter to the left of the door there is a staircase

that goes all the way up, and it is platforms set for each range. That's where the fire extinguishers is kept. And to access each range is another door from said platforms.

Q. Okay. Look at -- if you look at the complaint, document eight that I have in front of you, turn to page five. And then on paragraph 24, so here you state that -- you say that: Reagle, Neal, Wardlow, Buss, Jane/John Doe 1, JD 1, and Jane/John Doe II, JD II, knew or should have known that the fire extinguishers in ACH were not in working order, whether empty or otherwise. Did I read that correctly?

A. Yes, sir.

Q. And then the Jane and John Doe I and Jane and John Doe II, your understanding of that is that the court -- we identified those individuals as being Beecher and Taylor?

A. Yes.

Q. So what evidence do you have to support your statement that these individuals knew or should have known that the fire extinguishers in A cell house were not in working order?

A. If I remember correctly, through the discovery there were no clear fire extinguisher inspection

forms or -- so it's not -- I would say my evidence is not that I can produce evidence, there's the lack thereof to show that there has been a reasonable effort to make sure that there is clear documentation that every fire extinguisher in the prison itself has been reasonably checked.

Q. Okay. I want to make sure I'm clear, though, for purposes of this case. So do you have evidence that these individuals, that Reagle, Neal, Wardlow, Buss, Beecher, and Taylor, that they were aware that the extinguishers were not in working order?

A. I believe that it can be -- I'd like to say produced to show that my claim is true.

Q. I'm not understanding your answer.

A. What I am saying is that I believe that through further discovery it will show.

Q. Okay. Turn to the next page, please. So for paragraph 25 you allege that Reagle, Neal, Wardlow, Buss, Beecher, and Taylor knew or should have known that the door and/or locking mechanism on the cells at ISP warped, expanded, and/or deformed under heat. Am I reading your allegations correctly in paragraph 25?

A. That is correct, sir.

Q. Okay. What evidence do you have to support that

these individuals had knowledge of the door and/or locking mechanism warping, expanding, or deforming under heat?

A. Past fires in ISP, which are numerous.

Q. How do you know that -- do you have any evidence that Major Wardlow was aware of all these fires that you're referencing?

A. I know for a fact he worked here in 2017 when they had to use a crowbar to open up Mr. DeVine's door. It was a well-known understanding of anyone who was even in the position to know anything then, and there were things that I believe were commented on by court prior to the 2023 fire that ruled that those things should be addressed, those types of things should be addressed.

Q. What court are you referring to?

A. I believe that it was prior to the -- the finding of the DeVine family case. I can't -- I have read over it, but I can't pinpoint you to something right now.

Q. Okay. Anything else related to why you claim Mr. Wardlow was aware of all these other numerous fires?

A. Because he was the warden. A lot of the stuff is recent, and he's been the warden for a while now.

Q. I'm talking about Mr. Wardlow.
A. I mean, not the warden, but the major. He's been the major for a while now. Pardon me.
Q. Okay. What about with Warden Neal, what makes you believe he is aware of every single fire at ISP?
A. Because anything resulting in -- per policy, anything resulting in anything serious has to be e-mailed to him. He's notified of any major event in this prison.
Q. What about the commissioner -- the former commissioner Reagle? What makes you think that she's aware of everything that happens at ISP?
A. I have no reason to believe that she is made aware of anything that happens in ISP, but as the commissioner of DOC I am under the assumption that something that results in death or serious harm or possible serious destruction, you'd communicate that to the DOC commissioner.
Q. All right. What makes you believe that Deputy Warden Buss would be aware of every single fire that occurs at ISP?
A. I wouldn't say that she be made aware of every single fire that occurs in ISP, but as the deputy warden, or someone who's promoted to deputy warden, I'd believe that it would be reasonable to assume

that someone that is promoted to deputy warden and is deputy warden is made aware of a serious event in ISP.
Q. And then what about with Gordon Beecher, what makes you believe that he's aware of every single fire that occurs at ISP?
A. Once again, I don't believe that every single fire he's made aware of, but as someone who is over -- my understanding of his position as the fire safety supervisor, he would be made aware of serious fire-related events.
Q. Okay. And then same question with Deborah Taylor?
A. As someone who is the hazard supervisor, I believe I would be reasonable to assume that she is made aware of serious events concerning any hazard.
Q. Okay. With respect to the fires that ISP -- so as we established earlier, you're aware that inmates start fires on their own, right?
A. No, I said -- as I said earlier, it would be a reasonable assumption. I've never seen anybody start any fires.
Q. Okay. Have you seen inmates mess with the electrical outlets in A cell house?
A. No, I have not.
Q. Have you ever messed with the electrical outlets?

A. I have not.
Q. Have you ever seen inmates mess with the wiring in their electronics?
A. Yes, I have.
Q. Have you ever messed with the wiring in your own electronics?
A. I don't mess with anything that has to do with electric at all. I been shocked before, before prison, so I know better than that.
Q. And so when you say you have seen inmates mess with the wiring in their electronics, can you give me a little brief explanation of what you have personally seen?
A. Well, I wouldn't -- to clarify, I've seen people with extra wiring. I'm not going to say I seen people alter their wiring. I've seen people with, like, stripped-down cable cords or stripped-down headphone wiring, things like that. Maybe an altered headphone, something like that.
But I'm not aware of -- or not that I'm not aware, I've seen no one, like, actually altering their electronic equipment and stuff like that, as far as with my own eyes.
Q. Okay. And then I want to talk to you a little bit about fire drills. Have you ever participated in

any fire drills?
A. Yes.
Q. How many -- when was the last time you participated in a fire drill?
A. Not that long ago. Not that long ago. I can't recall that exact date, but it wasn't that long ago.
Q. How often would you say you participate in fire drills?
A. I've been here over a decade, I've been in less than ten.
Q. When the fire drills are conducted, who is in charge of conducting those fire drills?
A. The inmate firemen are in charge of the fire drills, but the officers oversee them.
Q. Are there any specific officers that oversee them or is it just whoever's working?
A. Whoever's in the cell house, sir.
Q. Have you seen staff participate in fire drills?
A. Yes. Yes.
Q. Have you seen fire drills during day shifts?
A. Yes, that was -- are the only shifts I've seen fire drills in, other than one we had maybe -- the one nighttime fire drill I've ever seen since I been in this prison was a couple months ago, I believe.

Q. Okay. So you have been in A cell house. You've also been in B cell house --
A. Yes, sir.
Q. -- in your time here?
A. Yes, sir.
Q. Have you lived in any other cell houses at ISP?
A. I've been in D cell house and C cell house.
Q. Did you observe any fire drills in other cell houses not -- not including A cell house?
A. Yes, only in -- I was in -- the majority of the fire drills I've been in was in B cell house because I spent my first five and a half, six years in B cell house. I was in C cell house for about 10, 11 months; seen no fire drills.
I was in D cell house for two months. They don't run fire drills in there at all. And there were a couple of fire drills in A cell house since I been in A cell house.
Q. Okay. Would you agree with me that because you're obviously only living in one cell house at any given time, that you can't be aware of what happens in the other cell houses at ISP?
A. That's a reasonable assumption, but I'd only comment on my experience. I would not comment as to what goes on in B or C cell house while I'm not

living there.
Q. Because you wouldn't know?
A. There's no way for me to know.
Q. Right. Okay. So one of the issues that you take within your complaint is you take issue with the fire suppression system, right?
A. Yes, sir.
Q. So in your opinion what would be a proper fire suppression system for ISP to have?
A. I am not a professional in fire prevention, sir. I just know that there is none. Anything has to be better than nothing.
Q. All right. We talked about the fire extinguishers. Are you aware that A cell house also has a fire alarm?
A. It has a smoke detector. The fire alarm is -- the only time I've seen the fire alarm work is if -- during the fire drill they set it off. You get the smoke detector. You don't get a fire alarm.
Q. And that would be -- the smoke detecter that you're describing, that would be at the top of the cell house?
A. Yes, sir.
Q. On January 14th of 2023, did the smoke detector go off?

A. Yes, sir.
Q. Was there an alarm that went off?
A. No, not until they were evacuating.
Q. So when you first saw the smoke and saw flames coming from second-floor range, you obviously were hearing yelling from inmates?
A. Yes, sir.
Q. Did you hear any alarm at all?
A. Only the beeping of the smoke detector. The fire alarm and smoke detector make totally different sounds.
Q. Okay. You said that the fire alarm eventually went off at what point?
A. During the evacuation. Like I said prior, usually the only time you hear it is when firefighters come in and set it off during the fire drills. That's what my assumption would have been. Can be wrong, sir. Just my assumption of the events.
Q. Okay. And with respect to the fire extinguishers, in your opinion, how often should the fire extinguishers be checked?
A. I'd say -- I'd say maybe once, twice a month to -- say twice a month to maybe four or five times quarterly.
Q. What is that opinion based on?

A. It's just that these individuals -- like, say for example you work an eight-hour shift, I work an eight-hour shift, she works an eight-hour shift, if these aren't communicated properly and they aren't kept up in a certain way, if you go vacation for a week or two, come back on and nothing's been inspected properly and you face an emergency, well, if everything hasn't been checked and everything hasn't been kept up, how would you know what's right and what isn't? And then if you change shifts and I come on, or my shift is now on and things isn't kept properly and we aren't on the same shift so we don't communicate everything to each other the way that things may be or may not be.

So when an emergency occurs, who's going to be there to make sure that -- who's communicating, who's checking things are right to make sure that all the fire prevention or whatever is where it needs to be and in working order?

Q. Okay. Are you aware of the -- any training that staff receive with respect to responding to fires?

A. No, but to my knowledge I'm not alleging that. I'm alleging that it was a failure, so it has to be improper training or none at all. So I'm -- but to

answer your question, I'm not aware of the training they are receiving.
Q. Okay. So if I'm understanding you correctly, your assumption is that because of the fire that staff or -- your -- you believe that there is improper training?
A. Due -- yes, due to their failure on that day.
Q. And in your opinion -- or what would you consider not a failure on January 14, 2023?
A. Not letting a man die would be one. Putting a fire out before it's a full-on blaze is two. Evacuating a cell house before it's completely filled with smoke is another. I mean, there are others, but those are the most serious, I believe, offenses of either a poorly trained or a failure to execute the necessary training that you've received.
Q. Okay. Have you ever gone through -- have you ever worked as a correctional officer?
A. I have not.
Q. You said that you are not an expert in fire suppression?
A. I am not.
Q. Do you have any medical training?
A. I do not.
Q. Do you have any medical degree?

A. I do not.
Q. Okay. And then I think the last topic that we kind of touched on that I want to make sure I'm clear on is the dorm rep meetings that you mentioned. You said that they're played on TV?
A. They are.
Q. Have you ever attended them?
A. I have not. They are only for -- at the time they were mentors. Recently they changed over -- mentors is a cell house thing; dorm reps represent the cell house.
Q. Do you know which staff members are present at these dorm rep meetings?
A. Majority of the time Dawn Buss, Douglas Wardlow, and sometimes -- I believe his name is Novacheck (phonetic), but he's rarely there, the other deputy or assistant warden --
Q. Nowatzke?
A. Yeah, yeah, yeah. I'd like to believe, about 50 to 75 percent of the time the warden is there.
Q. Okay. When these dorm rep meetings are being played, are you able to see, like, who's present at the dorm meetings?
A. Every time.
Q. Mr. Griffin, I'm almost done here. I'm just going

to show you a couple of exhibits. So I'm going to first show you Exhibits 1 through 4.

(Defendant's Exhibits 1 - 4 marked.)

Q. Mr. Griffin, I handed you what we marked as Exhibit 1 for your deposition. So that is a notice of tort claim. Do you recognize this document?

A. I do.

Q. Okay. And did you write this yourself?

A. I did.

Q. Did you have any help in writing this?

A. Not at all.

Q. Was this -- was any of this related to any alleged damages for whatever you're claiming out of this lawsuit?

A. It is not.

Q. Okay. I just wanted to be sure.

I'm going to now hand you what I marked as Exhibit 2 and 3 together. So 2 are the interrogatory responses we received and 3 are just a couple of pages from your first deposition from when we deposed you on the exhaustion defense.

A. Yes, sir.

Q. And so on your interrogatory responses if you look at the fourth page, do you see the verification on there?

A. Yes, sir.
Q. And is that your signature there?
A. Yes, sir.
Q. Is that your signature on there?
A. Yes, sir.
Q. You signed this after reviewing your responses?
A. After reviewing what responses?
Q. The interrogatory responses.
A. Yes, sir. Yes, sir.
Q. And are you aware that in verifying, that you're verifying the responses under penalties of perjury?
A. Yes, sir.
Q. Okay. And so if you look at the responses, they have several places where it says ECF and then just a line and then it looks like you just filled in, like, your information and then the ECF number?
A. Yes, sir.
Q. Who wrote this?
A. It -- I believe that it was -- if I'm not mistaken, it was in assistance with a clerk at the law library. And he was assisting -- he was willing to assist anyone that was on the fire lawsuit.
Q. Do you know who that clerk was?
A. I -- not offhand, I do not remember.
Q. Do you know what the race of this individual is?

A. He could be a black dude, but he's light skinned, so if I'm not mistaken -- I don't want to be like: He's a Mexican or, you know what I mean, Hispanic or black dude or whatever, but light skinned, middle-aged.
If I seen him right now I would be able to give you his name, but -- at least his nickname or whatever but...
Q. What's his nickname?
A. I said if I seen him. I don't -- I can't tell you offhand who it is because I don't remember, but -- because he don't -- I don't believe he works in there any longer. But I believe that that was -- because we had a few -- a few of us needed assistance with a few things, and that's what they were there for.
Q. Are you aware -- have you seen the interrogatory responses for any other inmates who also filed similar lawsuits?
A. No. But I assume that if one guy was helping a few of us, they might look similar. They might even look identical because, like I said, he gave me a premade form as to -- with -- when I gave him my request from y'all, he was like: This is the -- go over this and if that is how you seek to answer,

then it should be fine.
Q. And you were fine with the answers that this other person prepared for you?
A. He prepared them, but he allowed me to make changes as to where -- like everyone that has the burdensome -- it being unduly burdensome as State Defendants have easier access, that's me.
Q. All right. Let's talk about number two on page two because -- so in the interrogatory we asked you to identify who was assisting you with the discovery responses, right?
A. Yes, sir.
Q. And in your answer -- so the answer is "Objection. After I previously disclosed a person who helped me IDOC staff retaliated against them. Therefore, I will not be disclosing the identity of anyone else who helps me in abundance of caution and security of those who help me."
A. Yes, sir.
Q. But you have not disclosed any particular person to us. So -- so to me this statement isn't true.
A. Yeah, but that's your opinion because I didn't have to say that -- I'm answering that in a generic sense. I'm not saying: Hey, I disclosed it to y'all. I'm saying I disclosed it to IDOC staff.

That's not you. You work for the attorney general's office.

Q. Okay. So who did you disclose the person who's helping you -- which IDOC staff then; who did you disclose that information to?

A. A worker in the cell house. One of the officers. And as I told you leaving the deposition last time, that Kevin Cross was someone that was behaving in a way that made me feel unsafe. That's why I made you aware of it then. That is just one example of why I wouldn't reveal anyone that has assisted me.

Q. Okay. But you're saying that you did disclose the identity of whoever is assisting you to an officer?

A. Yes.

Q. So which officer did you disclose the identity to?

A. I do not remember at this time.

Q. Okay. What would help you remember?

A. I mean, I don't know, you give me bunch of they faces, I can't recall who -- you give me a bunch of they pictures, I might be able to pick one out of the lineup.

Q. You're saying that IDOC staff allegedly retaliated against the person who's helping you?

A. Yeah, they were moved.

Q. So the person who was helping you was moved?

A. Yes, sir.
Q. Moved where?
A. I'd rather not disclose where because then it give you an understanding of who. I'm not interested in disclosing any of my assisting individuals.
Q. So do you know -- so you know the identity of whoever is assisting you?
A. Not all of them. There are quite a few people who assisted me. Just like who helped me with this document isn't the same person I told you was helping me with my complaint.
Q. Okay. So there are a couple of people who have pretty much filed the same exact responses, they're all the same. Do you know who Kory White is?
A. I do not.
Q. Do you know who Brandon Phillips is?
A. I do not know -- I believe so. I believe so. He in B cell house. I do know that individual.
Q. Okay. And then if you look at number three.
A. Yes, sir.
Q. So we asked you to identify who you would call as witnesses to provide testimony --
A. Yes, sir.
Q. -- if this case were to go to trial, and you didn't identify anyone.

A. Yes, sir.
Q. So do you expect to call any witnesses at trial?
A. I do.
Q. Okay. And who do expect to call?
A. All defendants. I'd like to go through some of the individuals still living in A cell house to see if they're willing to. I am not going to call anyone that wouldn't cooperate as a witness. But I know that there are a few -- like I said, the defendants, a few ones that lived -- inmates that lived in A cell house, probably about four or five of the firefighters. I know I'd like to have the chief, the lieutenant chief or the assistant chief. I'd like to -- it's a few of the firefighters. And that's probably -- I think that's about it.
Q. And I misspoke earlier, Mr. Griffin. You did state in your response, you did answer that you expected every defendant and you said every person who was in A cell house on that day. So I misspoke when I said you didn't identify anyone. I just wanted to make that clear.
So have you spoken with anyone and asked any witness or any potential witness if they would be willing to testify?
A. No, not at this point. Not as far as some of the

inmates because this isn't something you walk up on somebody in prison: Hey, you willing to testify. You know, like if push come to shove and I feel that I need a few of them instead of the defendants and the firefighters who would have made firsthand knowledge of the dealings or the procedures and things that I would be calling into question, I think that would be more my route as opposed to an inmate that may have the same perspective as I would, unless they lived on 200 in particular, 200 of A cell house in particular.

Q. Okay. And then if you go down to number seven, so if you turn the page. We asked you to identify any documents that you intend to use. And just so that we're clear, you know, we expect you to provide any documents that you intend to rely on --

A. Yes, sir.

Q. -- for that case.

A. Yes, sir.

Q. And so to the extent you don't, I just want to make it clear to you that, you know, we're -- our intention is to move to exclude anything that you don't produce; does that make sense?

A. Yes, sir. Yes, sir, completely.

Q. Okay. And then the last thing I'm going to show

you here -- I'm not going to use Exhibit 3, actually. But I'll give you 4.

So this is a letter -- so we're asking you to supplement your interrogatory responses and your request for production responses. So we mailed that to you, I think, last week; have you received that yet?

A. I have not.

Q. Okay. So it's probably on it's way through the mail, but I have a copy of that. Actually, I don't have a copy for you. But that should be making its way over to you soon. Okay?

A. Yes, sir.

MR. JIMENEZ: I believe that's all I have for you. I will turn you over to -- I will turn over the witness now.

CROSS EXAMINATION

BY MR. McCARNEY:

Q. Hi, Mr. Griffin, my name is Patrick McCarney and I represent Dr. Chico, and it's my privilege to ask you a few questions today. I shouldn't -- I won't be nearly as long as Gustavo was. My questions, because I'm going second, are going to kind of jump around. But first question: Prior to the fire, have you ever lost consciousness before?

A. I have not.
Q. Okay. And when you were evacuated from A cell and then eventually ushered to the gym, you were able to do that under your own power, correct?
A. There's railings and stuff, but that's -- excluding structural assistance, yes, sir.
Q. I like the way you put that. Structural assistance. Very good. And then your -- when you were returned to A cell, same situation, you did it under your own power, maybe with some structural assistance?
A. Yes, sir.
Q. Okay. When you were evacuated from A cell, did you have any sense of the state of the fire at that time?
A. No, just smoke. At that time it -- for all I knew, the fire could have been completely out. It was -- the whole -- like I said, from my distance to even you, wouldn't have been able to see you. That was the extent of my visibility.
Q. Okay. So there's still smoke in the air --
A. Yes, sir.
Q. -- but you're not seeing flames spilling up into the third floor anymore?
A. No, sir.

Q. Okay. Earlier you testified about a number of symptoms that you -- that arose from being in that smokey environment, correct?
A. Yes, sir.
Q. And then you also testified that at some point, after lockdown, those symptoms went away and your focus was more on what you believe was exacerbation of chest pains and the throat issue, correct?
A. Yes, sir.
Q. How -- about how long did those original symptoms last?
A. I'd say we came off about -- a little less than -- we came off of lockdown a little less than three weeks later. I'd say they were still there after an entire month, but they were mild by then.
Q. Okay. Did some of the symptoms last longer than others?
A. Yes, sir.
Q. Which ones?
A. My breathing, even to this day, has not returned to normal. My sinuses and things of that nature lingered a little longer than, say, my eyes burning and thing of that nature.
Q. Okay. Have you ever seen, at any time since the fire, a medical professional specifically related

to your breathing?

A. No, but it wasn't specifically related to my breathing. I was sent to an outside hospital during a cardiac emergency, which my breathing was also hampered, but that isn't -- just my breathing; you know what I mean. Like it wasn't just the breathing, but it was a culmination of the symptoms, not just one.

Q. I see. When was that cardiac event?

A. February 1st, 2024.

Q. Okay. So more -- a little over a year later?

A. Yes, sir.

Q. Okay. Has any medical professional diagnosed that cardiac event as being related to injuries you sustained during the fire?

A. No. I actually mentioned it during that -- both the sinus problem and the breathing and stuff, and she told me that there was no way for her to be able to diagnose that. Like, you didn't come immediate, there were no way for me, as a medical professional, to be like: Well, this was contributed (sic) to -- this should be contributed to a fire.

Q. Okay. And with the shortness of breath you suffered from the cardiac event, was there any

diagnosis from a medical professional that that shortness of breath was related to the fire as opposed to related to the cardiac event specifically?

A. No. She, again, stated that -- I'm paraphrasing, but to the effect of: You weren't seen immediately, that's how I diagnose something after a fire. This far apart, it could be, it couldn't be, but I'm addressing your problem now, not something that you now want me to assess -- or you, as the patient, would contribute it to -- that's not something, as a medical professional, she was comfortable doing.

Q. Okay. And you said that you went to an outside hospital or provider for treatment?

A. Yes, sir.

Q. Okay. Can you describe for me what that process entails? So I guess start from, you know, you noticing something's wrong --

A. Yes, sir.

Q. -- to the time you get to the hospital. Who do you have to talk to, what steps are there in getting emergent medical care?

A. Well, because of the way the medical process is set up here, I could not just go over there or even

talking to someone else, that wasn't the steps to be taken. Because it was something that I was dealing with previously and was feeling -- was exacerbated, I put in a healthcare request.

Eventually, maybe no more than seven days later, they called me over there, hooked me up to an EKG, listened to my lungs and stuff, and told me then -- I was -- go back a step. I was there for not only the heart problems, but as well as the throat problems. She assessed both. Told me about the sinus draining that was -- may be contributing to my throat problems. But said that I was going through a cardiac emergency and said this needed to be taken care of right now.

They then hooked me up to a few machines, put one of those IVs in. I guess they already called 911. They put you in the little cuff box and took me to the guard or custody hall, which is where we are currently, and wheeled me out the front door.

Q. Okay. So -- and I really appreciate this information because I'm not involved with it on a day-to-day basis like you are. When you submit a healthcare request, what is your understanding of what happens with that request and who reviews it and how you get put on the schedule for medical

treatment?
A. Well, there are multiple layers to a healthcare request. I'll take it out of the framework of this incident, because it's an entirely -- I'll give you the main one, then I'll give you the second one.
The first one is every healthcare request slip is given -- or an inmate receives a healthcare request two ways. You get it from the officer in your unit or you can -- if you have a relatively cooler officer on the walk, they might let you go into medical and get one yourself. But nine times out of ten you're going to get it from the officers' station. That's the only place you can get it. They have them. You fill it out, you put it in the dropbox outside of the medical unit.
And I have no idea what goes on on the inside after that. Whoever gets it, whatever they do with it. The process to get on the list is completely out of my understanding.
Q. Okay.
A. In this situation, being in the cell, you aren't down there with an officer to be like: Hey, man, can I get one of those request slips. You have to trust that that individual will then go down there, remember you out of another 300 people, 300-plus

people, and get you that slip, bring it up to you, you fill it out, you know, put it in the door. They'll either know or not know to grab it, so it's best to put it in their hand.

Then you have to trust that they'll do what's right with it and then get it to the medical unit. And then once again, it's a process that I have no understanding of.

Q. Okay. As you sit here today, what's your understanding of what Dr. Chico's position was within ISP?

A. My understanding, prior to this incident, was that she was the healthcare -- I mean, a mental health professional.

Q. Okay. All right. And as you sit here today, has that changed in any way?

A. No, not at all.

Q. Okay. Prior to the fire, had you ever met with Dr. Chico?

A. Not on a mental health need. I've encountered her on the main street or things of that nature.

Q. Okay. So fair to say you knew who she was?

A. Yes. Yes, sir.

Q. Okay. And on the day of the fire, when did you first see Dr. Chico?

A. When she was making her rounds. That was -- if she was there prior to, I have no recollection of seeing her prior to her making her rounds after we returned to our cells.
Q. Okay. And earlier you described what happened when Dr. Chico stopped at your cell, and I'll paraphrase because I can't quote it exactly, and you feel free to correct me if I'm wrong, supplement however you want. But you said: I need medical attention, and she said: I'm not here to provide medical attention. I'm here for mental health, or something to that effect?
A. Yes, sir. Yes, sir.
Q. Was there any more to that conversation?
A. Nope, it was exactly -- I explained to her the same things or -- to the same effect that I explained to my -- with my encounter with the custody defendants. In my own words: I passed out. I'm feeling weak. You know, I need some medical assistance. It was brief. And like I said, she was like: I'm mental health. I'm not here to provide medical, and kept walking.
Q. Okay. Do you recall whether Dr. Chico was carrying anything at the time?
A. She might have been. To my recollection, no. But

if you show me a picture of her carrying a binder, I wouldn't have -- wouldn't have known otherwise.
Q. Okay. Did you observe Dr. Chico stopping at other inmates' cells?
A. I wouldn't say stopping. I'd say, you know, when you come to a stop sign, you kind of drive through it; not complete stop, but, you know, that's pretty much as I seen her moving.
Q. Okay. Did you overhear any of the interactions that she had with other inmates?
A. I did not. Other than I say -- clarify, other than the two people next to me, maybe a guy above and under me, but she wasn't like: I'm mental health, you know, in a shouting tone or whatever so that what you might have said I would have heard. You know, just what in close enough proximity that I heard her speaking and it -- I didn't hear any distinct conversation though.
Q. Okay. After Dr. Chico was either out of your visual range from within the cell or kind of the auditory range of you could hear her within your cell, do you have any knowledge about what she did thereafter?
A. I do not.
Q. Okay. Since that interaction on the day of the

fire, have you had any conversation with Dr. Chico?
A. No, I have not.
Q. Okay. And since that interaction on the day of the fire with Dr. Chico, have you had any conversations with anyone at ISP about Dr. Chico?
A. No, I have not.
Q. After the fire, did you ever see Dr. Chico?
A. No, no.
Q. Okay. Prior to the fire had you ever requested any mental health services at ISP?
A. Yes.
Q. For -- let's start with: How many times?
A. I only seen mental health for one thing, but over a span of, maybe, like nine, ten months I was seeing someone for an incident that occurred on a job site when I worked in one of the prison units.
Q. Okay. All right. And when was that?
A. 2015.
Q. Have you ever been diagnosed by a licensed professional with any kind of mental health condition?
A. ADHD. I forgot what they call it, but it's like -- it was when I was younger, when you have problems with authority, but it's a clinical term for it, but I can't recall the term at this moment. And

that's about it.
Q. Okay. After the fire, did you submit any healthcare request seeking mental health treatment?
A. I did not.
Q. For my understanding, your complaint with respect to Dr. Chico -- and again, I'm going to paraphrase and tell you what I think, and then I want you to tell me where I'm wrong, if I'm wrong.
You told her you needed medical treatment and you did not get that medical treatment, so your belief is that she did not pass that information along to anyone?
A. I -- I can't disagree with your assessment because I just feel like it's incomplete.
Q. Okay.
A. It isn't -- on its face, her not being a medical professional and me voicing my medical complaint and me not receiving the medical assistance is benign at its best; it was the interaction. It was blowing me off, so if she did do something later I never seen, like -- like, a few things in discovery that -- or in her written interrogatories and stuff. She said that she did some of these things. It's not in my ability to see what she did. I knew she blew me off and then she went on about what her

actual duties was, if she was there to provide those duties.

I can't put myself in the interrogatory prior to; you know what I mean. So with that being said, my claim is that someone who was technically an ISP staff member making her rounds as a mental health professional, Corizon or Centurion or whatever they are, was informed of me having what I consider to be an emergency episode, and she disregarded it.

Q. Okay. And along those lines, if I'm understanding, again, your testimony earlier correctly, your expectation is that one of the other ISP employees that you testified you talked to should have taken your complaint to someone who could provide you with medical treatment --

A. Yes, sir.

Q. -- is that fair?

A. Yes, sir.

Q. So similarly then with respect to Dr. Chico who -- actually, let me ask this first. Do you know what kind of doctor Dr. Chico is?

A. I believe mental health doctor.

Q. Okay. Do you know whether Dr. Chico went to medical school?

A. No, I do not.

Q. Okay. I'll represent to you that she's a doctor of psychology, which is different than an MD or even a psychiatrist.
A. Yes, sir.
Q. So with that said, ignore Dr. Chico for a moment. If you had said to some other person who worked in, you know, maybe not the CO capacity or administrative capacity, but maybe somebody -- could be anybody -- any other ISP employee and in this instance, where you required emergent care, you would have expected them to take that information to someone who could have gotten you the treatment that you needed?
A. Yes, sir.
Q. Okay. So similarly, if Dr. Chico was unable to provide you with medical treatment herself, she should have taken that -- that information to someone who could have provided you with medical treatment?
A. Yes. I don't think that she had any responsibility to provide me with medical care. She probably would have got in trouble for touching me; you know what I mean. I am not alleging that at all. It is the latter. If you knew someone was in need of medical care, you should have gotten either someone

who could have provided it or gotten to someone who would have gotten to that person to provide it.

Q. Okay. And then -- I am just about done. But I just want to be clear. Are there any other conditions or ailments that you believe were caused or made worse by any delay in receiving medical treatment as a result of the fire?

A. No, because, you know, everything that occurred from the fire, whether it was mental, emotional, or physical, was either there or it no longer is; you know what I mean. It wasn't nothing that I was dealing with other than what has been previously stated that was made worse or -- of that like.

Q. Okay. We didn't talk very much about mental or emotional issues that you suffered as a result of the fire.

A. Yes, sir.

Q. Can you expand on that a little bit?

A. Well, this isn't my first time in an ISP fire-related fatality, so certain things I am hypersensitive to. And post second fire, not being able to sleep, being in a situation where you have night terrors of someone dying in a fire or something small laying next to you becoming a full blaze, waking up and ain't nothing there.

Things like when it's time to secure in your cell, extreme anxiety, heart racing, and this is going to occur every day for as long as you're in prison. And having that awareness that this is occurring. And to be honest with you, I don't believe that that's something that will go away, given the circumstances of my personal situation, given the time that I have.

The -- when you think that something like, for example, there are exhausts at the top of the cell house. Well, post fire they hadn't cleaned the filters that's in them. Every now and then it'll smell like something's burning, and panic and thinking that: Here it goes again. You know what I'm saying? That's what I can think of off the cuff talking to you now. If I had a little more time, I can give you an abundance of things that I have attempted to work through myself.

Q. Okay. And these are things that you have experienced since the fire or are continuing to experience or some of -- you know, one thing went away, but this still lingers? Help me parse through, like, what you went through right after the fire, what you're still going through, if anything?

A. Everything I just described to you is things that is reoccurring. I might feel -- you know, you watch a basketball game or something, there's relief, you got a distraction. In the mode -- like I said, when I'm about -- secure time, everyone secure in their cells, that reoccurs. It's not something that's there with me all the time. And if we on lockdown, I'm not in a full-blown panic the whole time I'm locked in my cell. It's when it's now time to be resecured. Something -- so that's something that goes -- comes and goes.

The night terrors, I'm not not sleeping; you know what I mean. It isn't happening every day, so it isn't something that stays with me, but almost everything that I described to you is something that's there. It hasn't gone anywhere.

Q. Okay. You mentioned a minute or two ago that these are things that you try to work through on your own. Is there any particular reason why you tried to work through them on your own as opposed to reaching out for mental health treatment?

A. Well, it would -- I'm -- I'm not saying this as like it was -- like it's definite, but requesting those request slips from these people that were ignoring me would have given me an opportunity to

address this early. If the people that was around at the time of the fire and then there on aren't giving me the type of treatment that I felt was an emergency, I don't see any reason to try to get assistance from them later.

Could have been detrimental or whatever as far as the mental health thing. I think the medical stuff was a wash. I don't think they cared to help at all. But I think as far as the mental health stuff, I spent a long time, as part of my ADHD, going through therapy and stuff. I was like -- and I'm not receiving help. I try to work through it myself.

Q. Okay. What have you done to try to work through it yourself?

A. For the most part, we got, on our tablets, they have things like meditation and educational programs, keep your mind busy. Try to expand things that -- PBS, you understand. Try to expand your mind on a more educational level. Don't so much dwell on the prospect of what you dealing with in the moment. Stay on my legal work so that I can try to get out of prison; you know what I'm saying. Maybe get some help on the outside, as opposed to what I consider inadequate help in prison.

But for the most part, as long as you keep your mind busy and focus on things that are more of a mitigating thing, as opposed to something that -- people drink moonshine, toilet water; you know what I mean, getting high, stuff like that. That's not my thing. I try to work out, do little push-ups and other things to try to strengthen my body, as well as my mind. Things of that nature.

Q. So have you found some relief with these efforts that you've taken?

A. I have. I have.

MR. McCARNEY: Excellent. I think that's it for me. I really appreciate your candor and your time.

Gustavo, I'll turn it back to you if you have any follow-up.

MR. JIMENEZ: Just a couple and then we'll be done, Mr. Griffin.

REDIRECT EXAMINATION

BY MR. JIMENEZ:

Q. So from the time that -- when you first noticed that there was a fire to the time that you evacuated, do you have any sense of how long that took?

A. No, that's why in my complaint I gave an

approximation. Traumatic experience had me believing -- because of the count time and when they ran the evacuation or whatever, I made an approximation on an assumption. If my timing was wrong, it was strictly due to the traumatic nature of the incident.
Q. Okay. And then with respect to the evacuation, do you remember the order that the north side of A cell house was evacuated in?
A. I have no idea.
Q. Okay. Earlier in your testimony -- and correct me if I misstate anything -- but I believe you testified it was hard -- as you were evacuating it was kind of hard for you to see other -- what was going on in full because of the smoke; am I remembering that correctly?
A. Yes, sir.
Q. Was the -- to your recollection, was it just your range that was full of smoke or was it the entire cell house that was full of smoke?
A. I can't see the other side. The entire north side was completely smoked out.
Q. So once you are evacuating and right before you exited through the front door of A cell house, was it still filled with smoke at the time?

A. I mean, toward the front door it was not smokey. Only in -- I say by the time you reached the front of the range, it was significantly thinner.
Q. Okay. And then once -- you said that once you got out of A cell house you were just talking and some of the custody defendants were outside, right, and you were talking and saying: I need help. I need medical attention. I have shortness of breath, those symptoms that you described, right?
A. Yes, sir.
Q. Were other inmates -- did you hear other inmates complaining -- saying the same things?
A. I'd say yes. I'd say yes.
Q. Okay. Who?
A. A large, significant -- I mean, you had to be insane to have went through the whole thing and not be suffering through the same -- so I can't put a number on it, but I guarantee you that everyone who left that cell house needed medical assistance.
Q. What makes you say that?
A. Because it was -- let me clarify. I'll say the entire north side, because it was completely engulfed in smoke. Human breathing smoke, medical problems. It's bound to be a cause.
Q. All right. Once you were in the gym and you

mentioned that you had a conversation with Ms. Mayes and Ms. Mayes told you that they were doing count, right?
A. Yes.
Q. What -- did you observe what Ms. Mayes did after you had this conversation with her?
A. I did not.
Q. At the time that you exited A cell house -- or back up a little bit. When you're saying that you're saying: I have shortness of breath. I need medical, did you see what some of the other custody defendants were doing at the time?
A. Some of them were drinking water and stuff like that. I assume they was needing some -- you know what I'm saying, some assistance. They were in smoke, too, you understand, but I wasn't -- I'm not going to lie. I wasn't focused on them. I was trying to figure out what's going on with me.
Q. Okay. Just to be clear, did you see what Officer Crockett was doing?
A. If I did, I can't give you exactly what he was doing now; you know what I mean. Like I said, I was focused on my health.
Q. Did you see what Lieutenant -- or Sergeant Walton was doing?

A. Once again, if I did, I couldn't give you a definition; you know what I'm saying. Like a definitive answer of what her activities was.
Q. Did you see what Nadine Smith was doing?
A. Once again, if I did, I couldn't tell you here now.
Q. Did you see what Officer Cross was doing?
A. If I did, I could not explain to you now.
Q. And did you see what Mr. Cain was doing?
A. If I did, I could not explain to you now.
Q. Okay. With respect to some of the people I asked you about earlier, I asked you if you knew who Kory White and Brandon Phillip were. Do you remember those questions?
A. Yes, I do.
Q. You said you do know Brandon Phillips?
A. I do.
Q. And then do you know who Damon Gregory is?
A. That might be the one I said lives on the same range as me.
Q. Do you know who Jeffrey Findley is?
A. Yeah, we from the same neighborhood.
Q. Okay. So are you friends with Mr. Findley?
A. We are -- the same way I describe Mike, I describe him.
Q. Okay. Are you friends with Mr. Gregory?

A. I am not.
Q. Are you friends with Mr. Phillips?
A. I am not.
Q. And then you mentioned a D earlier --
A. That's the one --
Q. -- if I remember right?
A. He lives on the same range as me. I believe that's his name.
Q. Damon Gregory?
A. Yes, sir.
Q. Okay. And then lastly -- so you mentioned there's some people helping you with some of the discovery responses, right?
A. Yes, sir.
Q. Are they also helping you with other parts of the litigation?
A. Yes, sir.
Q. Are you compensating them in any way for their assistance?
A. Not at all, sir. I have nothing to give.
Q. Have they asked for anything in return for their assistance?
A. They have not. And they know -- the individuals that -- I'm poor, sir. If people see me walking around prison, they'll see I have nothing.

Q. Have those individuals who are assisting you, have they ever told you not to share their information with us?
A. They have not. I'm just not comfortable doing it.
MR. JIMENEZ: All right. That's all I have, Mr. Griffin. Thank you.
(The deposition concluded at 12:15 p.m.)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| LEETRAVIS GRIFFIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Cause No. |
| -v- | ) | 3:24-cv-00066-PPS-JEM |
| | ) | |
| RON NEAL, et al., | ) | |
| | ) | |
| Defendants. | ) | |

Job No. 199859

I, LEETRAVIS DELSHAWN GRIFFIN, state that I have read the foregoing transcript of the testimony given by me at my deposition on June 10, 2025, and that said transcript constitutes a true and correct record of the testimony given by me at said deposition except as I have so indicated on the errata sheets provided herein.

____________________________________
LEETRAVIS DELSHAWN GRIFFIN

STEWART RICHARDSON & ASSOCIATES
Registered Professional Reporters
One Indiana Square, Suite 2425
Indianapolis, IN 46204
(800) 869-0873

EXHIBIT A

STATE OF INDIANA )
)
COUNTY OF LAPORTE )

I, Julie-Samantha Smith, a Court Reporter and Notary Public in and for said county and state, do hereby certify that the deponent herein, LEETRAVIS DELSHAWN GRIFFIN, was by me first duly sworn to tell the truth, the whole truth, and nothing but the truth in the aforementioned matter;

That the foregoing deposition was taken on behalf of the State Defendants; that said deposition was taken at the time and place heretofore mentioned between 9:20 a.m. and 12:15 p.m. CST;

That said deposition was taken down in stenograph notes and afterwards reduced to typewriting under my direction; and that the typewritten transcript is a true record of the testimony given by said deponent;

And thereafter presented to said witness for signature; that this certificate does not purport to acknowledge or verify the signature hereto of the deponent.

I do further certify that I am a disinterested person in this cause of action; that I am not a relative of the attorneys for any of the parties.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 25th day of June, 2025.




Notary Public - State of Indiana
My Commission Expires: 04/24/2027

Job No. 199859

**Exhibits**

**LeeTravis Griffin Ex 01** 3:8 92:2,3,5

**LeeTravis Griffin Ex 02** 3:9 92:18

**LeeTravis Griffin Ex 04** 3:12 92:2,3

**1**

**1** 79:9 92:2,3,5

**10** 86:14

**100** 47:7

**10:00** 26:13

**11** 86:14

**11:00** 26:5,13,22 28:13

**12-2** 8:25

**12:15** 124:7

**14** 11:17 44:21 64:14 67:19 68:3 70:16 71:5 90:9

**14th** 15:18 21:13 25:9 45:9 64:22 66:11,16 67:12,23 68:9,20 70:6 71:23 72:3 87:24

**1st** 103:10

**2**

**2** 92:18

**20** 55:7

**200** 18:21 99:10

**2012** 11:19

**2013** 12:6

**2014** 11:17

**2015** 110:18

**2017** 44:25 45:2,5 70:21 81:8

**2020** 45:1

**2021** 13:15 16:21,25 17:4

**2023** 13:17,18,24 15:18 16:18 17:4,7,10 19:5 21:24 22:6,17,24 23:15,23 24:14,19 25:3,9 44:21 45:9 64:14,22 66:11,16 67:12,19, 23 68:3 70:6,16 71:5 81:13 87:24 90:9

**2024** 103:10

**2069** 12:11

**233943** 4:20

**24** 74:1 79:7

**25** 80:18,23

**252** 19:18,22 20:11 61:24

**3**

**3** 92:18,19 100:1

**30** 26:25 55:8

**300** 18:1,8,9,21 42:6 106:25

**300-plus** 106:25

**358** 12:24 13:3,5,12,14,19 17:2,8 18:2 29:14,21 46:17 61:17 62:9, 15

**360** 36:9

**3:00** 26:5

**3:24-cv-66-pps-jem** 8:24

**4**

**4** 92:2,3 100:2

**5**

**50** 91:19

**52** 29:13

**56** 36:12

**58** 29:13

**7**

**75** 91:20

**7:00** 16:4,13,14 26:5,7

**9**

**911** 105:17

**9:00** 26:10

**9:15** 16:6

**9:45** 26:10

**A**

**a.m.** 16:14 28:14

**ability** 111:24

**able** 20:20 29:14,21 31:16 32:15 33:20 36:24 37:8 40:21 42:24 43:13 46:18,21 48:2,17,19 49:1,9 50:12 61:23 62:4 63:22 91:22 94:6 96:20 101:3,19 103:19 114:22

**about** 10:9 11:5 13:17 15:17 17:16 19:7 21:11,17 22:16 25:1 26:12 35:3,25 38:15 41:7 42:14, 16,18 44:3,24 45:22 46:8 47:2 58:8 62:12 67:10 68:1 71:6,12,21 72:5,9,13 73:9 74:18 76:9 82:1,4, 10 83:4 84:25 86:13 87:13 91:19 95:8 98:11,15 102:1,10,12 105:10 109:22 110:5 111:1,25 114:3,14 116:5 122:11

**above** 29:17,19 109:12

**absurd** 49:17

**abundance** 95:17 115:17

**access** 78:22,23 79:3 95:7

**accumulate** 63:23

**accurate** 5:7 8:3

**ACH** 79:11

**acquire** 65:6

**action** 18:19

**activities** 122:3

**activity** 54:21

**actual** 28:10 112:1

**actually** 10:12,24 29:7 35:7 39:3 40:20 71:2 77:25 78:14 84:21 100:2,10 103:16 112:20

**address** 7:12 66:24 67:5 117:1

**addressed** 67:22,24 81:14,15

**addressing** 104:9

**ADHD** 110:22 117:10

**administrative** 113:8

**adverse** 66:22

**after** 16:6 19:16 30:22 38:4,6,9, 12,14 47:21 65:1,9 66:16,20,21 68:19 69:3 70:21 71:5 93:6,7 95:14 102:6,14 104:7 106:17 108:3 109:19 110:7 111:2 115:23 121:5

**again** 6:19 7:1 23:24 26:13 30:21 83:7 104:5 107:7 111:6 112:11 115:14 122:1,5

**against** 14:21 15:1,8,13 39:10 95:15 96:23

**ago** 11:15 14:10 25:1 85:5,7,25 116:17

**agree** 28:12 86:19

**Ah** 56:18

**ahead** 28:24

**ailments** 114:5

**ain't** 114:25

**air** 101:21

**alarm** 87:15,16,17,19 88:2,8,10, 12

**alcohol** 7:22

**alert** 29:1 37:17,20

**all** 4:21 5:17 6:4,19 7:4 8:5,21 9:15 10:7,21 11:2,20 12:18 13:21 14:1 15:17 16:9 18:25 21:11 22:8 23:17 25:8,25 28:23 29:16 31:25 32:1 37:8 38:19 40:10,13,16 42:3 44:2 48:5 51:16,23 52:6,7,12,20 53:1,8,10,24 54:23 57:3,6,22 60:14,19 64:3 66:6,11,15 70:2 72:22,24 76:25 79:1 81:6,22 82:19 84:8 86:16 87:13 88:8 89:19,25 92:11 95:8 97:8,14 98:5 100:14 101:16 107:15,17 110:17 113:23 116:7 117:9 120:25 123:20 124:5

**allegation** 34:16

**allegations** 5:15 38:21 44:3 80:22

**allege** 80:18

**alleged** 15:12 92:12

**allegedly** 34:16,23 96:22

**alleging** 89:23,24 113:23

**allow** 43:24

**allowed** 14:20 27:25 69:8 95:4

**allowing** 49:19

**allows** 26:21

**almost** 65:20 91:25 116:14

**along** 111:12 112:10

**already** 16:16 31:9,12 34:7 36:10 42:18 76:19 105:16

**also** 7:5 9:5 13:18 15:11 17:10 19:4 21:24 22:5,8,20,23 23:1 24:13,18 25:11,18 27:21 35:1,16 43:7 49:22 54:17 57:19 66:23 74:15 77:18 86:2 87:14 94:18 102:5 103:5 123:15

**alter** 84:16

**altered** 84:19

**altering** 84:21

**am** 4:15 7:21,23,25 13:7 24:9 29:13 41:4 43:15 46:3 51:13 56:10 76:1 77:21 80:15,22 82:15 87:10 90:22 98:7 113:23 114:3,20 119:15 123:1,3

**Amendment** 14:25 15:6,12

**amounts** 7:11

**an** 4:12 6:24 7:14 14:25 15:6 37:11 38:21 39:20 43:2,7,8 44:16 63:10 65:12 67:1 69:13,14,17,24 84:18 88:2 89:2,3,7,16 90:20 96:13 97:4 99:8 102:15 103:3 104:14 105:7 106:4,7,22 110:15 112:5,9 113:2 114:19 115:17 116:25 117:3 118:25 119:3,4

**and** 4:3,10,13,15 5:4,6,7,13,14,23 6:1,14 7:11,13,15 8:2,9,17,21,24 9:3,5 10:7,11 11:9 12:8,21 13:16 14:19,20 15:3,9,11,14 16:1,4,6,8, 10,16 17:5,7,13,15,17 18:7,12,18, 20,21,24,25 19:2,12,20,22 20:10 21:15,16,22,24 22:1,2,5,12,20,23 23:1,14 24:13,23 25:2,5,7,11,18, 20,23 26:13,14,21,23 27:9,11,12 28:7,11,12 29:3,5,10,14,25 30:1, 8,13,17,24 31:1,11,17 32:3,7,10, 13,16,24 33:5,7,9,19,23 34:3,8, 10,22 35:20,23 36:3,4,16,20 37:15,18 38:2,24 39:7,12 40:4 41:11,14 42:9,18,20,23 43:7,10, 23,24 44:11,25 45:5 46:9,11,13, 17 47:5,9 48:1,2,5,13,19,20,23 49:5,18,21 50:7,9,15,21,24 51:4, 10,15,20,22 52:3,4,11,14,15,16, 17,21 53:4 54:11,23 55:11,21 56:2,7,10,21,22,24 57:3,19,22,25 58:2,12,13,21 59:1,22 60:17,18, 22,25 61:1,2,3,8,16 62:8,11,13,14 64:7,9,11,13 65:23,24 66:4,5,20 67:7,16 68:11,22,23 69:6,14 70:2, 4,10,15 72:11 73:15 74:5,11,12, 19,25 75:4,19 76:1,4,17,18 77:7, 8,15 78:4,14,20 79:1,3,7,9,15,18 80:10,19 81:11,25 83:1,4,12 84:10,22,24 86:7,12,16 87:20 88:4,10,16,19 89:4,6,7,8,10,11, 12,20 90:8 91:2,15 92:8,18,19,23 93:2,10,13,14,15,16,21 94:15,25 95:2,13,17 96:7 97:19,24 98:4,14, 16,18,22 99:3,5,6,12,14,20,25 100:4,19,20 101:2,5,8 102:5,6,8, 21,23 103:17,24 104:14 105:3,7, 13,17,19,20,24,25 106:11,16 107:1,6,7,15,24 108:5,6,7,9,20,22 109:12,17 110:3,17,25 111:6,7,9, 17,18,22,25 112:9,10 113:9 114:3,21,25 115:2,4,5,12,13,19 116:7,11 117:2,11,12,17 118:2,7, 13,17 119:2,7,11,23 120:4,5,6,7, 16,25 121:2,13 122:8,12,17 123:4,11,23

**and/or** 80:20,21 81:1

**another** 15:11 25:2 27:10 69:1 78:9 79:4 90:13 106:25

**answer** 5:5,23,24 6:15,20,25 7:9, 14,15,17 20:5 46:5 54:4 76:12,15, 18 80:14 90:1 94:25 95:13 98:17 122:3

**answered** 76:19

**answering** 7:8 27:7 95:23

**answers** 7:4 16:23 95:2

**anxiety** 115:2

**any** 6:4,12 7:20,22,24 8:1,5,18 11:6 12:12,13,14,16 14:1 17:11 20:15 22:14 27:18 30:23 36:25 37:3 40:5 41:15,16 42:11,20,24 44:19 47:15 49:5 53:20 56:4,25 58:4 59:2,8,11,19,21,24,25 60:1 61:9,13 62:15,18,22,24 63:2,6,7, 14,15,17,18 64:25 66:13 67:18 68:18 69:20 71:5,6,10,11,12,19, 24 72:4,7,12,15 75:23 77:24 81:5 82:8 83:15,21 85:1,16 86:6,8,20

88:8 89:21 90:23,25 92:10,12 94:13,18 95:20 97:5 98:2,22,23 99:13,15 101:14 102:24 103:13, 25 107:16 108:14 109:9,17,22 110:1,4,9,20 111:2 113:9,20 114:4,6 116:19 117:4 118:16,23 123:18

**anybody** 21:8 35:13 83:20 113:9

**anymore** 71:12 101:24

**anyone** 9:16 11:3 20:15 36:14 40:24 51:5 53:14,25 55:18 56:12 59:10 71:10 81:10 93:22 95:16 96:11 97:25 98:7,20,22 110:5 111:12

**anything** 6:13 8:13 9:12 29:15, 18 30:21 35:16,25 36:13,18 39:8 45:10 46:2,9 58:21,23 59:5 62:5 71:7,21,25 72:5,9,13 81:11,21 82:6,7,14 84:7 87:11 99:22 108:24 115:25 119:12 123:21

**anywhere** 70:13 116:16

**apart** 53:2,7 104:8

**apologize** 16:19

**appreciate** 105:20 118:13

**approximate** 39:20 67:1

**Approximately** 16:19

**approximation** 37:12 119:1,4

**are** 7:20,22,24 10:18,19 11:9 12:7,21 16:9 17:21,22 19:1 21:1,4 26:14,15,24 27:3,9,25 28:6,7,8 29:14,21 32:20 36:24 37:8 39:7 40:12,15 41:14 42:24 43:13 46:18 49:1,5,13,14,22,23 50:12 52:21, 25 53:13 54:17,18,20,23 55:6,8 60:25 61:23 65:13 73:21 74:22 75:1,10,22 77:4,8 78:7,20 81:4,16 85:12,14,16,22 87:14 89:18,21 90:2,13,14,20 91:6,8,12,21,22 92:18,19 93:10 94:17 97:8,12 98:9 100:23 104:22 105:19,22 106:2 112:8 114:4 115:10,19,20 116:18 118:2 119:23 122:22,23, 25 123:2,15,18 124:1

**area** 40:6

**aren't** 53:11 74:1,3,4,25 89:4,12 106:21 117:2

**Arnold** 27:11 37:15

**arose** 102:2

**around** 44:19 100:24 117:1 123:25

**Art** 36:10

**as** 4:2,4,21 5:1,3,11,12,17,19 6:23 7:4 8:12 9:8 11:1 14:16,19 19:15, 17 21:20 23:12 28:22 31:18 32:1 36:9 38:16,21 39:7 44:4 45:19,21, 23 46:8 47:17 48:10 49:13,14,15, 19 50:2,9,11,15,17,18 51:4,11,16, 19 52:9 54:4,5,7,11 56:2,6,10 59:19 60:2,18,22,23 61:5,8,22 64:6 66:14 69:7,17 71:10 73:11 74:2,3,9,10,13,14 75:3,4,6,9,10 76:13 78:16,22 79:17 82:14,23 83:8,9,13,16,19 84:22,23 86:24 90:18 92:4,17 94:23 95:5,6 96:7 97:21 98:8,25 99:8,9 100:22 103:14,20 104:2,11,12 105:9 107:9,15 109:8 112:6 114:7,15 115:3 116:20,22 117:6,7,9,10,24 118:1,3,7,8 119:13 122:19 123:7

**ask** 5:4,22,24 6:5,6,15 7:19 10:13 11:2 20:19 21:17 28:18 33:17 56:5 71:17 78:15 100:20 112:20

**asked** 8:15 10:11 16:16 42:18 45:20 75:24 76:21 95:9 97:21 98:22 99:13 122:10,11 123:21

**asking** 33:14 48:13 76:1,7,14,16 77:2 100:3

**assess** 30:13 104:10

**assessed** 105:10

**assessing** 60:18

**assessment** 111:13

**assign** 45:21

**assigned** 16:12

**assist** 65:7 93:22

**assistance** 93:20 94:15 101:6,8, 11 108:20 111:18 117:5 120:19 121:15 123:19,22

**assistant** 91:17 98:13

**assisted** 96:11 97:9

**assisting** 93:21 95:10 96:13 97:5,7 124:1

**associates** 20:3,6,9

**assume** 82:25 83:14 94:20

121:14

**assumption** 82:15 83:20 86:23 88:17,18 90:4 119:4

**at** 6:4,11,12 7:7,13 8:23 9:25 10:7,18 12:3,18,21 13:21 14:3 16:20 18:16 21:22 22:2,21 23:19, 25 24:9 26:12 28:21 29:16,21 30:10 31:1,6,8,17,19,25 32:16,19 33:2,21 35:23 36:3,8,23 39:15 40:10,13,16,17 41:14,19 42:3,23 43:14 45:5 46:4,16 47:18,24 48:5 49:5,20,22 50:13,15 51:4,8,9 53:23 54:10,18 55:20 56:12 57:2 58:23 60:10,13 61:14 64:20,22 66:8,11,15 68:11,13 70:7,12,15 72:22,24 73:23 76:10,16 77:24 79:5 80:21 82:5,12,21 83:6 84:8 86:6,16,20,22 87:21 88:8,13 89:25 91:8,12,22 92:11,24 93:13, 20 94:7 96:16 97:19 98:2,25 101:14,16 102:5,24 107:17 108:6, 24 109:3 110:5,10,25 111:19 113:23 115:10 117:2,9 119:25 121:8,12 123:20 124:7

**attempted** 65:6 66:24 115:18

**attempting** 67:5

**attended** 91:7

**attention** 50:17 51:14 62:11 108:9,11 120:8

**attorney** 4:12 21:17 27:10 96:1

**attorneys** 27:11

**attribute** 9:9 68:19

**auditory** 109:21

**authority** 110:24

**authorizes** 60:22

**automatic** 48:7,12,16

**automatically** 48:1

**available** 70:17

**aware** 15:24 21:1,6 22:14 28:20, 23 31:19 72:20 80:10 81:6,22 82:5,12,13,20,22 83:2,5,8,10,15, 17 84:20,21 86:21 87:14 89:21 90:1 93:10 94:17 96:10

**awareness** 115:4

**away** 53:9 57:6 78:11 102:6 115:6,22

**B**

**back** 13:24 17:10 19:4 21:24 22:5,16,23 23:1,23 26:15 27:9 53:15 60:10,15 61:5,8,12,16,17 62:7,8,14,19,21,24 63:2,12,18 65:1,9 69:3 70:6 71:20,23 72:3,7, 11,15,21 89:6 105:8 118:15 121:8

**bad** 37:24 44:16 55:10

**banging** 39:10,12

**bar** 18:17

**bars** 17:23,24 29:25 39:10,12

**based** 12:25 14:24 16:23 28:11 65:24 88:25

**basically** 7:14 26:22 30:7 53:8

**basis** 105:22

**basketball** 116:3

**be** 5:13 6:10,11 7:5,16 8:11 16:19,24 17:3 18:2,3,5,13 20:20, 21 26:7,8,9,12 27:18,21 28:3,15 33:20 34:8 37:13 39:20 40:23 41:17 48:19 49:17 50:10 53:22 54:9 55:5 56:21,22 60:23 62:3 65:8,12,24 68:12 73:14 75:5,15 77:20 78:5,12 80:12 81:14,15 82:7,20,22,25 83:10,14,19 86:21 87:8,11,20,21 88:17,21 89:14,15, 16,20,24 90:10 92:16 94:1,2,6 95:1,16 96:20 98:23 99:7,8 100:11,22 103:18,21,22 104:8,9 105:2,11,14 106:22 112:9 113:9 114:4 115:5 116:10 118:17 120:15,17,24 121:19 122:18

**became** 28:20,23

**because** 6:19 8:10 9:20 14:9,14 26:11,14 30:24 31:24,25 34:7 36:23 38:7,20 40:20 43:2 44:13 47:19 48:13 49:11,16 50:2 53:6 54:9,17 57:4,5 65:11 66:19 68:23, 25 75:2 77:12 81:24 82:6 86:12, 19 87:2 90:4 94:11,12,14,22 95:9, 22 97:3 99:1 100:23 104:24 105:2,21 106:4 108:7 111:13 114:8 119:2,15 120:21,22

**becoming** 114:24

**bed** 39:24,25 40:7

**Beecher** 15:14 24:4 73:5,14 79:18 80:10,19 83:4

**been** 4:3 6:21 11:18 12:3,4,14,15 13:14,18 14:5,7,14 15:18 16:14, 17,24 17:3,8 19:20,22 36:10 40:21 43:16 44:19 48:8,17 49:9 50:2 60:2 62:1 67:22 68:5 74:11, 12 77:18,24 78:2,4 80:3,6 81:25 82:2 84:8 85:10,24 86:1,2,7,11,18 88:17 89:6,8,9 101:17,19 108:25 110:19 114:12 117:6

**beeping** 88:9

**before** 4:10 5:23,24 6:16 11:20, 25 12:2 21:12 33:25 34:1 38:4,12 42:10 57:15 78:17,18 84:8 90:11, 12 100:25 119:23

**began** 38:2

**begin** 29:3 47:16

**beginning** 35:17 36:4

**begins** 30:15

**behaving** 96:8

**being** 7:11 28:5 29:25 31:16 38:22 54:12 55:7 59:6 74:7,10 79:17 91:21 95:6 102:2 103:14 106:21 111:16 112:4 114:21,22

**belief** 111:11

**believe** 10:24 13:4,15 14:14 16:2 22:11 24:8 25:1 30:20 41:3,9,11 44:17 45:1 48:11,25 51:12,17,23 52:5 55:15 56:23 57:4 61:14 62:17,20,23 63:1,4 64:7 66:24 70:12 71:9 80:12,15 81:12,17 82:5,13,19,25 83:5,7,13 85:25 90:5,14 91:15,19 93:19 94:12,13 97:17 100:14 102:7 112:22 114:5 115:6 119:12 123:7

**believing** 119:2

**below** 19:23 76:5

**Bend** 11:24

**benefit** 33:9

**benign** 111:19

**beside** 40:7

**besides** 14:2 35:20 36:13,16 59:1,6,8 63:14

**best** 5:5 16:2 23:25 46:8 64:2 107:4 111:19

**better** 10:1 84:9 87:12

**between** 8:8 30:11

**big** 35:18

**billow** 30:15

**binder** 109:1

**bit** 15:17 17:15 19:7 21:11 23:2 34:15 37:22 44:2 67:10 73:9 84:24 114:18 121:9

**black** 44:14 94:1,4

**blank** 9:7,14

**blaze** 90:11 114:25

**blew** 111:25

**blowing** 111:20

**blurriness** 45:15

**blurring** 45:17

**body** 49:19 118:7

**both** 13:9 18:21 103:16 105:10

**bound** 120:24

**box** 105:17

**brandon** 27:10 37:15 97:16 122:12,15

**break** 6:12,17 34:15

**breakfast** 16:3

**breath** 45:13 51:14,21 53:18 54:2 56:4 58:13 66:15 103:24 104:2 120:8 121:10

**breathing** 68:22,23 102:20 103:1,3,4,5,7,17 120:23

**brief** 39:17 84:12 108:20

**briefly** 14:13

**bring** 9:6 107:1

**bunch** 96:18,19

**burdensome** 95:6

**Burglary** 12:8

**burning** 45:13,14 102:22 115:13

**Buss** 15:14 22:2 23:4 72:24 73:14 79:9 80:10,19 82:20 91:14

**busy** 29:2 117:18 118:2

**but** 4:10,25 6:11 8:9,13 11:12 16:4,17,20 18:15,19 19:17 20:8,

19 21:4,6,9,18 23:25 24:9 28:4,19 29:1 30:21,22 31:15,23 32:14 33:15,20 34:12 35:8,17 38:1,22 39:17,19 40:19 43:2,6,17 45:19 46:7 47:8,18 48:7,11 49:18 51:16 53:1,8,23 54:3,5,8,20 55:19,22 56:12,15,16 57:4,8 60:1,7,19 61:5,14,15,25 62:3,5 63:22 65:6, 22 66:21,22 67:24 68:21,24 70:25 71:3 74:8 75:3,15,24 76:7,12,21 77:6 78:22 81:19 82:2,14,23 83:8 84:20 85:6,15 86:23 89:23,25 90:13 91:16 94:1,4,7,8,11,13,20 95:4,20,22 96:12 98:8 100:2,10, 11,24 101:5,23 102:15 103:2,5,7 104:6,9 105:9,12 106:11 108:9,25 109:7,13 110:13,22,24,25 113:8 114:3 115:22 116:14,23 117:9 118:1 119:12 120:18 121:16

**buttons** 17:19 74:8

**by** 4:2,6 5:10 11:6 23:20 30:13 31:1,12,13 37:23 55:22,25 62:10 63:23 65:12 71:17 81:13 100:18 102:15 110:19 114:6 118:20 120:2

**C**

**cable** 84:17

**Cain** 15:3,9 25:16 34:12 35:2 51:9 52:4 53:21 56:23,25 62:25 66:5 72:12 122:8

**calculate** 16:20,22 17:5

**call** 10:25 17:19 20:8 26:20 74:8 97:21 98:2,4,7 110:22

**called** 4:2 26:14 105:6,16

**calling** 99:7

**came** 30:12 33:5,15 36:25 42:6 47:1 48:4 66:20 102:12,13

**cameras** 43:25

**can** 4:7 7:5 8:1,5 9:23 15:5,22 18:2,3,5,7,9,13 21:8 27:18,21 29:18 30:6,20 31:1,2,10 32:12,23 33:17,18 36:15 37:22 43:17,19 46:6,8 47:13 53:24 55:9 60:15 61:5,10 63:9 71:13 74:25 77:6,20 78:22 80:2,12 84:11 88:17 104:17 106:9,13,23 114:18 115:15,17 117:22

**can't** 16:20,21 17:4 28:25 30:21 33:20 37:13 49:16 55:19 65:21 75:16,19 76:5 81:18,19 85:5 86:21 94:10 96:19 108:7 110:25 111:13 112:3 119:21 120:17 121:21

**candor** 118:13

**cannot** 8:13

**capacity** 113:7,8

**cardiac** 103:4,9,14,25 104:3 105:13

**care** 15:1 104:23 105:14 113:10, 21,25

**cared** 117:8

**carrying** 108:23 109:1

**case** 4:14,22 5:2 6:8 8:24 10:22 21:12,19 38:24 80:8 81:18 97:24 99:18

**cases** 10:18,19

**caseworker** 25:23

**catch** 6:22,23

**cause** 67:1 120:24

**caused** 67:1 114:5

**causes** 20:16 67:16

**caution** 95:17

**cell** 12:22,23 13:5,7,10,12,13,14, 18,19 15:19 16:12,17,24 17:1,2,8, 13,14,16,18,21 18:23 19:18,22 20:11,24 21:2 24:23,25 25:8,25 26:1 27:15,25 28:1,4,17 29:3,5,8, 10,11,14 30:5,6,12,14,15,16,18 31:10,11,14,18,21 33:5 34:4 35:23 36:10,12,18 37:4 38:2,8 39:4 40:9,12,15 42:1,9 43:3,7,11 44:25 45:1,5,24 46:17 49:2,13,25 50:4,24 51:1,4,19,24 52:3,9,22 54:17 56:1 57:11,13,22 59:15,17, 20 60:2,7,11,15 61:8,11,12,16,17, 24 62:3,8,9,14,15,19,21,24 63:2, 12,18 65:1,10 69:3,4,9,21 70:8,17 71:20,23 72:3,7,11,15,22 73:18, 22 74:7,9,14 75:16 77:7 78:15,24 79:22 83:23 85:18 86:1,2,6,7,8,9, 11,13,15,17,18,20,22,25 87:14,21 90:12 91:10,11 96:6 97:18 98:6, 11,19 99:11 101:2,9,13 106:21 108:6 109:20,22 115:2,10 116:9 119:9,20,24 120:5,19 121:8

**cellmate** 13:12

**cellmates** 17:11,14

**cells** 13:3 17:13,16,18,21 18:1,2, 7,12 27:16 28:2,6,8 29:13 34:10, 17 47:11 48:1,5,18 49:22 69:12 80:20 108:4 109:4 116:6

**Centurion** 112:7

**certain** 14:21 51:15 89:5 114:20

**change** 89:10

**changed** 91:9 107:16

**changes** 74:13 95:4

**characterization** 44:7 73:19 76:23

**characterize** 44:4 45:16 49:15 52:19 53:12 69:7

**characterized** 54:6 73:11

**charge** 85:13,14

**charged** 12:16 56:14,19

**check** 77:13

**checked** 75:10 76:2 77:4,9,11 80:6 88:21 89:8

**checking** 77:12,15 89:18

**checkpoint** 55:23

**checks** 27:3

**chest** 67:7 68:1,2,6,8,12,14 102:8

**Chico** 15:3,9 21:17 62:10 63:6, 11,14 100:20 107:19,25 108:6,23 109:3,19 110:1,4,5,7 111:6 112:19,21,23 113:5,15

**Chico's** 21:16 27:11 107:10

**chief** 98:13

**chow** 54:10

**Christina** 22:8,17 23:6 73:7

**circumstances** 69:16,21 115:7

**claim** 8:20 15:1,7,12 31:25 75:9 80:13 81:21 92:6 112:5

**claiming** 92:13

**claims** 14:13,21

**clarify** 41:1 76:7 84:14 109:11 120:21

**clarifying** 60:21
**clean** 5:20 6:1 7:1
**cleaned** 115:11
**clear** 20:21 32:4 35:15 36:4 40:23 46:10,13 65:8,24 71:16 75:15 76:4 77:1 79:25 80:4,7 91:3 98:21 99:15,21 114:4 121:19
**clerk** 93:20,23
**clerks** 10:3
**clinical** 110:24
**clock** 37:7
**clocks** 37:3
**close** 20:3,9 28:13 29:25 31:20 53:8 57:6 61:23 109:16
**closer** 45:16 55:23
**closest** 50:4
**CO** 113:7
**colors** 44:13
**come** 18:18 27:6,9 31:20 33:4 46:24 77:13 88:15 89:6,11 99:3 103:19 109:6
**comes** 32:22 116:11
**comfortable** 104:13 124:4
**coming** 31:2,4,16 32:21 33:23 41:8 49:2 69:18 88:5
**comment** 86:24
**commented** 81:12
**commissioner** 22:9,18 82:10, 11,15,18
**communicate** 71:13 82:17 89:13
**communicated** 42:7 47:20 60:24 61:6 68:13 89:4
**communicating** 41:3,7,9,12 53:10 89:17
**communications** 71:6,10
**compensating** 123:18
**complaining** 120:12
**complaint** 9:3,11 14:20 17:17 37:11 38:20 44:4 63:23 73:17,24, 25 79:5 87:5 97:11 111:5,17 112:14 118:25
**complete** 5:14 56:15 109:7
**completed** 11:12,16
**completely** 90:12 99:24 101:17 106:18 119:22 120:22
**computer** 43:20,23
**concern** 34:2
**concerning** 9:19 64:5 83:15
**concerns** 41:16
**concluded** 124:7
**condition** 73:23 110:21
**conditions** 66:23,25 67:3 73:18 114:5
**conducted** 85:12
**conducting** 85:13
**confirms** 60:21
**conscious** 34:1
**consciousness** 37:24,25 38:17 39:16,21,22,25 58:12 100:25
**consider** 38:16 54:8 90:8 112:8 117:25
**considered** 57:20
**consist** 9:20 16:5 74:6
**consists** 9:21
**continuing** 115:20
**contracted** 68:23
**contrary** 74:24
**contribute** 104:11
**contributed** 103:22
**contributing** 105:11
**conversation** 42:4,21 58:16 59:1,2 63:5 108:14 109:18 110:1 121:1,6
**conversations** 42:11 62:15,18, 22,25 63:3,7,15,17 64:3,8 71:19, 24 72:4,8,12,16 110:4
**conveyed** 77:19
**convicted** 12:14
**convictions** 12:12,13
**cooler** 106:10
**cooperate** 98:8
**copy** 100:10,11
**cords** 84:17
**Corizon** 112:7
**correct** 12:19 13:7 16:24 19:23 22:3,10 24:14,19 25:12 26:9 28:15,16 31:21 32:21 41:20 42:18 44:7 46:20 54:15 69:25 76:6 80:24 101:4 102:3,8 108:8 119:11
**correctional** 16:10 22:21,23 23:15 24:14,19 25:3,12,18,23 26:24 90:18
**Corrections** 22:10
**correctly** 56:11 77:22 79:13,24 80:22 90:3 112:11 119:16
**could** 4:18 8:11 10:1 31:12 62:1 69:12,15 76:21 78:12 94:1 101:17 104:8,25 109:21 112:14 113:9,12, 18 114:1 117:6 122:7,9
**couldn't** 49:7 54:4 76:22 104:8 122:1,5
**counselors** 65:13
**count** 16:7,8,9,11 58:9 59:6 119:2 121:3
**counted** 58:3
**counting** 58:14
**counts** 58:19
**couple** 7:19 10:17 27:13 28:18 38:20 39:2 59:15 60:9 85:25 86:17 92:1,20 97:12 118:17
**course** 38:18
**court** 5:3,10,18 6:19 14:10,11,17, 19,20 27:9 73:10 79:17 81:13,16
**cover** 9:2
**COVID** 34:13 35:4,9,10 68:22,23
**create** 5:20
**crime** 12:14,16
**Crockett** 15:2,8 24:18,21,23 25:7 40:13 42:14 51:9 52:4,16 53:21 56:22,25 62:19 66:5 71:25 121:20
**Cross** 15:2,8 24:13,16,25 25:7 40:10 42:12 46:24 51:9,20 52:3, 14 53:20 56:22,24 62:16 66:5 71:6,19,20 96:8 100:17 122:6

**crowbar** 81:9

**crux** 76:11

**cuff** 105:17 115:16

**culmination** 103:7

**current** 22:11,12,15

**currently** 7:20 12:7,18,21 13:21 58:14 59:16 75:7 105:19

**custody** 105:18 108:17 120:6 121:11

**D**

**damages** 92:13

**Damon** 122:17 123:9

**danger** 74:5

**Darnel** 24:18

**date** 12:10 15:19 16:21,25 17:7 85:6

**Dawn** 22:1 23:4 72:24 91:14

**day** 15:22 26:6 27:18 60:11 62:16 66:2 69:10 85:21 90:7 98:19 102:20 107:24 109:25 110:3 115:3 116:13

**day-to-day** 105:22

**days** 65:23 105:5

**daytime** 65:25 66:6,8

**dealing** 51:13 66:23 105:3 114:12 117:21

**dealings** 99:6

**death** 82:16

**Deborah** 23:1,17 24:2 73:3 83:12

**decade** 85:10

**December** 11:19 12:6

**decision** 60:14 61:11

**defendant** 21:20 25:2 98:18

**defendant's** 92:3

**defendants** 4:2,14 9:8,9 14:21 15:2,8,13 21:12,18 58:4 60:1 61:9,13 63:8 64:9 73:10,11 95:7 98:5,10 99:4 108:18 120:6 121:12

**defense** 4:23 92:21

**definite** 116:23

**definition** 122:2

**definitive** 54:4 122:3

**definitively** 37:8 40:22 41:5 65:21 77:8

**deformed** 80:21

**deforming** 81:2

**degree** 90:25

**delay** 114:6

**deliberant** 14:25 15:7

**Delshawn** 4:1,9

**demonstrating** 55:4

**Dennis** 25:16

**deny** 21:9 48:10

**Department** 22:10

**depending** 8:10 26:3

**depends** 28:3

**deposed** 4:22 92:21

**deposition** 5:1,3,17 8:19 9:16,20 10:15 11:5 92:5,20 96:7 124:7

**deputy** 22:2,5 27:10 82:19,23,24 83:1,2 91:16

**describe** 26:1 31:18 68:2 104:17 122:23

**described** 18:20 66:14 108:5 116:1,15 120:9

**describing** 87:21

**destruction** 82:17

**detail** 30:9 47:8

**detailed** 33:15

**detecter** 87:20

**detector** 87:16,19,24 88:9,10

**detrimental** 117:6

**Devine** 45:3 81:18

**Devine's** 81:9

**diagnose** 103:19 104:7

**diagnosed** 103:13 110:19

**diagnosis** 104:1

**did** 8:17 9:6,15,17,18 10:5,16 11:2,4,13,14,20,25 13:24,25 17:10 20:17,21 31:8 34:20 35:11, 21,25 36:13,18,21 37:25 38:4,12 39:16,21 40:5,9,11,12,14,15,19 41:19 42:3,11,20,22 46:23,24 48:1 52:13,14,15 56:4,24,25 57:4 58:4,7 59:2,4,5,10,11,14,17,19, 24,25 60:13,17,19 61:3,8,12,15 62:15,18,21,24 63:2,6,14,17,19 64:22,24,25 65:8,17 66:11,12,13, 15,17,20 70:7 71:5,19,22,23 72:2, 3,6,7,10,11,14,15,18,22,24 73:1, 3,5,7 76:17 79:12 86:8 87:24 88:8 92:8,9,10 96:3,4,12,15 98:16,17 101:9,13 102:10,16 107:24 109:3, 9,11,22 110:7 111:2,4,10,11,20, 23,24 120:11 121:5,7,11,19,21,24 122:1,4,5,6,7,8,9

**didn't** 19:15 23:25 33:19 35:12 40:20 47:18 61:15 63:16 64:7 70:25 71:11 95:22 97:24 98:20 103:19 109:17 114:14

**die** 46:7 90:10

**differ** 26:3,4

**different** 26:6 44:13 53:5 56:5 64:8,10 70:22 74:6 76:18 78:16 88:10 113:2

**differently** 6:7

**direct** 4:5 42:4,20 51:17 56:17,18 58:16 71:9

**directed** 55:7,9

**directing** 55:11,14 56:14

**directions** 47:15

**directive** 47:23

**directly** 31:10 71:11

**disability** 8:14

**disagree** 111:13

**disclose** 96:3,5,12,15 97:3

**disclosed** 95:14,20,24,25

**disclosing** 95:16 97:5

**discovery** 5:3 17:18 20:22 23:20,24 47:18,21 60:17 61:3 64:18 79:24 80:16 95:10 111:21 123:12

**discussed** 20:15

**disregarded** 112:9

**distance** 8:8 49:9 101:18

**distant** 20:3,6

**distinct** 109:18

**distraction** 116:4

**dive** 28:10

**do** 4:15,17 5:8,9,11,16 7:4,14,16 10:12,13,17 11:3,6,25 12:9,12 13:12,21,23 14:8,21 15:3,9,14,16 17:18,20,21,22,25 18:2,12 19:9, 12 20:13,14 21:5,6 23:22 24:7,11, 12 27:15 28:1 33:2,10,11,15 34:1, 22 35:21,22 36:7,13,15 37:3,6,23 44:1 46:8 47:10,15 48:23 49:2,25 50:15 51:1,5,7 53:4 54:5 56:24 57:14,17,18 60:8,13,22 62:17,20, 23 63:1,4,20,25 64:1 65:3 67:3 70:6,15,16 74:13 77:12,15 79:20 80:8,25 81:5 84:7 90:23,24,25 91:1,12 92:6,7,24 93:23,24,25 96:16 97:6,14,15,16,17,18 98:2,3, 4 101:4 104:21 106:17 107:5 108:23 109:22,24 111:20 112:20, 23,25 118:6,23 119:7 122:12,14, 15,16,17,20

**DOC** 4:18 22:18 82:15,18

**docket** 38:23

**doctor** 62:12 112:21,22 113:1

**document** 8:21,22,25 38:24 73:24 79:6 92:6 97:10

**document's** 33:18

**documentation** 28:12,15 33:10 80:5

**documents** 8:18 20:22 32:10 64:16 99:14,16

**Doe** 79:9,15,16

**does** 6:2,3,17,18 7:1,17 20:7 24:25 32:16 43:19,20 69:6 99:23

**doesn't** 6:7

**doing** 6:21 28:21 29:1 33:24 39:8 58:19 75:22 104:13 121:3,12,20, 22,25 122:4,6,8 124:4

**don't** 6:4,10 7:5,7,9,10,11,15 10:1,7,10,20,24 16:3 21:5 28:19 31:18 32:19 34:6,12,21 38:1 42:6 46:3,4 47:12,24 49:17 50:2,3 54:8 59:21 60:20 61:14 62:2,5 65:13 71:9 75:1,22 77:3,13 83:7 84:7 86:16 87:19 89:13 94:2,10,11,12 96:18 99:20,23 100:10 113:20 115:5 117:4,8,20

**done** 9:20 27:3 47:14 59:6 74:7 91:25 114:3 117:14 118:18

**door** 17:22 18:16,17,18,19 35:23 46:17 48:19 51:1,3 52:2 53:7 55:22,25 78:7,9,18,25 79:4 80:20 81:1,9 105:19 107:2 119:24 120:1

**doors** 11:1 18:22 28:7 47:8,10 48:17 74:3

**dorm** 75:4 77:18,24 78:2 91:4,10, 13,21,23

**Douglas** 22:20 23:10,14 91:14

**down** 5:19 6:1 11:1 29:13,22 30:21 31:12,23 33:5 34:15 40:17, 20 41:2,6,8 48:20 50:6,9,10,16, 19,21 61:23 76:21 99:12 106:22, 24

**Dr** 15:3,9 21:16,17 27:11 62:10 63:6,11,14 100:20 107:10,19,25 108:6,23 109:3,19 110:1,4,5,7 111:6 112:19,21,23 113:5,15

**draining** 105:11

**drill** 85:4,24 87:18

**drills** 84:25 85:1,9,12,13,15,19, 21,23 86:8,11,14,16,17 88:16

**drink** 118:4

**drinking** 121:13

**drive** 109:6

**dropbox** 106:15

**drugs** 7:24

**dude** 94:1,4

**due** 37:12 90:7 119:5

**Dugan** 60:5

**duly** 4:3

**during** 28:7 33:24 40:8 42:3 58:9 63:24 66:2 68:22 72:19 85:21 87:18 88:14,16 103:4,15,16

**duties** 60:19,20 112:1,2

**dwell** 117:21

**dying** 114:23

**E**

**e-mailed** 82:8

**each** 27:21 29:17 79:2,3 89:14

**earlier** 83:17,19 98:16 102:1 108:5 112:11 119:11 122:11 123:4

**earliest** 12:9

**early** 26:14,16,17,22 117:1

**easier** 95:7

**ECF** 93:14,16

**education** 11:11

**educational** 117:17,20

**effect** 104:6 108:12,16

**effective** 77:21

**effects** 66:22

**efficiently** 75:6

**effort** 80:4

**efforts** 118:9

**eight** 38:23 73:25 79:6

**eight-hour** 89:2,3

**Eighth** 14:25 15:6,11

**either** 18:15 29:22 34:11 35:2 53:20 56:24 78:12 90:15 107:3 109:19 113:25 114:10

**EKG** 105:7

**elaborate** 37:22

**electric** 84:8

**electrical** 70:24 83:23,25

**electronic** 18:22 84:22

**electronically** 18:3,5,11

**electronics** 84:3,6,11

**else** 9:6,12 35:1,20,22 36:13,15, 19 39:8 40:19 45:10 46:2,3,5 55:18 58:21,23 59:6 70:13 71:7 81:21 95:16 105:1

**emergency** 69:17 74:8 89:7,16 103:4 105:13 112:9 117:4

**emergent** 104:23 113:10

**emotional** 114:9,15
**employee** 113:9
**employees** 112:12
**employment** 12:2
**empty** 79:12
**encounter** 52:3,10 108:17
**encountered** 107:20
**end** 48:18 60:7 61:16 62:13
**ended** 60:10
**energy** 26:11
**engulfed** 120:23
**enough** 39:17 53:8 109:16
**entails** 104:18
**enter** 26:18 78:24,25
**entire** 33:24 43:6 65:20 72:19 102:15 119:19,21 120:22
**entirely** 106:4
**entryway** 78:24
**environment** 102:3
**episode** 112:9
**equipment** 36:25 84:22
**established** 83:17
**evacuate** 50:1
**evacuated** 34:8 41:18,20,25 42:11 47:4 54:12 57:12,13,14,17 101:2,13 118:23 119:9
**evacuating** 49:14 54:17,24 56:2 88:3 90:11 119:13,23
**evacuation** 45:24 47:2 88:14 119:3,7
**evacuations** 47:16,23
**even** 20:9 49:8 52:19 81:11 94:21 101:18 102:20 104:25 113:2
**event** 82:8 83:2 103:9,14,25 104:3
**events** 8:7 83:11,15 88:18
**eventually** 33:25 62:10 88:12 101:3 105:5
**ever** 12:12,15 14:1 20:15,24 23:2,4,6,10 24:2,21 25:5,14,16,20 43:16 44:19 46:23 78:2 83:25 84:2,5,25 85:24 90:17 91:7 100:25 102:24 107:18 110:7,9,19 124:2
**every** 6:20 26:20,25 27:4 30:8 52:10,11 69:9 77:3 80:5 82:5,20,22 83:5,7 91:24 98:18 106:6 115:3,12 116:13
**everybody** 48:2
**everyone** 40:18 51:17 53:4 95:5 116:5 120:18
**everything** 5:18,20,25 6:1 82:12 89:8,13 114:8 116:1,15
**evidence** 79:20 80:1,2,8,25 81:5
**exacerbated** 105:4
**exacerbation** 102:7
**exact** 11:1 85:6 97:13
**exactly** 29:1 37:13 38:1 53:23 108:7,15 121:21
**EXAMINATION** 4:5 100:17 118:19
**examined** 4:3
**example** 89:2 96:10 115:10
**Excellent** 118:12
**exchanging** 64:10
**exclude** 99:22
**excluding** 59:25 101:5
**execute** 90:15
**execution** 74:15
**exhaustion** 4:23 92:21
**exhausts** 115:10
**exhibit** 38:22 92:5,18 100:1
**exhibits** 92:1,2,3
**exit** 48:3 49:1,25 50:24 51:1
**exited** 119:24 121:8
**exiting** 49:13,22 51:4,19
**expand** 114:18 117:18,19
**expanded** 80:21
**expanding** 81:2
**expect** 5:5,6 98:2,4 99:15
**expectation** 112:12
**expected** 5:13 98:17 113:11
**experience** 8:12 32:14 37:13 46:14 47:6 64:13 86:24 115:21 119:1
**experienced** 46:12 71:7 115:20
**experiences** 64:11
**experiencing** 45:11 68:2,5,12,14
**expert** 90:20
**explain** 8:10 51:10 75:25 76:8 122:7,9
**explained** 42:8 58:9,10 108:15,16
**explanation** 84:12
**extended** 43:4
**extent** 99:20 101:20
**extinguisher** 70:20 71:4 79:25 80:5
**extinguishers** 70:7,11,17,20,23 74:1,19,20,22 75:10,23 76:9,16 77:4,14,20 78:5,9 79:3,11,22 80:11 87:13 88:19,21
**extra** 84:15
**extreme** 115:2
**eyes** 45:14,17 84:23 102:22

## F

**face** 53:15 89:7 111:16
**faces** 96:19
**facing** 53:20,25
**fact** 44:1 61:25 69:23 81:8
**factor** 74:4
**facts** 63:23
**failure** 89:24 90:7,9,15
**fair** 53:2 54:24 55:1 57:9,10 64:20 73:19 107:22 112:17
**false** 7:6,11,16
**familiar** 19:11 69:23
**family** 81:18

**fan** 34:3 35:15,20

**far** 6:22 8:12 50:2,17,18 53:7,9 60:18,23 64:6 71:10 74:10,13 84:23 98:25 104:8 117:6,9

**fast** 49:19

**fatality** 114:20

**fear** 45:18

**February** 103:10

**federal** 5:2 14:11,17,19

**feel** 46:3 71:11 96:9 99:3 108:7 111:14 116:2

**feeling** 45:22,23 46:13 55:10 58:10,12 105:3 108:19

**felony** 12:8

**felt** 46:6 64:5 66:21 67:8 117:3

**fenced** 43:18

**few** 45:10 52:8 65:23 94:14,15,20 97:8 98:9,10,14 99:4 100:21 105:15 111:21

**figure** 30:24 35:19 121:18

**file** 8:23

**filed** 5:2 14:1,17 94:18 97:13

**filing** 14:19

**fill** 106:14 107:2

**filled** 90:12 93:15 119:25

**filters** 115:12

**find** 33:18,20

**finding** 81:17

**Findley** 122:20,22

**fine** 16:23 95:1,2

**finish** 5:22,24

**fire** 13:16 15:13,19 16:1 19:9 20:11,13,16,18,24 21:9 24:8 28:11,13,23 29:5,8 30:5,12,14,24 31:13,16 32:23 33:4,12,16 35:17 36:1,6,14,18,20 37:10,18 41:17 44:25 45:2,5,8,25 46:20,23 47:4 54:13 59:18 60:6,19 61:1,4 64:23 65:25 66:9 67:2,6,9 68:24,25 70:7,10,17,20,21,23 71:4,8,21 72:1,5,9,13,17,21 73:22 74:1,4,9, 19,22 75:9,23 76:9,16 77:4,13,19 78:5,8,12 79:2,10,22,25 80:5 81:13 82:5,20,23 83:5,7,9 84:25 85:1,4,8,12,13,14,19,21,22,24 86:8,11,14,16,17 87:6,8,10,13,14, 16,17,18,19 88:9,12,16,19,20 89:19 90:4,10,20 93:22 100:24 101:14,17 102:25 103:15,23 104:2,8 107:18,24 110:1,4,7,9 111:2 114:7,9,16,21,23 115:11, 20,24 117:2 118:22

**fire-like** 74:11

**fire-prevention** 64:6

**fire-related** 83:11 114:20

**firefighter** 69:24

**firefighters** 61:2 70:2 77:17 88:15 98:12,14 99:5

**firemen** 54:10 77:7 85:14

**fires** 21:2,7 49:5 70:23,24,25 81:4,6,23 83:16,18,21 89:22

**first** 4:3 18:16,18 20:5 28:20 33:6,25 37:1 38:7 41:22,23 44:24 50:21 57:15,17 72:20 75:19 86:12 88:4 92:2,20 100:24 106:6 107:25 112:20 114:19 118:21

**firsthand** 64:14 99:5

**five** 10:18 11:1 13:8,9 18:24 39:19 73:25 79:7 86:12 88:23 98:11

**five-minute** 59:22

**flag** 33:6 41:8 42:24

**flames** 31:2,4 33:22,23 38:5,7, 10,13 88:4 101:23

**floor** 29:13,15 31:3 46:25 47:1 50:13,22 75:16,17,20 78:8 101:24

**floors** 40:20

**focus** 21:15 102:7 118:2

**focused** 30:23 35:18 121:17,23

**folder** 9:5

**follow-up** 118:16

**follow-ups** 28:18

**follows** 4:4

**food** 28:5

**foot** 43:3

**for** 4:8 5:2,21 6:10 8:18,21,23 9:16 11:25 12:7,13 14:9 16:8,12, 21 17:12 18:20 20:16 22:9,18 27:8 31:23 34:6 36:11 37:9 38:22 39:17 44:1 45:9 46:8 47:15,23 58:2 60:23 65:4,5,16,23 66:13,16, 19 67:18 68:5,8 69:6,9,22 70:23 71:16 74:11,16 76:8 78:4,20 79:2 80:7,17 81:8,25 82:3 86:13,15 87:3,9 89:1,5 91:8 92:5,13 94:16, 18 95:3 96:1 99:18 100:5,11,14 101:16 103:18,20 104:15,17 105:8,25 108:11 110:12,13,15,24 111:5 113:5,22 115:3,9 116:21 117:16 118:1,13 119:14 123:18, 21

**forgive** 16:16

**forgot** 110:22

**form** 64:25 65:3,4,11 94:23

**former** 22:9,12,14 82:10

**forms** 65:9,17,20 80:1

**forth** 74:24

**forward** 76:13

**found** 118:9

**four** 18:24 88:23 98:11

**fourth** 92:24

**framework** 10:14 106:3

**free** 108:7

**friendly** 20:8

**friends** 20:2,4,9 122:22,25 123:2

**from** 8:2,6,15 9:10,21 15:23 16:5, 20,25 17:7 19:9 21:14 28:15,16 29:4,6,13,14,21 30:15,17 31:1,6, 8,10,17 32:19 34:18 35:6,8 39:5 41:19,22 42:23 43:4,14,19 44:20 45:2,8 46:16,18 47:5 48:18 49:2 53:6 57:22 59:15,20 60:2 61:9,11 64:13,14 65:18 67:8 70:21 72:20 73:12 78:11 79:4 88:5,6 92:20 94:24 101:2,13,18 102:2 103:25 104:1,18 106:8,12 109:20 114:9 116:24 117:5 118:21 122:21

**front** 8:20,22 9:5,12 18:10 31:10 38:25 43:3 49:16,17 50:3 51:3,24 52:2,9 70:12 78:23 79:6 105:19 119:24 120:1,2

**full** 4:8,18 8:25 38:8 114:24 119:15,19,20

**full-blown** 116:8

**full-on** 90:11

**fumes** 44:5,12

**further** 55:23 80:16

G

**game** 116:3

**gave** 33:18 35:3 47:15,22 94:22, 23 118:25

**GED** 11:12,13

**general** 13:10 21:3,5 27:10 41:2 56:13

**general's** 4:13 96:2

**Generally** 25:25

**generic** 95:23

**get** 5:25 7:13 11:13 13:16 16:1 21:12 30:17,18 32:13 42:11 57:3 62:8 65:11 69:13 76:25 78:9,19 87:18,19 104:21 105:25 106:8,11, 12,14,18,23 107:1,6 111:10 117:4,23,24

**gets** 106:17

**getting** 26:11 30:25 34:3 47:4 104:22 118:5

**gist** 59:18

**give** 6:24 9:23 17:6 28:22 30:6 31:23 37:11 47:8 49:8 54:4 56:25 65:21 84:11 94:7 96:18,19 97:3 100:2 106:4,5 115:17 121:21 122:1 123:20

**given** 10:2 27:18 61:25 64:15 65:12 76:15 86:21 106:7 115:7,8 116:25

**giving** 6:23 8:2 117:3

**go** 4:23 6:14,16 11:6 18:10,16 28:24 38:20 39:2 48:20 50:10 51:17 52:14,15 55:17 60:22 61:5, 17 62:7 69:11,12 78:8,18 87:24 89:5 94:24 97:24 98:5 99:12 104:25 105:8 106:10,24 115:6

**goes** 79:1 86:25 106:16 115:14 116:11

**going** 4:23 5:21 7:19 10:12,17 13:16 15:25 28:20 29:22 30:1 32:2 38:21 39:9 41:24 46:6 50:12, 17,19 51:11 54:11 55:6,8 57:2,3 60:10,18,22 61:16 70:19 71:16 75:3,17,19 76:5 78:16,17 84:15 89:16 91:25 92:1,17 98:7 99:25 100:1,23 105:12 106:12 111:6 115:3,24 117:11 119:15 121:17, 18

**gone** 32:25 90:17 116:16

**good** 4:7 101:8

**Gordon** 24:4 73:5 83:4

**got** 8:17 9:12,15,23 11:23 12:18 17:15 23:22 26:6 35:14,17 39:4 43:5 54:9 55:7 62:14,19,21,24 63:2,18 65:1,9 69:3 71:20,23 72:3,7,11,15,21 113:22 116:4 117:16 120:4

**gotten** 64:18 113:12,25 114:1,2

**grab** 78:8 107:3

**grade** 11:12

**grayish** 44:14

**great** 6:21

**Gregory** 122:17,25 123:9

**grievance** 9:22 76:9

**grievances** 75:25

**Griffin** 4:1,7,9,10,21 8:17 9:1 27:6,15 38:25 91:25 92:4 98:16 100:19 118:18 124:6

**group** 54:6

**guarantee** 120:18

**guard** 105:18

**guess** 104:18 105:16

**guide** 37:7

**Gustavo** 4:12 27:5 100:22 118:15

**guy** 36:9 94:20 109:12

**guys** 59:15,17

**gym** 47:9 50:7 51:18 55:12 56:7 57:19,23,25 58:5 59:3,9,12,20 60:3,8 101:3 120:25

H

**had** 12:2,12 16:4,17 17:14 27:6 29:5 30:12,14 31:9,13,20 32:25 34:1 35:15 39:14 44:11 56:3 58:11 63:5,6,11 64:8 65:14 67:11, 14,18,22 68:5,8,18,23 69:14 71:9 81:1,9 85:23 94:14 107:18 109:10 110:1,4,9 113:6,20 115:16 119:1 120:15 121:1,6

**hadn't** 115:11

**half** 17:5 31:11 59:23 86:12

**hall** 105:18

**hampered** 103:5

**hand** 92:17 107:4

**handed** 92:4

**hands** 34:2

**happened** 28:22 47:3 48:23 52:18 57:25 108:5

**happening** 37:18 116:13

**happens** 21:10 30:5 62:8 82:12, 14 86:21 105:24

**happy** 6:6

**hard** 8:9 16:21 31:23 34:5 119:13,14

**harm** 15:12 82:16

**has** 8:8,22 9:7 14:5,7 17:14 20:15 37:7 43:7 65:12 69:24 74:12 78:4 80:3,6 82:7 84:7 87:11,14,16 89:24 95:5 96:11 102:20 103:13 107:15 114:12

**hasn't** 89:8,9 116:16

**hastily** 49:15

**have** 4:10 5:18 6:1,19 7:1 8:22 9:5,12 11:6,12,18,22 12:3,4,12, 14,15 13:9,12,14,18 14:1 15:18 16:14 17:3,8,11,16,18,22 18:3,9, 14 19:20,22 20:18,24,25 23:2,4,6, 10 24:2,3,4,6,16,17,21,22 25:5, 14,16,20 26:5 27:10,16 28:3 32:10 36:11 37:3,6 40:21 42:7,11, 20 43:16,20 44:19 48:8,9,17 49:9 53:18 54:1 59:2,5 60:1,6,23 61:17 62:1,15,18,21,24 63:2,6,14,17 64:8 65:13,14 67:6 68:16 71:5,19, 24 72:4,7,12,15 74:6,24 75:3,4 77:18,19,24 78:2,3,7,19 79:6,10, 20,22 80:8,19,25 81:5,18 82:13 83:22,24,25 84:1,2,4,5,10,12,25 85:19,21 86:1,6 87:9 88:17 90:17,

19,23,25 91:7,8 92:10 93:14 94:17 95:7,20,22 97:12 98:12,22 99:5,9 100:6,8,10,11,14,25 101:1, 14,17,19 102:24 104:22 106:9,14, 16,23 107:5,7 108:2,25 109:2,15, 22 110:1,2,4,6,19,23 112:13 113:11,12,17,18,22,25 114:1,2,22 115:8,18,19 116:25 117:6,14,17 118:9,11,15,23 119:10 120:8,16 121:10 123:20,21,23,25 124:1,4,5

**having** 4:2 33:9 51:21 58:16 64:3 66:22 74:7 112:8 115:4

**hazard** 23:19,23 83:13,15

**he** 10:25 19:18 21:24 22:21,23 23:14 24:11,13,18 29:5 30:12,14 31:13 36:10,17,20,21 70:22 81:8, 24 82:5 83:10 93:21 94:1,12,22, 24 95:4 97:17 121:21 123:7

**he's** 21:22 25:18 36:10 81:25 82:2,8 83:5,8 91:16 94:1,3

**head** 6:22 50:9 61:12 62:7

**headed** 62:3

**heading** 52:2 60:2 61:8,22

**headphone** 84:18,19

**health** 65:5 107:13,20 108:11,21 109:13 110:10,13,20 111:3 112:6, 22 116:21 117:7,9 121:23

**healthcare** 64:25 65:3,9,11,17, 19 105:4,23 106:2,6,7 107:13 111:3

**hear** 30:4,20 34:20 35:11,12,25 36:18 88:8,15 109:17,21 120:11

**heard** 29:7 30:9,10 32:7 34:18 35:6 57:1,5,8 109:15,17

**hearing** 30:7 33:7 34:21 36:17 39:3,7 88:6

**heart** 105:9 115:2

**heat** 80:22 81:3

**help** 10:1 36:20,21 41:15,17 53:11 55:10 56:8,10,13,18 58:13 92:10 95:18 96:17 115:22 117:8, 12,24,25 120:7

**helped** 33:16 95:14 97:9

**helping** 53:11 56:15 94:20 96:4, 23,25 97:11 123:12,15

**helpless** 46:7

**helps** 95:17

**her** 16:10 25:14 40:21,22 41:6,8, 10,12 42:7,21 52:18 58:9,17 62:11,12 103:18 107:20 108:1,3, 15 109:1,8,17,21 111:9,16,22,25 112:6 121:6 122:3

**here** 5:21 6:2,10,11 14:3 21:22 22:2,21 24:9 33:21 38:23 41:15, 17 50:18 52:7,8 55:8 79:7 81:8 85:10 86:4 91:25 100:1 104:25 107:9,15 108:10,11,21 115:14 122:5

**herself** 113:16

**Hey** 10:11 33:17 41:24 52:14 60:14 61:10 95:24 99:2 106:22

**Hi** 100:19

**high** 118:5

**high-ranking** 73:11

**highest** 11:11

**him** 10:25 19:11,15,17 24:5 25:1, 16 30:11,17,18 36:9,18 51:20,21 52:15,16,17 82:8 94:6,10,23 122:24

**his** 10:24 16:10 19:12 20:11 24:7 29:5 30:5,12,14,15,18 31:14 33:5 36:18 60:5 83:9 91:15 94:7,9 123:8

**Hispanic** 94:3

**honest** 5:13 115:5

**Honestly** 26:4

**hooked** 105:6,15

**hospital** 103:3 104:15,21

**hour** 26:20,22 27:4

**hours** 6:11 60:9

**house** 12:22 13:5,8,10,19 15:19 16:12,17,25 17:1,13,14,16,18,21 18:23 19:18 20:24 21:2 24:23,25 25:8,25 26:1 27:15,25 28:1,17 30:16 38:8 39:4 43:7,11 44:25 45:1,5 50:24 51:2,5,19,24 52:3,9, 22 54:18 56:1 57:11,13,22 59:15, 17,20 60:2,7,11,15 61:12 69:4,21 70:8,18 73:18,22 74:8,9,14 77:7 78:16,24 79:23 83:23 85:18 86:1, 2,7,9,11,13,15,17,18,20,25 87:14, 22 90:12 91:10,11 96:6 97:18 98:6,11,19 99:11 115:11 119:9, 20,24 120:5,19 121:8

**housed** 12:21 75:7

**houses** 86:6,9,22

**how** 6:10 7:12 10:5 11:9,15,18 12:3 13:3,14 16:17 18:7,13 20:13 27:2 28:19,23 30:24 32:14 35:19, 25 37:8,13 41:7 42:6 45:22,23 46:3,4,13 47:7 53:4,12 60:8,14 63:22 64:5,23 68:5 81:5 85:3,8 88:20 89:9 94:25 102:10 104:7 105:25 110:12 118:23

**however** 108:8

**Hubbard** 60:5

**Human** 120:23

**hypersensitive** 114:21

## I

**I'D** 26:3 31:12 40:19 51:8 55:22 57:4 66:22 80:12 82:25 86:23 88:22 91:19 97:3 98:5,12,14 102:12,14 109:5 120:13

**I'LL** 6:15 7:7 21:15,16 28:18 47:8 100:2 106:3,4,5 108:6 113:1 118:15 120:21

**I'M** 4:12,23 5:21 6:6 7:8,13,19 10:16 30:6,7,22,23 31:1,24,25 32:3 33:17 35:18 36:4 38:21 41:1, 3,9 46:9,10,13 47:7 48:13 49:18 50:17,19 51:10,11,12,15 52:9,13, 15,21 53:9,10,17 55:9,10,19 56:14,16,17 57:2 70:19 71:12,15, 16 75:2 76:4 77:1,2,7 80:7,14 82:1 84:15,20 86:25 89:23,25 90:1,3 91:3,25 92:1,17 93:19 94:2 95:23,24,25 97:4 99:25 100:1,23 104:5,9 105:21 108:8,10,11,18,21 109:13 111:6,8 112:10 115:15 116:5,8,9,12,22 117:12,23 121:15,16 122:2 123:24 124:4

**I'VE** 7:8 20:19 21:8 34:7 76:15,18 83:20 84:14,16,21 85:10,22,24 86:7,11 87:17 107:20

**idea** 36:11 106:16 119:10

**identical** 94:22

**identifiable** 8:11

**identified** 79:17

**identify** 95:10 97:21,25 98:20 99:13

**identity** 95:16 96:13,15 97:6

**IDOC** 95:15,25 96:4,22

**if** 6:4,7,8,12,13,22 7:8,9,11,14,16 16:3,16 18:1 20:19 23:22 26:4 28:3,4 31:24 33:14,17 39:20 40:19 41:4 45:18 47:17 48:7,9,16 51:15 53:22 56:24 57:8,14,17 59:21 60:4 62:5 67:21 68:11 69:11,13,14,18 71:14 73:23 74:16 76:9,14,15,22 79:5,24 87:17 89:3, 5,8,10 90:3 92:23 93:13,19 94:2, 6,10,20,25 97:19,24 98:6,23 99:3, 12,13 106:9 108:1,8 109:1 111:8, 20 112:1,10 113:6,15,24 115:16, 24 116:8 117:1 118:15 119:4,12 121:21 122:1,5,7,9,11 123:6,24

**ignore** 113:5

**ignoring** 116:25

**II** 79:9,10,16

**immediate** 103:20

**immediately** 104:7

**important** 6:20

**impossible** 29:17

**improper** 89:25 90:5

**in** 4:14,22 5:2 6:4,12 8:11,18,20, 22 9:5,12,16 10:2,3,11,18 11:20, 22,23 12:4,21 13:5,14,17,18,24 14:11,17,19,21 15:19,25 16:17,24 17:1,2,8,10,13,16,17,18,21 18:23 19:4,8,18 20:11,24 21:2,4,12,19, 24 22:5,17,23 23:8,12,15,23 24:2, 5,14,16,19,21,23,25 25:3,8,25 26:15 27:6,15,16,25 28:6,8,14,16 29:2,5,8,11,18,21 30:5,6,12,14 31:10,14,15,18 32:1,20 33:15 34:24 35:17 36:9,10,11,12,18 37:3,11 38:2,23,24 39:14,15 40:8, 15 41:1 42:1,9 43:3,18 44:3,19, 23,24,25 45:1,5,23 46:16,17 47:17 48:23 49:16,17 51:11,23 52:7,9 53:5,24 54:13 56:13 57:6, 25 58:5 59:3,9,11,16,17 60:7,8,18 61:3,5 63:23 65:11,13,14,25 70:17,21 73:17 74:2,5,7,8,9,10, 20,23 75:7,13,16 77:1,7 78:15,23 79:6,11,22,23 80:5,11,22 81:4,8, 11 82:6,7,9,14,16,23 83:3,23 84:2,5,11,25 85:4,8,10,12,14,18, 19,23,24 86:1,2,4,6,7,8,10,11,13, 15,16,17,18,20,22,25 87:8,10 88:16,20 89:5,20 90:8,20 92:10 93:10,15,20 94:12 95:9,13,17,23 96:6,8 97:4,18 98:6,11,17,19 99:2,10,11 101:21 102:2 104:22 105:4,16,17 106:8,15,21 107:2,4, 16 108:18 109:14,16 110:16 111:21,22,24 112:3 113:6,9,22,24 114:6,19,22,23 115:1,3,12 116:4, 6,8,9 117:22,25 118:25 119:9,11, 15 120:2,23,25 121:15 123:18,21

**inadequate** 117:25

**incarcerated** 11:13,18,21 12:1 14:2

**incident** 28:10 37:17 72:20 74:11 106:4 107:12 110:15 119:6

**include** 31:25 45:18,19

**including** 63:8 86:9

**incomplete** 111:14

**Indiana** 11:20,22,23 12:3,19 21:14 22:9 69:24

**Indicates** 40:1

**indication** 57:1

**indifference** 15:1,7

**indirect** 56:17

**indistinct** 44:17

**individual** 19:8 22:1 93:25 97:18 106:24

**individually** 48:5

**individuals** 9:24,25 10:17 21:19 34:9 35:6 63:24 66:4 79:17,21 80:9 81:1 89:1 97:5 98:6 123:23 124:1

**influence** 7:22,24

**information** 64:15,19 71:1 93:16 96:5 105:21 111:11 113:12,17 124:2

**informed** 112:8

**initially** 33:11 36:5 41:22

**injuries** 103:14

**inmate** 34:22 69:8,14,24 70:4 85:14 99:9 106:7

**inmates** 9:19 16:9,11 21:1 26:21 27:15,18,21,25 28:6,8,16 32:2 34:18 35:8,12 39:4,7,8 41:6 49:21 54:12,14,17 55:11,14 56:5 57:22 59:11,19,21 60:15 61:7 63:18 69:11 70:2 77:12,15,16 83:17,22 84:2,10 88:6 94:18 98:10 99:1 109:10 120:11

**inmates'** 109:4

**insane** 120:16

**inside** 40:12 43:13,16 51:25 106:16

**inspected** 74:2,25 89:7

**inspection** 79:25

**instance** 113:10

**instances** 44:23

**instead** 99:4

**instructions** 35:3

**insulin** 69:17

**intend** 99:14,16

**intention** 99:22

**interaction** 53:12 59:1 63:11 109:25 110:3 111:19

**interactions** 109:9

**interested** 97:4

**interrogatories** 111:22

**interrogatory** 92:19,23 93:8 94:17 95:9 100:4 112:3

**interrupt** 27:5

**into** 13:3 16:1 27:13 28:10 34:2 51:15 54:11 78:18 99:7 101:23 106:11

**investigation** 69:8

**involved** 105:21

**is** 4:11 5:3,20 6:2,15,16 7:13,17 8:1,5,15,20,25 9:7,19 10:12,14, 22,24 12:10,23 13:3,5,8,10,12,13 14:5 16:8,9 18:2,6,19,20,22,23 19:2 20:10 21:20 22:2,12,16,21 23:18 24:7 25:2,23 26:8,19,20,22, 23 27:2 28:5,15 29:14 30:16,25 32:19,23 33:6 34:11 35:22 39:12 40:2 41:24 43:2,10,23 44:7 45:2 46:8,17 47:13,22 49:7,19 50:5 52:13,18 53:2 54:24 55:1,11 57:9,

19 61:6,11,24 64:20 65:3,4 67:15 73:18,20 74:5,9,12,14 76:5,23 77:2,4,6,21 78:18,23,25 79:1,3,16 80:2,4,13,15,24 81:24 82:5,13 83:1,2,8,13,14 85:12,17 87:5,11,16,17 88:15,25 89:11,19 90:4,5,11,13 91:4,10,15,20 92:5,15 93:2,4,25 94:11,24,25 95:13 96:10,13 97:7,14,16 99:22 100:3,19 104:24 105:18,23 106:6,7,18 111:11,18 112:5,12,17,21 113:2,23 114:10 115:2,4 116:1,2,15,19 122:17,20

**isn't** 41:4 47:12,19 52:8 53:7 55:4,7 89:10,12 95:21 97:10 99:1 103:5 111:16 114:19 116:13,14

**ISP** 12:21 14:3 22:21 23:19 27:12 60:1 63:15 80:21 81:4 82:5,12,14,21,23 83:3,6,16 86:6,22 87:9 107:11 110:5,10 112:5,12 113:9 114:19

**issue** 9:21 67:11,14,22 73:17,21 76:11,12,14 87:5 102:8

**issues** 67:19 68:18 73:21 87:4 114:15

**it** 6:3,6,18 7:11 8:11,17 9:7,12,15,23 11:2,16,23 12:18,25 13:13 14:5,7,9,11,15,16,19,20 16:19,22,24 17:15 18:19 19:2,4,16 20:19,20 21:9 22:16 23:22 26:3,4,8,12,13,20 28:3 29:4,5,11 30:18 31:18 32:22 33:11,15,18,21,25 34:24 35:2,7,8,14 37:7,9,13 38:6 39:17 43:5,17,20 44:12,13,14,15,16,17 45:1,16,18,21 46:12 47:12,14,17 48:7,9,10,11,16 50:2,9 51:11 52:8,19 53:7 54:3,5,6,8,13 55:7,15 56:5,14 57:5 59:18 61:4 62:1 63:21 65:4,12 66:21,22 67:16,24 69:1,7,9 70:20,25 73:20 74:14 79:1 80:12,16 81:10,17,19 82:25 83:19 85:6,17 87:16,18 88:15,16 89:19,24 92:15 93:14,15,19,20 94:11 95:1,6,24,25 96:10 97:3 98:15 99:21 101:9,16,17 103:2,6,7,16 104:8,11 105:2,21,24 106:3,8,12,14,15,17,18 107:1,2,3,4,6 108:7,15,20 109:7,17 110:22,23,24 111:1,16,19 112:9 113:23 114:1,2,9,10,11 115:14 116:13,14,16,22,23 117:13,14 118:12,15 119:5,13,18,19,25 120:1,3,18,21,22 124:4

**it'd** 49:18

**it'll** 6:11 26:7,9 115:12

**it's** 6:20 8:9,24 9:7 14:14 16:21 17:5 18:14,15 23:18 28:5 29:16,17 31:23 34:5,13 40:7 43:2,18 46:4 50:2 53:6 55:1,3,4 56:15,16,17,18 59:21,22 65:4 73:23 74:11,14 76:11 80:1 89:1 90:11,12 98:14 100:9,20 106:4 107:3,7 110:22,24 111:14,24 115:1 116:6,9,10,23 120:24

**its** 100:11 111:16,19

**itself** 28:11 47:2 80:6

**IVS** 105:16

## J

**Jacqueline** 25:20 51:16 55:15,17 58:6,7,15,23 72:16

**James** 27:12 37:15

**Jane** 79:15

**Jane/john** 79:9

**January** 13:17,18,24 15:18 16:18 17:7,10 19:4 21:13,24 22:6,17,24 23:15,23 24:14,19 25:3,9 44:21 45:8 64:14,22 66:11,16 67:12,19,23 68:3,9,20 70:6,16 71:5,23 72:3 87:24 90:9

**JD** 79:9,10

**Jeanine** 25:2

**Jeffrey** 122:20

**Jimenez** 4:6,12 27:8 100:14 118:17,20 124:5

**job** 28:3 60:17 69:14 110:15

**jobs** 61:4

**John** 79:15

**Joshua** 45:3

**jump** 100:23

**June** 13:15 16:20,25 17:4

**just** 4:11,23,24 5:10,25 6:5,14,25 7:19 8:20,21 9:2,14,25 10:10,16 11:8 14:13 15:23 16:8 17:15 18:19,20 20:21 21:18 23:2 26:2 27:8,18,21 28:1,22 29:2,25 30:1 32:22 36:20 38:20,22,24 39:2,25 40:23,25 41:16 42:8 43:1,18 44:24 46:4,10,12 48:2 49:6 50:10 53:13,17 54:20 56:13 62:1,3 63:21 64:3,10 65:8,24 68:25 69:1,6 71:15,16 74:14 75:15 76:4 77:2 85:17 87:11 88:18 89:1 91:25 92:16,19 93:14,15 96:10 97:9 98:20 99:14,20 101:16 103:5,6,8 104:25 109:16 111:14 114:3,4 116:1 118:17 119:18 120:5 121:19 124:4

## K

**Katie** 27:12 37:15

**keep** 34:4 117:18 118:1

**kept** 74:2,20,23 78:20 79:3 89:5,9,12 108:22

**Kevin** 24:13 96:8

**key** 18:9,16 48:4

**kind** 28:1 30:1 45:11 53:1 56:13 91:2 100:23 109:6,20 110:20 112:21 119:14

**knew** 19:17 32:16 53:22 64:20 70:19 79:10,21 80:19 101:16 107:22 111:24 113:24 122:11

**know** 4:21 5:3,19 6:6,8,10,14 7:5,9,10,11,12,14,15,16 10:1,7,14,17,20,23,24 11:3 12:9 14:16 16:4 18:1,13 19:9,12,15 20:13 23:22,25 24:7,11 28:21 29:2 30:8 31:18 32:5,12,13,15,19 33:10,11,15,16,20 34:13,22 36:9 38:1 40:22 41:23 42:6 44:1 45:19 46:3,4,5 47:4,10,15 48:3,8,14 49:17 50:2 51:8 52:14 53:24 54:3,5,14 56:24 57:14,17 60:5,8,13,16,17,20,21 61:2,6 63:22 64:15,19,22 65:3 70:6,7,15,16,24 75:22 77:3,7 81:5,8,11 84:9 87:2,3,11 89:9 91:12 93:23,25 94:3 96:18 97:6,14,16,17,18 98:8,12 99:3,15,21 103:6 104:18 107:2,3 108:19 109:5,7,14,16 112:4,20,23 113:7,22 114:8,11 115:14,21 116:2,13 117:23 118:4 121:14,22 122:2,15,17,20 123:23

**knowing** 45:24

**knowledge** 5:6 10:20 16:2 17:12 22:11 23:21 24:1 47:7,12 48:7,11,16 51:23 55:23 64:14 70:10,15

71:3 76:19 81:1 89:23 99:6 109:22

**known** 79:10,22 80:19 109:2

**Kory** 97:14 122:11

## L

**lack** 74:15 80:3

**large** 43:1 52:8 120:15

**last** 4:24 10:25 27:13 85:3 91:2 96:7 99:25 100:6 102:11,16

**lastly** 123:11

**later** 39:19 66:21 102:14 103:11 105:6 111:20 117:5

**latter** 113:24

**laughing** 46:3 65:4

**law** 9:25 10:2,3 93:20

**lawsuit** 8:7 14:16,17 92:14 93:22

**lawsuits** 14:1 94:19

**layers** 106:2

**laying** 114:24

**leads** 55:24

**learned** 19:16 23:20,24

**least** 6:11 51:8 68:13 94:7

**leave** 69:9,12,15

**leaves** 69:21

**leaving** 34:10,17 52:10 96:7

**led** 44:17

**Lee** 11:8

**Leetravis** 4:1,9

**left** 29:23 37:16 50:1,3 78:25 120:19

**legal** 4:8 69:19 117:22

**less** 8:11 85:10 102:12,13

**let** 5:22,23 6:5,8,14 11:2 21:16 23:1 48:5 53:15 56:5 106:10 112:20 120:21

**let's** 15:17 21:11 28:10,18 30:9 34:15 45:22 47:2 53:15 73:9 95:8 110:12

**letter** 100:3

**letting** 90:10

**level** 11:11 26:1,12 117:20

**library** 9:25 10:2,3 93:21

**licensed** 110:19

**lie** 121:17

**lieutenant** 25:12,18 62:25 72:8,12 98:13 121:24

**life** 34:2 56:20 78:13

**light** 46:9 94:1,4

**lightheaded** 51:13 53:18 56:3 58:11,12

**lightheadedness** 45:13 66:14

**like** 8:12,13,14 11:1 16:6 17:5,22 19:16 20:3,8,9 23:21 26:10 27:21 29:4,16,22 30:19 31:10,11,15 32:15 33:4,19 34:6 39:18 41:5,16 42:4 43:1,2,3,7,20 44:5,11,13,15,16,18,19 45:14 46:6 48:9 49:8 51:8 52:7,15,20 53:5,6,14,15,20 55:4,7,22 56:17,24 57:4,5,19 58:16 60:13 61:1,2,14 66:21,25 67:7 68:22 69:19,21 70:24 71:1 74:1 77:19 78:23 80:12 84:17,18,19,21,22 88:14 89:1 91:19,22 93:15,16 94:2,22,24 95:5 97:9 98:5,9,12,14 99:3 101:7,18 103:6,19,21 105:22 106:22 108:20,21 109:13 110:14,22 111:14,21 114:13 115:1,9,13,23 116:4,23 117:11,17 118:5 121:13,22 122:2

**likewise** 5:23

**line** 26:20 33:19 54:10 73:25 93:15

**lines** 26:14,16,17,22 112:10

**lineup** 96:21

**lingered** 102:22

**lingers** 115:22

**list** 106:18

**listened** 105:7

**literally** 31:2

**litigation** 123:16

**little** 15:17 17:15 19:7 21:11 23:2 34:15 37:22 44:2 53:2 61:1 67:10 73:9 84:12,24 102:12,13,22 103:11 105:17 114:18 115:16 118:6 121:9

**live** 11:20 70:4

**lived** 11:22 86:6 98:10,11 99:10

**lives** 10:25 122:18 123:7

**living** 11:25 86:20 87:1 98:6

**located** 70:8,11

**lockdown** 65:20 66:19,20 69:4 71:13 102:6,13 116:8

**locked** 28:7 35:23 46:17 116:9

**locking** 17:25 18:6,10 80:20 81:2

**locks** 28:7

**long** 6:10 11:15,18 12:3 13:14 16:17 37:9,13 39:17,20 60:8 68:5 85:5,6 100:22 102:10 115:3 117:10 118:1,23

**longer** 94:13 102:16,22 114:10

**look** 31:25 68:11 73:23 79:5 92:23 93:13 94:21,22 97:19

**looked** 57:2

**looking** 30:1 50:19

**looks** 93:15

**lose** 37:25 39:21

**losing** 38:16

**lost** 37:24 39:21,25 58:11 100:25

**lot** 54:21 81:24

**loud** 26:7,8,9 53:13 55:1,3

**louder** 39:5

**lump** 67:15,18

**lungs** 105:7

## M

**machines** 105:15

**made** 15:24 44:3 60:14 61:11 65:15 66:24 67:8 68:19,25 72:20 75:5 82:13,22 83:2,8,10,14 96:9 99:5 114:6,13 119:3

**mail** 100:10

**mailed** 100:5

**main** 55:16 106:5 107:21

**major** 22:21,23 23:15 81:6 82:2, 3,8

**majority** 86:10 91:14

**make** 4:25 5:19,25 6:2,7,17,25 7:2,17 32:4,16 35:14 36:4 46:9, 10,12 49:18 50:6,21 61:4 71:15 75:1 76:4 77:1,2 80:4,7 88:10 89:17,18 91:3 95:4 98:21 99:20, 23

**makes** 16:10 44:11 60:20 74:22 77:10 82:4,11,19 83:4 120:20

**making** 56:6 100:11 108:1,3 112:6

**man** 90:10 106:22

**manager** 23:19,23

**manually** 18:2 19:1

**many** 10:5 13:3 85:3 110:12

**mark** 38:21

**marked** 92:3,4,17

**marshal** 61:1

**marshal's** 20:18

**mask** 35:9,10

**masks** 34:14 35:4

**matter** 69:19

**may** 26:12 28:3 60:6 64:8 89:14 99:9 105:11

**maybe** 19:16 26:8,10 31:11 43:3 51:9 55:22 59:22 60:4,9 84:18 85:23 88:22,23 101:10 105:5 109:12 110:14 113:7,8 117:24

**Mayes** 15:3,9 25:20,21 51:16 55:15,17,21 58:6,7,16,23 59:2,3,8 63:3 66:5 72:16 121:2,5

**Mccarney** 27:5 100:18,19 118:12

**MD** 113:2

**me** 5:22 6:5,8,14,23,24 7:7 8:15, 16,20 9:23 10:1 11:1,2 15:22 16:16,21 20:19 23:1 28:13,22 29:4 31:16,23 32:1 33:14,17 34:6, 9 39:17 41:6 44:17 45:20 47:3,5 48:9 49:8,19 50:18 51:17 53:11, 15 55:10 56:5,15 57:2,5 60:4,24 61:5 65:7 67:10 69:19 75:24,25 76:7,8,14,16,21 78:14 82:3 84:11 86:19 87:3 94:22 95:4,7,14,17,18, 21 96:9,11,18,19 97:9,11 103:18, 20 104:10,17 105:6,7,10,15,18,19 108:8 109:1,12,13 111:8,17,18, 20,25 112:8,20 113:21,22 115:22 116:7,14,25 117:3 118:13 119:1, 11 120:21 121:18 122:19 123:7, 24

**mean** 14:8 20:7 37:23 39:17 46:6 48:9 57:2 61:25 67:4 69:6 75:16 76:2,5 82:2 90:13 94:3 96:18 103:6 107:13 112:4 113:23 114:11 116:13 118:5 120:1,15 121:22

**measures** 46:19

**mechanism** 17:25 18:11 80:20 81:2

**mechanisms** 18:7

**medical** 15:1,7 51:14,22 53:19 54:1 56:4 62:11,12 66:11,13,15 67:18,21 68:8,11,14,16 69:11,12, 17 71:14 90:23,25 102:25 103:13, 20 104:1,12,23,24 105:25 106:11, 15 107:6 108:9,10,19,22 111:9, 10,16,17,18 112:15,24 113:16,18, 21,25 114:6 117:7 120:8,19,23 121:11

**medications** 7:20

**meditation** 117:17

**medium** 26:9,12

**meetings** 77:24 91:4,13,21,23

**member** 48:3 59:8 112:6

**members** 21:14 31:20 32:13,20 36:25 37:9 52:25 54:7,20 59:24 63:7 91:12

**memory** 60:4

**mental** 8:14 107:13,20 108:11,21 109:13 110:10,13,20 111:3 112:6, 22 114:9,14 116:21 117:7,9

**mention** 63:5

**mentioned** 32:24 36:3 63:10 74:18 91:4 103:16 116:17 121:1 123:4,11

**mentors** 75:4 77:19 91:9,10

**merits** 5:2 10:19

**mess** 83:22 84:2,7,10

**messed** 83:25 84:5

**met** 4:10 23:2,4,6,10 24:2,4,16,21 25:5,14,16,21 107:18

**metal** 17:22

**Mexican** 94:3

**Michael** 19:14,15

**middle-aged** 94:5

**might** 26:13 60:1 94:21 96:20 106:10 108:25 109:15 116:2 122:18

**Mike** 19:13,17 29:5 122:23

**mild** 102:15

**mile** 57:6

**mind** 8:12 29:2 117:18,20 118:2, 8

**minute** 17:1 59:22 116:17

**minutes** 26:25 39:19 45:10

**mischaracterization** 55:5 56:16

**misleading** 53:22

**missing** 9:2 39:18

**misspoke** 98:16,19

**misstate** 119:12

**mistaken** 93:19 94:2

**mitigate** 74:10

**mitigating** 74:4 118:3

**mode** 116:4

**moment** 24:10 33:21 34:25 110:25 113:5 117:22

**monitor** 43:24

**monitors** 43:20

**month** 19:16 25:1 88:22,23 102:15

**months** 85:25 86:14,15 110:14

**moonshine** 118:4

**more** 16:1 21:12 30:13,19 37:22 39:19 44:3 49:5 64:15,19 66:22 67:10 71:3 75:5 77:20 99:8 102:7 103:11 105:5 108:14 115:16 117:20 118:2

**morning** 4:7 5:1,17 8:3 26:2,10 28:14

**most** 90:14 117:16 118:1

**motion** 26:15

**mouth** 46:22

**move** 26:21 52:16 99:22

**moved** 25:1 47:9 52:17 96:24,25 97:2

**movements** 49:15

**moving** 49:19 109:8

**Mr** 4:6,7,10,21 8:17 9:1 20:2 24:16,21,23,25 25:7 27:5,6,8,15 29:7,11 30:4 31:21 35:25 36:16 38:25 71:6 73:1 81:9,22 82:1 91:25 92:4 98:16 100:14,18,19 118:12,17,18,20 122:8,22,25 123:2 124:5,6

**Ms** 25:5,8,21 55:21 59:2,3,8 63:3 66:5 121:2,5

**much** 39:13 45:18 55:6 62:10,13 71:13 97:13 109:8 114:14 117:21

**multiple** 30:20 44:22 65:6,15 75:3 78:10 106:2

**murder** 12:8

**my** 4:11 5:22,24 6:6 8:20 10:20 16:2 17:12 21:15 22:11 23:25 29:3,8 30:6 31:10,11,25 34:2,3,4 37:11 38:2 39:24 40:7 43:3 45:15, 17 47:7,12 48:7,11 49:15,19 50:4 51:11,23 53:9,12 55:23 56:19 60:4 62:2,3 63:23 67:6,15 71:3 75:25 76:8,19,23 80:1,13 83:9 84:23 86:12,24 88:17,18 89:11,23 94:23 97:5,11 99:8 100:19,20,22 101:18,20 102:20,21,22 103:2,4,5 105:7,12 106:19 107:12 108:17, 18,25 111:5,17,24 112:5 114:19 115:7 116:9 117:10,22 118:6,7,8, 25 119:4 121:23

**myself** 4:11 35:19 112:3 115:18 117:13

**N**

**Nadine** 25:11 42:16 72:8 122:4

**name** 4:8,11 9:8 10:17,24,25 11:3 19:12 60:5 65:21 91:15 94:7 100:19 123:8

**named** 21:19 22:1,8,20 23:1,17 24:4,13,18 25:11,16,20 66:4

**names** 9:23 10:2,7,10 34:13 63:25

**natural** 29:2

**nature** 24:9 64:9 67:7,17 69:18 70:25 102:21,23 107:21 118:8 119:5

**Neal** 15:14 21:20 23:2 72:22 73:15 79:8 80:9,18 82:4

**nearly** 100:22

**necessarily** 40:24 56:12

**necessary** 90:16

**need** 6:12,13 34:7,8 36:21 41:15, 16,17 51:14 53:11,18 54:1 56:18 62:11 71:11,14 99:4 107:20 108:9,19 113:24 120:7 121:10

**needed** 36:20 51:22 56:4 58:13 75:8 78:7,10 94:14 105:13 111:9 113:13 120:19

**needing** 121:14

**needs** 89:20

**negligence** 14:15

**neighbor** 31:11

**neighborhood** 122:21

**neighbors** 36:7

**never** 7:8 9:20 12:2,14 17:14 21:8 42:6 83:20 111:21

**next** 5:24 30:5 80:17 109:12 114:24

**next-door** 36:7

**nickname** 94:7,9

**nicknames** 10:9 11:6,7

**night** 65:22 114:23 116:12

**nighttime** 85:24

**nine** 106:11 110:14

**no** 8:10 9:14 10:8,10 17:2,12 18:22 20:17 27:1 29:20 34:17,24 35:7 36:2,11,20 37:2,11,19 38:6 41:1 42:6,13,15,17,25 43:17 47:1 52:19,20 55:2,4 56:14,18 57:10 58:22,25 59:7 60:16,23 62:6 63:16 65:2 66:17 68:21 69:8,16, 20 71:9 72:23,25 73:2,4,6,8 74:9, 12 76:1 79:25 82:13 83:19,24 84:21 86:14 87:3 88:3 89:23 94:20 98:25 101:16,25 103:2,16, 18,20 104:5 105:5 106:16 107:7, 17 108:2,25 110:2,6,8 112:25 114:8,10 118:25 119:10

**nobody** 34:10 57:4 65:7,16

**nodding** 6:22

**noise** 26:1,12

**none** 35:18 61:6 87:11 89:25

**nonverbal** 6:23

**Nope** 108:15

**nor** 12:15

**normal** 50:5 102:21

**north** 13:6,7 18:23,24,25 19:25 43:11 57:11,14,17 78:15 119:8,21 120:22

**not** 7:21,23,25 8:4,13 11:4 13:23, 25 16:4 17:20 20:14,17,25 22:14 23:20 24:3,6,12 28:4,5,16 29:16 30:22 31:19,24 32:1,22,23 33:4, 15 35:18 37:21 38:21 40:11,14,24 41:4,15 42:20,22 43:6,15 46:3,9, 18,21 47:7 50:17,19 51:11,15 52:7 53:1,6,9 54:20 55:3,4,9 56:11,15,17 57:2,8,9,18 59:4,10, 21 62:17,20,23 63:1,4,8 64:1,24 65:8 66:12,17,18,25 67:24 70:19 71:22 72:2,6,10,14,18 74:6,8,14, 19,20,22 75:2,10,24 76:2,10,20 77:8,10 78:3,6,20 79:11,23 80:1, 2,11,14 82:2 83:24 84:1,15,20 85:5 86:9,24,25 87:10 88:3 89:14, 23 90:1,9,10,19,20,22,24 91:1,8 92:11,15 93:19,24 94:2 95:16,20, 24 96:1,16 97:3,4,8,15,17 98:7,25 100:1,8 101:1,23 102:20 103:8 104:9,12,25 105:9,21 107:3,17,20 108:10,21 109:7,11,24 110:2,6 111:4,10,11,16,18,24 112:25 113:7,23 114:21 116:6,8,12,22 117:12 118:5 120:1,16 121:7,16 122:7,9 123:1,3,20,23 124:2,4

**notation** 68:12

**note** 54:9

**nothing** 35:22 36:15 62:10 87:12 114:11,25 123:20,25

**nothing's** 89:6

**notice** 92:5

**noticed** 118:21

**noticing** 104:19

**notified** 82:8

**notify** 36:14 39:9

**Novacheck** 91:15

**now** 5:2 8:8 16:22 19:2,7 28:10, 19 33:9,10,11,14 35:18 45:22 49:9,13 51:12 52:22 60:15 61:10 62:2 64:15 69:7 73:9 76:1,15 81:20,25 82:3 89:11 92:17 94:6 100:16 104:9,10 105:14 115:12, 16 116:10 121:22 122:5,7,9

**Nowatzke** 91:18

**number** 4:18 5:4 12:23,25 21:14 38:23 39:20 93:16 95:8 97:19 99:12 102:1 120:18

**numerous** 81:4,22

## O

**o'clock** 16:4,13 26:5,6,7,22

**oath** 5:10,12

**Objection** 95:13

**observe** 86:8 109:3 121:5

**observers** 26:18

**obviously** 17:17 21:13,15 30:16 32:10,12 33:9 46:10 64:15 86:20 88:5

**occur** 115:3

**occurred** 8:8 13:17 15:19 16:5 19:17 48:10 62:1 65:25 68:21 110:15 114:8

**occurrence** 69:1

**occurring** 115:5

**occurs** 82:21,23 83:6 89:16

**October** 11:16

**of** 5:1,4,5,11,12,17,20 6:1,15 7:22,24 8:1,6,8,16,20,22 9:5,7,8, 12,14,20,21,23,24 10:6,13,14,20, 21,23 11:11,17,19 12:2,14,25 13:5,7,15,17,18,24 14:19 15:12, 18,19 16:2,5,11,12,18,21,23,25 17:7,10,13 18:6,10 19:5 20:5 21:13,14,19,24 22:5,6,10,14,17, 24 23:15,23,25 24:8,11,14,19 25:3 26:1 27:2,11 28:1,11,16,23 29:2 30:1,7,9,11,18,23 31:2,11, 19,25 32:11,20 33:9,19 34:1,4,10, 13 35:3,18 36:23 37:3 38:8,18,21, 22,25 39:3,8 40:25 42:24 43:1,3, 11,13,24 44:3,9,13,14,15,18,20 45:9,11,13,15,17 46:9,21 47:18, 21,22 48:18 49:11,16,17 50:3 51:13,21,23,24 52:2,7,8,10,11,12, 20,22 53:1,10,18,20 54:1,6,9,21 55:5 56:3,13 57:6,11 58:4,10,13 59:15,18 60:6,7,13,19 61:6,9,13 62:13 63:23 64:2,9,25 65:21,24 66:8,13,15 67:1,7,12,15,16,23 68:25 69:1,8,18 70:12,16,23,24, 25 71:4,10,11,12 73:10,18,23 74:3,5,6,15,16,18 76:11,23 77:1 78:14,15,21,23,25 79:6,16 80:8 81:1,6,10,14,18,22,24 82:5,8,12, 14,15,20,22 83:2,5,8,9,10,15 84:12,20 85:13,14 86:10,17,21 87:4,21,24 88:9,18 89:21 90:1,4, 14 91:3,14,20 92:1,6,12,13,20 93:11,25 94:14,21 95:16,17,18 96:6,10,13,18,19,20 97:4,5,6,8,12 98:5,12,14,25 99:4,6,11 100:10, 23 101:14,20 102:1,8,13,16,21,23 103:7,24 104:2,6,24 105:14,16,23 106:3,12,15,19,23,25 107:8,10, 21,24 108:2 109:1,6,9,19,20,21, 25 110:3,14,16,20 111:23 112:8, 12,21 113:1,24 114:7,13,15,23 115:7,10,15,17,21 117:2,3,10,21, 23 118:2,8,23 119:2,6,8,14,15,19, 20,24 120:3,5,6,8 121:10,11,13 122:3,10 123:12,15

**off** 6:14 12:25 14:24 16:23 26:11 28:11 32:2 65:24 66:20 71:12 87:18,25 88:2,13,16 102:12,13 111:20,25 115:15

**offenses** 90:14

**offhand** 93:24 94:11

**office** 4:13 96:2

**officer** 16:10 24:14,19 40:10,13 42:12,14 43:7,8,10,13,16,19 46:23,24 51:20 62:16,18 65:12 69:13 71:19,20,24 90:18 96:13,15 106:8,10,22 121:19 122:6

**officers** 26:24 30:20 34:11 65:19, 22 74:17 78:7,21 85:15,16 96:6

**officers'** 65:14 70:14 106:13

**often** 27:2 68:5 85:8 88:20

**okay** 4:18 6:8,9 8:17 9:3,5,12,15 10:16 11:2,9 12:18 13:7,10,16 16:8,13 17:10,15,21,25 18:6,12 19:2,7,12,18 20:10,21 21:6,11 22:16,20 23:10,14,22 24:2,4,7,11 25:25 26:23 27:15 28:10,18 29:18 30:4 31:17 32:24 33:7,9,22 34:15, 22 35:1,20 36:3,13,16,23 38:4,15, 19 39:25 40:4,8,12,23 41:11,19, 25 42:9,23 43:7,13,19 44:2,7 45:2,8,22 46:16,23 47:2,10,15,21, 25 48:13,23 49:13,21,25 50:6,21 51:4,19 52:2 53:13,25 54:23 55:11,18 57:8,11,14,22 58:7,15, 19,21 59:5,24 60:10 61:8,16 62:7, 21 63:17 64:10 65:8,24 67:10,21 68:1,18 69:11,23 70:13 71:5,15 73:9,17 74:18 75:9 76:25 77:10 78:2,4 79:5 80:7,17,25 81:21 82:4 83:12,16,22 84:24 86:1,19 87:4 88:12,19 89:21 90:3,17 91:2,21 92:8,16 93:13 96:3,12,17 97:12, 19 98:4 99:12,25 100:9,12 101:2, 13,21 102:1,16,24 103:11,13,24 104:14,17 105:20 106:20 107:9, 15,18,22,24 108:5,23 109:3,9,19, 25 110:3,9,17 111:2,15 112:10,23 113:1,15 114:3,14 115:19 116:17 117:14 119:7,11 120:4,14 121:19 122:10,22,25 123:11

**old** 11:9

**on** 4:25 6:16 7:20 8:10 9:22 10:19,25 12:25 14:15,25 15:6,11, 22,25 16:11,17 18:1,7,9,12,22,23, 24,25 19:20,25 21:7,16 25:9 26:2, 3 27:7,9,18 28:4,19,21 29:10,11, 15,22 30:2,23 32:4,14 33:5 34:4, 14 35:3,10,15,18,20 36:23 37:7 38:22 39:9,12,24,25 41:8,24 42:23 43:10,11 46:10,13 47:25 49:21 50:12,17,20 60:11,18 62:12 64:22 65:20,23 66:11,19 69:4 70:6 71:23 72:3 75:15,17,19 76:5, 19 77:1,25 78:6,8,9,10,21 79:7 80:20 81:12 83:18 86:24,25 87:24 88:25 89:6,11,12 90:7,9 91:3,5 92:21,23,24 93:4,22 95:8 98:19 99:1,10,16 100:9 102:7 105:21,25 106:10,16,18 107:20,21,24 109:25 110:3,15 111:16,25 114:18 116:8,18,20 117:2,16,20, 21,22,24 118:2 119:4,15 120:18

121:17,18,23 122:18 123:7

**once** 30:4,21 33:22 35:17 45:1 47:3,4 49:1 57:25 58:1 62:8,14, 19,21,24 63:2,11,18 69:3 71:12, 20,23 72:3,7,11,15 83:7 88:22 107:7 119:23 120:4,25 122:1,5

**one** 8:4,20 9:22 10:6,20 12:4 14:2,4,5 18:14,15,19,25 21:19 22:5 27:11 29:13 34:10,12,13,17 35:3 44:24 46:11,12 47:1 48:5 52:7,10,11 60:6 65:14 69:20 71:3, 17 74:18 78:7 84:21 85:23 86:20 87:4 90:10 94:20 96:6,10,20 103:8 105:16 106:5,6,11,23 110:13,16 112:12 115:21 122:18 123:5

**ones** 12:15,16 66:25 98:10 102:19

**ongoing** 14:5 46:24

**only** 6:15 11:22 12:4 18:14,15,22 19:17 30:6 36:9 39:11,13 46:21 65:13 70:19 85:22 86:10,20,23 87:17 88:9,15 91:8 105:9 106:13 110:13 120:2

**open** 18:7 43:2,18 48:1,18,19 78:19 81:9

**opened** 18:2,4,5,13 47:8,10

**opinion** 75:13 87:8 88:20,25 90:8 95:22

**opportunity** 116:25

**opposed** 9:21 32:1 75:6 99:8 104:3 116:20 117:24 118:3

**or** 6:6,11,13,22,24 7:5,10,15 8:10, 14,23 9:1 10:6,7 11:6,16 13:12 14:5,11 16:4,10 17:6,22 18:2,3,9, 17 19:16 20:9 21:2 24:8 26:5,11 27:3 28:1,25 29:23 34:8,11 35:2, 16 37:3 38:4,12 41:4,16 42:24 43:10,20 45:18 46:7 48:3 49:5 50:1,4 51:14,25 52:18 53:13,21 56:25 57:8 60:5,19,21 64:7 65:14 66:8 67:1,15,18 68:5,13 69:17,18 70:15,24 71:7,14 74:2,15 76:10 77:18 78:12 79:10,12,21 80:1,19 81:2 82:16,24 84:17,20 85:17 86:25 88:23 89:6,11,14,19,25 90:5,8,15 91:17 94:3,4,7 98:11, 13,23 99:6 104:10,15,25 105:18 106:7,9 107:3,21 108:11,16 109:14,20 111:22 112:7 113:2,7 114:1,5,6,9,10,13,14,23 115:20, 21 116:3,17 117:6 119:3,19 121:8,24

**order** 14:24 65:11 73:12 74:2,20, 23 79:11,23 80:11 89:20 119:8

**original** 102:10

**Osborn** 27:12 37:15

**other** 8:9,13 9:14,19 10:20,22 12:14,15,16 14:1 16:23 22:1 27:22 30:23 31:24 32:2 34:6,18 35:6,8 42:7 44:19,23 46:5 49:21 54:7,14,17 55:19 56:5 59:2,8,19, 24 60:1 62:15,18 63:7,14,15,17, 18,24 68:18 69:16,20 70:23 71:6, 19,24 72:4,8,12,16 73:10 74:7 81:22 85:23 86:6,8,22 89:14 91:16 94:18 95:2 109:3,10,11 112:12 113:6,9 114:4,12 118:7 119:14,21 120:11 121:11 123:15

**others** 54:8 90:13 102:17

**otherwise** 79:12 109:2

**our** 5:10 6:19 20:21 39:14 49:8 50:5 99:21 108:4 117:16

**ours** 78:20,22

**out** 24:11 28:3 30:1,18,24 34:4,7 35:16,19 38:3,12,16 39:15 45:9 46:19 48:2,5 51:12,22 52:2,22 53:8,13,17 54:13 56:16 64:23 78:12 90:11 92:13 96:20 101:17 105:19 106:3,12,14,19,25 107:2 108:18 109:19 116:21 117:23 118:6 119:22 120:5 121:18

**outlets** 83:23,25

**outside** 51:25 52:1,23,25 53:7 54:7,15,21 103:3 104:14 106:15 117:24 120:6

**over** 38:20 52:7,8,16 56:7 59:20 60:3 63:21 77:13 81:19 83:8 85:10 91:9 94:25 100:12,15 103:11 104:25 105:6 110:13

**overhear** 109:9

**oversee** 85:15,16

**own** 21:7 34:2 83:18 84:5,23 101:4,10 108:18 116:19,20

**P**

**p.m.** 124:7

**page** 4:25 9:2 38:23 39:2 73:25 79:7 80:17 92:24 95:8 99:13

**pages** 9:8,10 92:20

**pain** 68:6

**pains** 67:7 68:1,2,8,13,14 102:8

**Pam** 27:12 37:15

**panic** 115:13 116:8

**paper** 9:7,14 44:16 70:25

**paperwork** 47:17

**paragraph** 79:7 80:18,23

**paraphrase** 108:6 111:6

**paraphrasing** 104:5

**Pardon** 82:3

**parse** 115:22

**part** 5:1,11,12,17 14:19 20:5 42:24 47:18 117:10,16 118:1

**participate** 85:8,19

**participated** 84:25 85:3

**particular** 15:22 95:20 99:10,11 116:19

**parts** 123:15

**pass** 28:4 38:12 50:10 61:20 111:11

**passed** 19:9 30:19 38:2,15 39:15 45:9 51:12,22 53:17 108:18

**passing** 50:11 61:22

**past** 30:22 43:17 81:4

**patient** 104:11

**Patrick** 100:19

**paying** 50:17

**PBS** 117:19

**penalties** 93:11

**people** 21:4 26:11,15 27:6 30:13, 17 31:22,24 32:24 33:2 34:6 54:9, 11,23 55:6,7,8,16,19 56:14,19,21 57:7 62:1 63:21,22 65:22 84:14, 16 97:8,12 106:25 107:1 109:12

116:24 117:1 118:4 122:10 123:12,24

**per** 82:6

**percent** 47:7 91:20

**period** 30:11 69:7

**perjury** 12:13 93:11

**person** 19:9 23:8,12 24:2,5,16,21 47:13 55:16 95:3,14,20 96:3,23, 25 97:10 98:18 113:6 114:2

**personal** 64:13 115:7

**personally** 84:13

**perspective** 47:5 99:9

**perspectives** 64:10

**Phillip** 122:12

**Phillips** 97:16 122:15 123:2

**phonetic** 91:16

**physical** 49:19 114:10

**physically** 32:15 45:12 46:18 48:4,19 52:14,15 53:20

**pick** 96:20

**picture** 109:1

**pictures** 96:20

**piece** 9:7

**pieces** 9:14

**pillow** 30:15

**pinpoint** 47:13 81:19

**place** 12:2 76:23 78:6,11 106:13

**placed** 5:10 29:16 69:4 75:2,6 77:20 78:5

**places** 93:14

**plastic** 44:15

**platforms** 79:1,4

**play-by-play** 30:7

**played** 91:5,22

**please** 4:7,19 5:22 6:8 80:17

**point** 6:4,12 10:18 14:7 16:20 21:8 28:16 30:22 39:15 41:20,24 42:10 47:24 49:20 51:10 60:10,13 61:14 88:13 98:25 102:5

**policy** 9:22 82:6

**poor** 73:23 123:24

**poorly** 90:15

**population** 13:10 21:5 70:4

**portion** 43:1

**position** 65:15 81:11 83:9 107:10

**possible** 12:9 49:15 82:17

**post** 61:4 68:24 114:21 115:11

**post-fire** 60:19

**potential** 20:16 98:23

**power** 101:4,10

**preexisting** 66:23 67:3 68:18

**preliminary** 7:19

**premade** 94:23

**preparation** 8:18 9:16

**prepared** 95:3,4

**present** 16:25 17:7 60:2 77:24 91:12,22

**presented** 73:24

**pretty** 39:13 44:16 45:18 55:1,6, 10 56:18 62:10,13 71:13 97:13 109:7

**prevent** 8:15

**prevention** 74:4 87:10 89:19

**previously** 4:22 58:11 95:14 105:3 114:12

**prior** 23:21 31:16 45:24 65:15 67:5,11,19,22,24 68:3,8 81:13,17 88:14 100:24 107:12,18 108:2,3 110:9 112:3

**prison** 12:2,3,4,19 13:22 17:12 21:2,4,15,22 22:3 26:21 69:24 80:6 82:9 84:9 85:25 99:2 110:16 115:4 117:23,25 123:25

**prisoner** 61:1

**prisoner's** 73:25

**prisoners** 21:6 75:3

**privilege** 100:20

**privy** 71:1

**probably** 11:1 16:6 17:5 28:25 43:1 45:16 49:7 61:15 62:3 63:21 98:11,15 100:9 113:21

**problem** 49:7 67:6,11 103:17 104:9

**problems** 67:16 68:22,24 69:2 105:9,10,12 110:23 120:24

**procedures** 64:6 99:6

**proceeding** 10:19 14:25 15:6,11

**process** 104:17,24 106:18 107:7

**produce** 80:2 99:23

**produced** 80:13

**production** 100:5

**professional** 87:10 102:25 103:13,21 104:1,12 107:14 110:20 111:17 112:7

**programs** 117:18

**progressed** 29:6

**progresses** 26:6

**prohibit** 8:2,6

**promoted** 82:24 83:1

**prompt** 6:24

**proper** 74:2,20,23 87:8

**properly** 75:2 89:4,7,12

**prospect** 117:21

**protect** 35:19,21

**provide** 5:6,7,14 65:16 97:22 99:15 108:10,22 112:1,14 113:16, 21 114:2

**provided** 74:16 113:18 114:1

**provider** 104:15

**proximity** 44:25 57:6 109:16

**psychiatrist** 113:3

**psychology** 113:2

**purchased** 70:22 71:2

**purposes** 38:22 80:8

**push** 99:3

**push-ups** 118:6

**put** 27:7 34:5,13 35:9,10 38:24 46:19 51:11 64:23 74:24 76:13

101:7 105:4,15,17,25 106:14 107:2,4 112:3 120:17

**putting** 35:3 74:8 78:12 90:10

**Q**

**quarterly** 88:24

**question** 5:22,25 6:5,6,16,21,25 7:9,14 8:11 45:20 46:4 76:8,13 83:12 90:1 99:7 100:24

**questioning** 21:16

**questions** 5:4,5 7:20 10:13 21:17 27:14 39:2 100:21,22 122:13

**quiet** 26:12

**quite** 11:16 14:10 36:11 54:13 58:2 65:23 66:19 68:7 74:12 97:8

**quote** 108:7

**R**

**race** 93:25

**racing** 115:2

**railings** 101:5

**ramp** 26:13

**ran** 51:15 119:3

**random** 9:25 63:21

**range** 11:1 13:1,3 18:1,8,9,10,12,21,23,24 19:20,22 29:10,12,17,18,22 31:20 33:5,6,13 36:24 37:1 41:8 42:24 48:1,3,18,21 49:3,21 50:4,11,19 61:20,22,23 63:21 70:12 78:10,18,19,21,23 79:2,3 88:5 109:20,21 119:19 120:3 122:19 123:7

**ranges** 13:8,9 16:11 18:25 26:25 64:4 78:6,16

**rarely** 91:16

**rather** 97:3

**reached** 120:2

**reaching** 116:21

**read** 20:18,19 33:14 47:17 79:12 81:18

**reading** 80:22

**Reagle** 15:13 22:8,17 23:6 73:7,15 79:8 80:9,18 82:11

**realize** 39:18

**realized** 41:22,24

**really** 10:10 30:22 60:20 105:20 118:13

**reason** 8:1,5 60:23 82:13 116:19 117:4

**reasonable** 80:4 82:25 83:14,20 86:23

**reasonably** 80:6

**reasons** 5:21

**rec** 16:3,4,13 26:5,6,7 28:5 54:11 55:24

**recall** 10:10 15:23 16:3 20:19 29:1 33:14,21 34:12,21 47:12,24 50:3 55:19 59:21 61:14 62:2 85:6 96:19 108:23 110:25

**recalling** 8:6

**receive** 20:21 89:22

**received** 90:16 92:19 100:6

**receives** 106:7

**receiving** 90:2 111:18 114:6 117:12

**recent** 81:25

**Recently** 91:9

**recognize** 92:6

**recollection** 62:2 64:2 108:2,25 119:18

**record** 4:8 6:14 8:21 16:8 27:7,8 69:6 71:16

**records** 67:21 68:11,16

**recounting** 34:6

**recreation** 57:20 59:16

**REDIRECT** 118:19

**referencing** 81:7

**referring** 60:25 81:16

**regain** 39:16

**regularly** 74:3 75:10 76:2 77:9,11

**reintroduce** 4:11

**related** 4:22 5:14 8:7 14:2 15:1,7,12,13,25 45:2,11 71:8,21,25 72:5,9,13,16 73:22 81:21 92:12 102:25 103:2,14 104:2,3

**relates** 14:16

**relation** 29:11

**relatively** 106:9

**release** 12:9 18:10

**releases** 18:17,18

**relief** 116:4 118:9

**rely** 99:16

**remember** 7:5,16 28:23 33:2 36:7 39:12 47:24 50:18 51:1 55:16 62:5 63:20,25 79:24 93:24 94:11 96:16,17 106:25 119:8 122:12 123:6

**remembering** 8:15 77:21 119:16

**reminded** 78:14

**reoccurring** 116:2

**reoccurs** 116:6

**rep** 77:24 78:2 91:4,13,21

**repeat** 15:5

**rephrase** 6:6 63:9

**report** 20:18

**reporter** 5:11,18 6:20 27:9

**reports** 28:11 32:11

**represent** 4:13,16 91:10 100:20 113:1

**reps** 75:4 77:18 91:10

**request** 64:25 65:3,9,11,17,19 94:24 100:5 105:4,23,24 106:3,6,8,23 111:3 116:24

**requested** 14:9 65:19 110:9

**requesting** 56:8,10,13 116:23

**requests** 65:15

**required** 113:10

**rescue** 74:5

**resecured** 116:10

**resolved** 14:6,7

**respect** 17:25 21:18 36:16 45:8 71:25 75:7,22 83:16 88:19 89:22

111:5 112:19 119:7 122:10
**respond** 37:9
**responded** 32:14 33:12
**responding** 32:20,22 89:22
**response** 6:23 98:17
**responses** 64:19 92:19,23 93:6, 7,8,11,13 94:18 95:11 97:13 100:4,5 123:13
**responsibility** 113:20
**rest** 10:21 58:10
**restroom** 6:13
**result** 114:7,15
**resulting** 82:6,7
**results** 82:16
**retaliated** 95:15 96:22
**return** 60:15 61:10 123:21
**returned** 101:9 102:20 108:4
**reveal** 96:11
**review** 8:17 67:21
**reviewed** 64:16
**reviewing** 33:10 47:21 93:6,7
**reviews** 105:24
**right** 4:21 5:17 6:4,19 7:4 8:5,21 9:15 11:2,20 12:18 13:21 14:1,17 15:17,20 16:6,22 19:2,23 21:11, 20 22:8,13 23:17 25:25 29:23 32:9 33:14,18,21 34:24 35:7,9 37:8 38:19 39:4 40:7,22 42:10 43:3 44:2 48:14 49:9 50:1 52:9 54:14 57:3 60:4 61:18 62:2 64:16 67:15 69:4 75:17 76:25 78:17,18 81:20 82:19 83:18 87:4,6,13 89:10,18 94:6 95:8,11 105:14 107:6,15 110:17 115:23 119:23 120:6,9,25 121:3 123:6,13 124:5
**risk** 15:12
**roam** 28:1
**robbery** 12:8
**roll** 18:17
**room** 27:13
**rounds** 16:10 108:1,3 112:6
**route** 50:5 99:8
**ruled** 81:13
**rules** 4:24
**run** 6:13 49:16 86:16
**running** 49:14 54:10

## S

**safeguarding** 56:19
**safety** 23:19,23 24:8 73:22 83:9
**said** 5:21 6:2 16:13 22:12 26:16 30:19 31:15 34:9,12,16,22,23 35:1,7,9,15 39:15 40:4,17 41:5 42:20 45:9 50:6 52:25 53:22 58:14,15,19,21 60:6 61:2 62:12 69:22 70:22 74:16 77:18 79:4 83:19 88:12,14 90:20 91:5 94:10, 22 98:9,18,20 101:18 104:14 105:12,13 108:9,10,20 109:15 111:23 112:4 113:5,6 116:5 120:4 121:22 122:15,18
**same** 4:24,25 10:25 36:9 38:16, 22 43:10 44:24 49:22 54:18 58:9 60:11 83:12 89:13 97:10,13,14 99:9 101:9 108:15,16 120:12,17 122:18,21,23 123:7
**saving** 78:12
**saw** 30:9 31:4 32:5 33:23 38:4,9, 12 62:5 64:7 88:4
**say** 20:3,4 26:3,4,8 31:24 34:7 35:13,25 36:18,21 37:8 38:15 39:19 40:19,21 41:2,5 44:11 45:15 46:6 47:13 48:11 51:8 52:14 55:22,25 57:2,3 60:14,25 61:10 66:22 67:1,3 68:24 69:1,18 70:19 75:3 77:10,15 79:8 80:1,12 82:22 84:10,15 85:8 88:22,23 89:1 95:23 102:12,14,22 107:22 109:5,11 120:2,13,20,21
**saying** 29:5,7 30:11 31:13,22 32:2,24 33:17 35:12 36:17 53:17, 19 54:1 56:3,6 57:1 76:2,25 80:15 95:24,25 96:12,22 115:15 116:22 117:23 120:7,12 121:9,10,15 122:2
**says** 93:14
**scared** 46:7
**scene** 55:5
**scent** 44:17,18
**schedule** 105:25
**school** 112:24
**screaming** 35:16 36:3,5
**screened** 14:20
**screening** 14:24 73:12
**screens** 43:21,24
**second** 29:15 50:12 75:17 100:23 106:5 114:21
**second-floor** 18:12 19:20 29:12 31:20 33:12 37:1 49:3 50:10,11 61:20,22 88:5
**secure** 16:9 115:1 116:5,6
**security** 95:17
**see** 21:8 29:15,18,21 30:21 31:2, 8,10,16 32:15,23 33:22,23 36:24 40:21 42:24 43:13,20 46:19,23,24 49:2,10,16 50:12,15,19 61:23 62:4 64:7 66:11,13,15,20 67:22, 24 72:22,24 73:1,3,5,7 74:13 75:1,16,19 76:5,21 91:22 92:24 98:6 101:19 103:9 107:25 110:7 111:24 117:4 119:14,21 121:11, 19,24 122:4,6,8 123:24,25
**seeing** 30:1 49:5 55:16 101:23 108:3 110:14
**seek** 94:25
**seeking** 111:3
**seen** 17:16 31:13 38:7 41:8 64:6, 18 67:18 68:8,16 83:20,22 84:2, 10,13,14,15,16,21 85:19,21,22,24 86:14 87:17 94:6,10,17 102:24 104:6 109:8 110:13 111:21
**sense** 6:2,7,17 7:2,17 32:17 95:24 99:23 101:14 118:23
**sent** 20:22 47:17 103:3
**separate** 76:11,12
**September** 11:16
**sergeant** 25:3 31:22 32:25 34:9, 11,16,23 40:9,16 42:3,4 62:22 72:4 121:24
**serious** 82:7,16,17 83:2,10,15 90:14

**served** 28:6

**serves** 60:4

**services** 110:10

**serving** 12:7

**set** 41:17 79:1 87:18 88:16 104:24

**seven** 99:12 105:5

**several** 54:14 93:14

**share** 124:2

**she** 22:2,5,11,12,15 23:18,22 24:1 25:3,23 33:5 40:17,20 41:6 42:6 55:22 58:13,19,21 59:5 62:11,12 82:13,22 83:14 89:3 103:18 104:5,12 105:10 107:13, 22 108:1,10,20,25 109:10,13,22 111:11,20,23,24,25 112:1,9 113:16,20,21

**she's** 25:11 41:2 82:12 113:1

**shift** 65:23 66:2 73:9 89:2,3,11,13

**shifts** 65:23 66:6,8 85:21,22 89:11

**shocked** 84:8

**short** 58:13

**shortness** 45:13 51:13,21 53:18 54:1 56:3 66:15 103:24 104:2 120:8 121:10

**should** 27:7 68:11 74:3 75:11 78:5 79:10,21 80:19 81:14,15 88:20 95:1 100:11 103:22 112:13 113:17,25

**shouldn't** 100:21

**shouted** 34:7

**shouting** 109:14

**shove** 99:3

**show** 38:19 77:25 80:3,13,16 92:1,2 99:25 109:1

**showed** 32:11

**shower** 69:9,22

**showing** 38:23

**sic** 103:22

**side** 13:5,6,7 18:23,24,25 19:1,25 31:2 43:10,11 57:11,14,15,17 78:15,21 119:8,21 120:22

**sides** 13:9

**sight** 45:15,17

**sign** 109:6

**signature** 93:2,4

**signed** 93:6

**significant** 120:15

**significantly** 120:3

**similar** 44:20 94:19,21

**similarly** 112:19 113:15

**simply** 7:10

**since** 11:19 12:5 13:15 14:14 47:25 85:24 86:17 102:24 109:25 110:3 115:20

**single** 52:10,11 77:3 82:5,20,23 83:5,7

**single-man** 13:12,13

**sinus** 103:17 105:11

**sinuses** 45:14 102:21

**sir** 9:4 10:4,8 12:20 13:2,11,20 14:18 16:15 17:3,9 19:3,6,19,21, 24 20:1,12,23 22:7 28:9 29:9 30:3 31:7 32:18 35:5 38:11 39:1 40:3 41:13 42:2 43:9,12,22 44:8,10 45:4 46:1,22 48:15 49:4,24 50:8, 23,25 52:24 53:3 54:4,16,19 55:20 56:9 62:6 64:12,21 66:1,3, 7,10 67:13 68:4,10,15,17 69:5 70:1,3,5,9 71:18 74:21 75:12,14, 24 76:3,22 77:12,23 79:14 80:24 85:18 86:3,5 87:7,10,23 88:1,7,18 92:22 93:1,3,5,9,12,17 95:12,19 97:1,20,23 98:1 99:17,19,24 100:13 101:6,12,22,25 102:4,9,18 103:12 104:16,20 107:23 108:13 112:16,18 113:4,14 114:17 119:17 120:10 123:10,14,17,20, 24

**sit** 107:9,15

**site** 110:15

**sitting** 24:9 39:23

**situation** 30:13 44:20 48:24 49:18 101:9 106:21 114:22 115:7

**six** 86:12

**skinned** 94:1,4

**sleep** 114:22

**sleeping** 116:12

**slip** 106:6 107:1

**slips** 106:23 116:24

**small** 114:24

**smell** 29:3 115:13

**smelled** 29:3 44:15

**smelling** 29:4

**Smith** 15:2,8 19:14,15 20:2 25:11 29:7 30:4 35:25 36:16 42:16 51:9 52:4,17 53:21 56:22,25 66:6 72:8 122:4

**Smith's** 29:11 31:21

**smoke** 29:4 30:14,24 31:8,9,13 33:23 34:4 37:24 38:8 41:23 44:4, 9,11,18,19 49:2,6,12 87:16,19,20, 24 88:4,9,10 90:13 101:16,21 119:15,19,20,25 120:23 121:16

**smoked** 119:22

**smokey** 102:3 120:1

**so** 4:10,21,23 5:19,21 6:7,11,21 7:19 8:24 9:23 10:3,17 11:2 12:18,25 13:16,17 14:16,24 15:6, 17,18,22 16:13,23 17:7 18:1,6 19:7 21:11,13,15,19 22:16 23:22 27:2,8,10,15,18 28:10,18,21 29:7, 17 30:4,6,9 31:4,12,17 32:10,11, 19,24 33:2,22 34:15,17 35:1,15 38:9,19,23 39:2,4,15,25 40:19,20, 23 41:11,19,22,25 44:2,4 45:2,8, 22 46:12,16 47:2,21,25 48:13,16, 25 49:13,25 50:6,9 51:19 52:2,5, 6,9,13,22 53:4,9,13,25 54:12,20 55:1 56:2,6 57:11 58:15 61:9,16, 20,22 62:7,17,20,23 63:1,4,10 64:10,13,14,18,19 65:8,24 66:23 67:3,10,21 68:2,11 69:3,23 71:5, 15,16 73:9,14,17,21 74:18 75:9, 15,22 76:4,22 77:10 78:17 79:7, 20 80:1,8,17 83:16 84:9,10 86:1 87:4,8 88:4 89:13,16,24,25 90:3 92:1,5,18,23 93:13 94:2 95:9,13, 21 96:3,15,25 97:6,12,17,21 98:2, 19,22 99:12,14,20 100:3,5,9 101:21 103:11 104:18 105:20 107:3,22 109:14 111:10,20 112:4, 19 113:5,15 114:20 116:10,13 117:20,22 118:9,21 119:23 120:17 122:22 123:11

**socially** 27:24

**some** 9:23,24 27:6 28:12 30:19 31:4,15 33:25 34:18 35:8 41:20 44:3,13,14,15 47:21 52:7 56:18 58:2 60:10 63:23 64:2,18 68:12 73:10,18 74:12 98:5,25 101:10 102:5,16 108:19 111:23 113:6 115:21 117:24 118:9 120:5 121:11,13,14,15 122:10 123:12

**somebody** 54:3 99:2 113:8

**someone** 30:12 35:1 41:4 48:17 74:5,10 82:24 83:1,8,13 96:8 105:1 110:15 112:5,14 113:12,18, 24,25 114:1,23

**someone's** 78:13

**something** 6:7 8:14 15:25 24:8 28:20 29:3 31:9 32:23 34:17 39:9 41:4,24 46:7 47:12,19 61:25 67:15 69:18,19 74:25 78:14 81:19 82:16 84:19 99:1 104:7,10,12 105:2 108:12 111:20 114:24 115:6,9 116:3,7,10,11,14,15 118:3

**something's** 104:19 115:13

**sometime** 28:13 66:21

**sometimes** 21:6 91:15

**somewhere** 39:23 77:20

**soon** 100:12

**sorry** 9:2 10:9 17:2 27:5 38:9 53:6 65:4

**sort** 39:8 40:25 43:24 60:13

**sounds** 88:11

**south** 11:24 19:1 57:15

**space** 39:18 43:2 52:8

**span** 110:14

**speak** 9:15,18 10:5,16 11:3 40:9, 13,15 41:19 42:3 51:5,7,8 53:4 58:7 59:10,11,14,19,24,25 61:9, 13 69:19 77:8

**speaking** 56:16 63:20 109:17

**specific** 12:23 16:1 40:6 41:15 85:16

**specifically** 41:14 53:15 56:12 66:4 77:16 102:25 103:2 104:4

**specifics** 21:13

**spent** 86:12 117:10

**spilling** 101:23

**spoke** 9:24 40:22 51:17,20 52:11,12,20 54:5 59:9,21

**spoken** 35:9 98:22

**spread** 53:2,8

**squad** 69:25

**staff** 18:7 21:14 31:19 32:13,20 36:25 37:9 39:9 43:24 46:19 48:3 52:25 54:7,20 59:8,24,25 60:1 63:7,15 71:14 75:22 85:19 89:22 90:4 91:12 95:15,25 96:4,22 112:6

**staircase** 48:20 78:25

**stairs** 33:5 43:2 50:4,7 61:18 78:17

**stamp** 8:23

**standing** 39:22 49:8 52:25

**start** 21:1,7 30:10 47:23 83:18,21 104:18 110:12

**started** 20:13,24 28:13 34:3 36:1 38:9 47:4 55:22,25

**starting** 21:9

**state** 4:2,7,13,18 7:10 12:3,19 14:11,12 21:15,18,22 22:2 29:2 58:4 63:6 69:24 79:8 95:6 98:16 101:14

**stated** 12:15,17 75:9 104:5 114:13

**statement** 79:21 95:21

**stating** 51:11

**station** 43:8,10,14,16,19 65:14 70:14 106:13

**stay** 28:2 117:22

**stays** 116:14

**step** 105:8

**steps** 78:10 104:22 105:1

**still** 17:8 22:12 24:25 40:8 42:1 46:16,24 49:2 98:6 101:21 102:14 115:22,24 119:25

**stop** 109:6,7

**stopped** 56:7 108:6

**stopping** 55:9 56:10 109:3,5

**story** 28:22

**street** 107:21

**strengthen** 118:7

**strictly** 119:5

**stripped-down** 84:17

**structural** 101:6,7,10

**stuff** 30:23,25 34:3 39:10,12 61:2 64:7 67:7 68:22 81:24 84:22 101:5 103:17 105:7 111:23 117:8, 10,11 118:5 121:13

**submit** 64:25 65:5,8 105:22 111:2

**succession** 33:16

**such** 6:23 7:4 66:14 69:17

**sued** 21:14

**suffered** 103:25 114:15

**suffering** 120:17

**suggested** 75:4

**suggestion** 78:4

**suggestions** 75:5

**supervisor** 24:8 83:10,13

**supplement** 100:4 108:8

**support** 79:20 80:25

**suppression** 74:9 87:6,9 90:21

**Supreme** 14:10

**sure** 4:25 5:19,25 6:25 32:4 35:14 36:4 37:13 46:10,13 47:7 55:19 57:8 71:15 75:1 76:4 77:1,2 80:4, 7 89:17,18 91:3 92:16

**surprised** 48:8

**surveillance** 43:25

**survey** 43:24

**sustained** 103:15

**sworn** 4:3

**symptoms** 66:13,16 71:7 102:2, 6,10,16 103:8 120:9

**system** 87:6,9

## T

**tablets** 117:16

**take** 6:12 7:7 12:25 17:6 34:2 69:13 73:17,21 76:14 78:11 87:4, 5 106:3 113:11

**taken** 50:7 105:2,14 112:13 113:17 118:10

**takes** 16:11

**taking** 5:1

**talk** 13:17 15:17 17:15 19:7 21:11 32:12 44:2 45:22 47:2 52:15 58:4 71:11 73:9 84:24 95:8 104:22 114:14

**talked** 52:17,18 87:13 112:13

**talking** 27:21 40:24 41:5 53:13, 23 54:23 56:12 61:5 63:24 82:1 105:1 115:16 120:5,7

**Taylor** 15:14 23:1,17,18 24:2 73:3,14 79:18 80:10,19 83:12

**technically** 40:19 112:5

**tell** 5:13 28:19 47:5 55:16 59:5,17 62:11 67:10 77:6 94:10 111:7,8 122:5

**telling** 7:7 50:18

**ten** 85:11 106:12 110:14

**tenth** 11:12

**term** 110:24,25

**terms** 32:20 77:1

**Terrified** 46:1

**terror** 45:19 46:5

**terrors** 114:23 116:12

**testified** 4:3 102:1,5 112:13 119:13

**testify** 98:24 99:2

**testimony** 5:7,14 8:3 77:22 97:22 112:11 119:11

**than** 8:9,13 12:15,16 39:19 42:7 46:5 64:19 69:16,20 71:3 84:9 85:11,23 87:12 102:12,13,16,22 105:5 109:11 113:2 114:12

**Thank** 124:6

**that** 4:24 5:2,6,8,11,12,19,20,22, 25 6:2,5,15,17,20 7:1,4,7,12,16, 17 8:1,5,6,8,9,10,13,14,22,25 9:7, 8,21,25 10:3,18,19,22 11:15 13:7, 16 14:5,22 15:4,5,9,15,19,22,23, 24 16:5,6,13,20,21,24 17:3,18 18:17,18,20 19:4,8,9,20,22 20:7, 10,22 21:1,6,8,9 22:16 23:18,20, 24,25 24:9 26:9,19,20,23 27:7,13 28:5,8,13,15,19,20,21,24 29:3 30:4,10,12,14,22,23 31:15,22 32:3,4,12,16,23,24,25 33:2,10,15, 20,24 34:7,9,10,15,16,18,20,21, 23 35:1,2,7,11,13,18 36:6,10,14, 17,20 37:17,23 38:1,15,16 39:3,9, 11,13,18,19,20 40:2,4,17,18,21, 22 41:2,4,5,7,9,11,14,15,16,22, 23,25 42:3,10 43:23 44:7,11,20 45:2,5,9,21,24 46:4,5,6,7,11,12, 15 47:5,13,17,19 48:4,10,18 49:5, 7,20 50:6,13,15 51:8,9,10,17,21, 22 52:18,20 53:2,7,9,14,22,24 54:5,9,12,24 55:1,4,5,15,24 56:3, 4,6,7,11,16 57:1,2,4,5,9 58:9,10, 11,12,19,21,23 59:1,6,8 60:1,5,6, 7,11,16,17,23 61:3,4,6,10,11,12, 25 62:11,13,16 63:5,9,10,22,24 64:7,9,20 65:22,24 66:4,25 67:1, 5,7,8,17,18,22,24 68:1,12,13,18, 19,21,24 69:6,7,14,18,20,23 70:21,22,25 71:1,7,12 73:14,18, 21 74:6,10,11,15,25 75:1,9 76:10, 15,17,19 77:3,4,6,10,18,19,21 78:11,14,19 79:1,6,8,10,12,16,21, 22 80:2,3,4,5,9,10,11,12,13,15, 18,20,24,25 81:5,6,7,12,13,17 82:11,12,13,14,15,16,18,19,21, 22,23,25 83:1,5,6,7,14,16,17 84:7,9,18,19,20,22 85:5,6,16,22 86:19,21 87:4,11,14,20,21 88:2, 12,25 89:1,14,17,18,21,23,24 90:4,5,7,16,20 91:2,3,4,5 92:5 93:2,4,10,19,22,23 94:13,20,25 95:2,5,23 96:5,8,9,10,11,12,22 97:18 98:8,9,10,17,19,21 99:4,7, 8,9,14,16,18,21,22,23 100:6,7,10, 11 101:4,7,14,16,19 102:2,5,21, 23 103:5,9,13,16,18,19 104:1,5, 10,14,17 105:1,2,11,12,24 106:17,24 107:1,5,7,12,16,21 108:1,12,14,16 109:10,14,16,25 110:3,15,17 111:10,11,22,23 112:4,5,12,13,17 113:1,5,11,13, 17,20,23 114:2,5,8,11,13,15,18 115:4,6,8,9,14,17,19 116:1,6,11, 14,15,17,18,24 117:1,3,19,22 118:2,3,5,8,10,21,22,23 119:8,16, 19,20 120:4,9,18,19,20 121:1,2,8, 9,14 122:18 123:24

**that's** 5:12 6:8 7:13 9:3 19:2,15 26:14 29:16,18,25 30:8,20 31:9 32:3 33:7 34:17 35:6,12,14 36:9 37:11 38:24 39:11,13 41:1,3,6,9 44:17 45:18 47:19 48:23 51:10,15 52:3,21 53:12 56:14,19 57:10 59:18 63:22 74:25 75:24 76:10, 11,12,18 78:10 79:2 86:23 88:16 94:15 95:7,22 96:1,9 98:15 100:14 101:5 104:7,11 106:13 109:7 111:1 115:6,12,15 116:7, 11,16 118:5,12,25 123:5,7 124:5

**the** 4:2,8,12,13,22,24,25 5:1,5,13, 17 6:8,13,14,25 7:9,17,22,24 8:6, 8,10,11,12,20,21,23,25 9:2,3,7,8, 11,22,23,25 10:2,3,14,19,21,22, 25 11:5,12 12:3,15,16,19,25 13:1, 3,6,7,16,21 14:9,19 15:2,12,13, 18,19,23,24,25 16:2,8,11,12 17:13,16,17,21,25 18:1,6,7,9,10, 12,16,17,18,19,21,22,23,24,25 19:1,2,4,7,8,9,20,22,25 20:5,13, 15,16,18 21:2,4,12,13,14,18,19, 22,24 22:1,2,5,9,11,17,18 23:19, 22,25 26:1,3,6,21,22,24 27:2,7,8, 13,25 28:1,7,10,11,12,13,14,16, 17,23 29:10,11,15,18,22,25 30:13,16,24 31:2,9,13,15,19,20 32:13,16,22 33:3,4,5,6,9,12,16, 17,22,23 34:4,11,15,24 35:17,20, 23,25 36:3,8,9,11,23 37:1,7,9,12, 17,21,24 38:4,7,10,12,16,22,24 39:4,7,9,10,11,12,13 40:8,17 41:8,22,24 42:10,23,24 43:1,4,6, 10,11,13,16,19,25 44:3,4,9,11,24, 25 45:2,6,20,24 46:4,11,17,19,23, 25 47:1,2,4,8,9,10,13,15,17,18, 21,22,23,25 48:1,3,4,17,18,19,20 49:2,7,11,12,18,21,22 50:1,3,4,7, 10,11,12,19,21 51:3,4,18,24 52:2, 9 53:6,7,23,24 54:6,10,13,17,18 55:5,11,14,15,22,23,24,25 56:7, 14,19 57:11,13,14,15,17,19,22, 23,25 58:4,5,9,10,23 59:3,9,11, 17,18,20,25 60:3,7,8,14,16 61:1, 9,11,12,13,17,20,22,23,25 62:13 63:8,21,23 64:2,3,4,6,8,20,22,23 65:12,13,17,19,20,21,22,23,25 66:2,4,8,13,14,25 67:2,6,9,10,14, 15 68:1,6,24,25 69:3,6,11,21,23 70:2,4,7,10,12,15,17,19,20,21,22 71:1,8,11,16,21,25 72:1,5,9,13,

17,19,20,21 73:10,11,12,18,21, 23,24,25 74:1,3,7,9,14,15,16,17, 18,19,22 75:9,15,17,19 76:9,11, 12,15,16 77:4,7,12,13,15,17,19 78:4,6,7,8,9,11,15,16,17,19,21, 23,25 79:1,2,5,10,15,16,22,24 80:2,5,11,17,20 81:1,11,13,17,18, 24,25 82:2,3,10,14,15,18,23 83:9, 13,16,22,25 84:2,5,11 85:3,12,14, 15,18,22,23 86:10,22 87:4,5,13, 16,17,18,20,21,24 88:4,9,12,14, 15,16,18,19,20 89:12,14,19,21 90:1,4,14,15 91:2,4,8,11,14,16, 20,23 92:18,21,24 93:8,11,13,16, 20,22,25 94:17,24 95:2,5,9,10,13, 16 96:1,3,6,7,12,15,21,23,25 97:6,10,13,14 98:5,9,12,13,14,25 99:4,5,6,9,13,20,25 100:9,16,24 101:3,7,14,17,18,20,21,24 102:8, 16,24 103:6,7,15,17,24,25 104:2, 3,6,11,21,24 105:1,9,11,17,18,19, 25 106:3,5,6,8,10,12,13,15,16,18, 21 107:2,6,13,18,21,24 108:15, 16,17,24 109:9,12,20,25 110:3,7, 9,16,25 111:2,18,19 112:3,12 113:7,13,24 114:7,9,16 115:7,8,9, 10,11,15,20,24 116:4,7,9,12 117:1,2,3,7,9,16,21,22,24 118:1, 21,22 119:2,3,5,6,7,8,15,18,19, 21,24,25 120:1,2,3,6,12,16,17,21, 25 121:8,11,12 122:10,18,21,23 123:5,7,12,15,23 124:7

**their** 10:2,7,9,10 21:7 27:16 28:2, 6,8 32:13 34:10,17 49:22 60:17, 19 61:4 69:9,12 78:22 83:18 84:3, 11,16,22 90:7 107:4 116:6 123:18,21 124:2

**them** 10:6,11,21 21:16 31:25 35:3 51:10,23 52:7,8,10,11,12,20 53:12 54:5,6,9 58:10 60:6 62:4 65:6,13,16 66:21 71:10,12 73:11 74:13,19 76:17 77:25 78:1,6 85:15,16 91:7 95:4,15 97:8 99:4 106:14 113:11 115:12 116:20 117:5 121:13,17 123:18

**then** 5:23 7:9,15 8:9,24 15:3,11 16:1,16 17:15 18:16,18 21:16 22:1,8,20 23:17 24:4 25:2,7,16,20 26:13 27:11,12 30:13,18 31:1,12 33:22 34:22,24 35:1,7 36:16 39:16 40:4,22 42:9 45:19,23 47:3, 25 48:1,2,5,20 50:6,7,21,24 52:16,17 53:4,13 57:19,25 58:2, 21 62:7,8 69:14 72:11 76:22,23 79:7,15 81:11 83:4,12 84:24 89:10 91:2 93:14,15,16 95:1 96:4, 10 97:3,19 99:12,25 101:3,8 102:5,15 105:8,15 106:5,24 107:5,6,7 111:7,25 112:19 114:3 115:12 117:2 118:17 119:7 120:4 122:17 123:4,11

**therapy** 117:11

**there** 8:1,5 10:11,18 15:25 16:13 20:10 21:1 28:20 29:6 30:11,17, 21 31:23 32:1,11 33:18 35:9,22 36:10,14,17,20 40:7,18 41:2,6 45:24 46:11,21 48:3 52:12 53:14 54:7,12,13,14,20 55:8,19 58:1,2 59:18 60:4,6,18 61:3,5 62:1 63:10 67:15,24 68:11,21 70:21 71:3 72:21 74:9,12 75:23 76:21 77:13, 18 78:18,25 79:25 80:3,4 81:12 85:16 86:16 87:1,11 88:2 89:17 90:5,13 91:16,20 92:25 93:2,4 94:13,16 97:8,12 98:9 102:14 103:18,20,25 104:22,25 105:6,8 106:2,22,24 108:2,14 112:1 114:4,10,25 115:10 116:7,16,19 117:2 118:22

**there's** 29:7,17 30:5 36:6,15 39:9 41:23 54:20,21 80:2 87:3 101:5, 21 116:3 123:11

**thereafter** 109:23

**Therefore** 95:15

**thereof** 80:3

**these** 10:18 39:7 53:19 57:7 58:15 78:5 79:21 80:9 81:1,6,22 89:1,4 91:13,21 111:23 115:19 116:17,24 118:9

**they** 10:2 17:18,20,21,22,23 18:3, 5,9,14 20:17 25:1,8 26:11,20 28:1 31:22 32:1,14 34:5,12 35:2,9 36:25 39:10 40:17 41:2,7,8,17 44:1 47:8 51:16,25 52:6,12 53:24 54:10 56:22,25 57:1,2,5,8 58:19 59:15 60:16,17,25 61:3,10 64:5,6, 7,8 65:13 66:6,8 68:25 69:12,14, 15 70:4 71:2 74:1,3,4,24 75:1,10 76:9,17,20,22 77:7,8,12,25 78:6, 22 80:10 81:8 86:15 87:18 88:3 89:4 90:2 91:6,8,9 93:13 94:15,21 96:18,20,24 98:23 99:10 102:14, 15 105:6,15,16,17 106:10,14,17 110:22 112:7 115:11 117:8,16 119:3 121:2,14,15 123:15,21,23 124:2,4

**they'd** 75:5

**they'll** 10:13 26:7 107:3,5 123:25

**they're** 16:11 53:1,5,8 55:6,9 70:2 75:6,7 76:2 77:10 78:8,10,21 91:5 97:13 98:7

**thing** 6:15 39:13 41:15 43:6 58:9 91:10 99:25 102:23 110:13 115:21 117:7 118:3,6 120:16

**things** 21:5 39:11 53:19 58:15 64:5,9 67:5,8,16 68:21 69:17 74:1,6,10,18 81:12,14,15 84:18 89:12,14,18 94:15 99:7 102:21 107:21 108:16 111:21,23 114:20 115:1,17,19 116:1,18 117:17,19 118:2,7,8 120:12

**think** 8:1,5 10:12,13 39:11 48:23 73:10 74:22 82:11 91:2 98:15 99:8 100:6 111:7 113:20 115:9,15 117:7,8,9 118:12

**thinking** 115:14

**thinner** 120:3

**third** 13:1 46:25 47:1 69:9 75:15 101:24

**third-floor** 29:10 36:24 42:23 47:25 49:21

**Thirty-one** 11:10

**this** 4:14,22 5:1,17 8:3,23 9:19,21 10:12,14,18 11:2 12:4 14:2,16,17, 24 15:18 16:16,20 17:12 21:12,19 24:9 33:21 38:21,24 44:20 45:8 47:13,24 48:24 54:3 55:20 61:14 67:11 78:12 80:8 82:9 85:25 92:6, 8,10,12,13 93:6,18,25 94:24,25 95:2,21 96:16 97:9,24 98:25 99:1 100:3 102:20 103:21,22 104:8 105:13,20 106:3,21 107:12 110:25 112:20 113:10 114:19 115:2,4,22 116:22 117:1 121:6

**those** 5:5,21 9:9,24 14:13 17:12 18:2,13 21:5 34:13 39:5 43:23 45:19 56:21 60:20 65:21 66:16,25 67:8 69:1 79:17 81:14 85:13 90:14 95:18 102:6,10 105:16 106:23 112:2,10 116:24 120:9 122:13 124:1

**though** 18:19 20:4 35:13 76:6 80:7 109:18

**thought** 22:15 39:3

**three** 18:23 29:13 97:19 102:13

**throat** 45:14 67:6,11,14,16,18 102:8 105:10,12

**through** 4:23,24 15:22 17:17 23:20,24 26:24 28:1 29:25 47:3 50:3 60:16 61:3 64:3 79:24 80:15 90:17 92:2 98:5 100:9 105:13 109:6 115:18,23,24 116:18,20 117:11,12,14 119:24 120:16,17

**throughout** 26:9,21 30:16

**time** 4:24 6:4,12 8:8 12:7 14:2 15:23,24 16:7,8,9 23:25 28:5,8,21 30:10,11,19 31:13,15,19 32:16 33:3,24,25 35:23 36:8 37:17,21 39:15 40:17 41:14,22 42:4 45:6 47:18 48:6 49:5,22 50:13,15 51:4 53:23 54:11,18 55:20 58:2,24 61:10,11,12 63:24 64:20,22 65:20 66:8 70:7,16 72:19,20,21 74:12 76:10,17 77:3 78:11 85:3 86:4,21 87:17 88:15 91:8,14,20,24 96:7,16 101:15,16 102:24 104:21 108:24 114:19 115:1,8,17 116:5,7,9,10 117:2,10 118:14,21,22 119:2,25 120:2 121:8,12

**times** 44:22 65:6 88:23 106:11 110:12

**timing** 119:4

**title** 22:14 24:7

**to** 4:11,22,23,25 5:5,13,14,19,21,25 6:6,12,13,24,25 7:11,12,13,14,19 8:7,9,10 9:9,18,24 10:5,12,17,20 11:3 13:16 14:2,7,9,16 15:1,7,12,13,24,25 16:2,3,5,9,12,21,22,25 17:4,7,12,15,25 18:3,9,10,14 19:5,7 20:19,20,21,22 21:12,18 22:11 23:21,25 24:23 26:9,12,13,21 27:5,9,21,25 28:13,22 29:3,4,11,13,15,21,22,23,25 30:8,12,13,15,16,23,24 31:16,20,23 32:1,3,4,13,14,15,22 33:4,5,12,14,20 34:1,3,4,8,13 35:14,19,21,22 36:4,13,16,24 37:1,8,9,12 38:19,20,21 39:2,8,18 40:21,22,23,24 41:1,6,17,24 42:3,6,8,10,24 43:13,24 44:2,17,20,25 45:2,8,11,16,24 46:3,5,6,9,10,12,18,19,21,25 47:1,7,9,10,12,13,16,20,23 48:2,4,7,11,13,16,17,19 49:1,9,16,25 50:1,4,7,12,17,19,21 51:1,5,7,8,10,11,12,17,18,20,23 52:9,11,12,13,14,15,16,17,18,19,20,21 53:4,7,9,10,23 54:4,5,9 55:7,9,11,16,22,23,24 56:7,14,18 57:2,3,4,6,19,23 58:4,7,9,10,15 59:9,10,11,14,19,20,21,24 60:3,6,10,14,15,22,23,24,25 61:4,5,6,8,10,12,13,14,16,17,23 62:1,3,4,7,8,14,19,21,24 63:2,12,18,20,22,24 64:2 65:1,6,8,9,11,12,14,15,24 66:24 67:5,12,15,19,23,25 68:3,8,14 69:3,8,11,12,13,19 70:10,15,19 71:1,3,8,11,14,15,16,20,21,23,25 72:3,5,7,9,11,13,15,17,21 73:22 74:4,24 75:3,5,6,7,15,23,25 76:4,7,8,12,15,17,19 77:1,2,13 78:7,8,9,15,19,25 79:3,6,20 80:3,4,7,12,13,17,25 81:9,11,13,16,17,19,21 82:7,8,13,18,24,25 83:1,14,16 84:7,14,15,24 86:25 87:3,9,11 88:19,22,23 89:13,16,17,18,20,22,23,24,25 90:7,15 91:3,19,22 92:1,12,16,17 93:21 94:2,6,23,25 95:4,5,9,20,21,23,24,25 96:5,13,15,20 97:21,22,24 98:2,4,5,6,7,12,14,20,24 99:2,3,8,12,13,14,15,16,20,21,22,25 100:1,3,6,12,15,20,23,24 101:3,4,9,18,19 102:20 103:1,2,3,14,18,19,21,22,23 104:2,3,6,10,11,14,21,22 105:1,6,7,12,13,15,18 106:2,12,18,22,23 107:1,3,4,5,6,12,18,22 108:2,3,4,8,10,12,14,15,16,21,25 109:6,12 110:9 111:6,7,12,24 112:1,4,8,13,14,19,23 113:1,6,11,12,15,17,21 114:1,2,4,21,22,24 115:1,3,5,16,18,20 116:1,10,15,18,20,25 117:4,8,12,14,18,19,23,24 118:3,6,7,15,22 119:5,7,14,18 120:15,16,24 121:17,18,19 122:7,9,10 123:20 124:2

**today** 5:21 6:2 24:1 100:21 107:9,15

**today's** 8:18 9:16

**together** 52:6 53:1 92:18

**toilet** 40:7 118:4

**told** 34:5,9 41:6 48:9 51:21 58:23 96:7 97:10 103:18 105:7,10 111:9 121:2 124:2

**tone** 109:14

**too** 16:24 35:17 43:11 54:15 121:16

**took** 30:19 33:25 37:9,14 46:19 76:23 105:17 118:24

**tool** 5:4

**tools** 39:14

**top** 8:23 87:21 115:10

**topic** 91:2

**tort** 92:6

**total** 16:12

**totally** 76:18 88:10

**touched** 91:3

**touching** 113:22

**toward** 120:1

**toxic** 44:4,5,12,18

**trace** 32:12

**trachea** 67:16

**trained** 90:15

**training** 74:15,16 89:21,25 90:1,6,16,23

**transcript** 5:20 6:1 7:1

**transfer** 14:9

**traumatic** 8:12 37:12 119:1,5

**treatment** 65:5 104:15 106:1 111:3,9,10 112:15 113:13,16,19 114:7 116:21 117:3

**trial** 97:24 98:2

**tried** 116:19

**trouble** 113:22

**true** 77:5,6 80:13 95:21

**trust** 106:24 107:5

**truth** 5:13

**truthful** 5:7,14 8:2

**try** 34:4 35:21 39:8 46:19 47:8 52:19 116:18 117:4,12,14,18,19,23 118:6,7

**trying** 7:13 30:23 32:3 35:19 46:9,10 52:13,21 76:4 77:2 121:18

**turn** 34:3 79:6 80:17 99:13 100:15 118:15

**turning** 35:20

**TV** 27:19 28:25 37:7 43:20 53:7 77:25 91:5

**TVS** 27:16

**Twenty-three** 13:4

**twice** 88:22,23

**two** 6:11 10:6 18:24 19:16 40:20 86:15 89:6 90:11 95:8 106:8 109:12 116:17

**two-part** 18:15

**type** 9:21 10:13,14 17:12 37:3 44:18,20 64:25 69:1 70:19 71:4 117:3

**types** 70:16,22,24 81:14

**typical** 26:2

**typically** 28:4

**typing** 5:18

**U**

**uh-huh** 6:24

**uh-uh** 6:24

**unable** 113:15

**under** 5:10 7:22,24 69:16,19,20 80:21 81:3 82:15 93:11 101:4,10 109:13

**understand** 4:15 5:8,11 6:5 7:4 10:1 14:22 15:3,9,15 32:3 52:13, 21 76:1 77:3 117:19 121:16

**understanding** 18:6 19:5 20:10 22:16 23:18 26:23 27:2 43:23 47:22 53:10 56:11 79:16 80:14 81:10 83:9 90:3 97:4 105:23 106:19 107:8,10,12 111:5 112:10

**understood** 32:8 46:15

**unduly** 95:6

**unit** 106:9,15 107:6

**units** 110:16

**unless** 69:9,21 99:10

**unlock** 18:18 48:4,17 78:7,9

**unlocked** 19:1 78:20

**unroll** 18:16

**unsafe** 96:9

**unsure** 24:9

**until** 26:7,10 88:3

**up** 15:24 16:2 23:1 26:7,13 29:13, 25 30:15 31:2,4,16 32:11,21,25 33:4,12,24 36:25 41:15,17 42:10 46:25 53:16 60:10 61:16,17,23 62:7 78:16,17 79:1 81:9 89:5,9 99:1 101:23 104:25 105:6,15 107:1 114:25 121:9

**upgrades** 74:7

**us** 20:8 28:19 47:20 78:20 94:14, 21 95:21 124:3

**use** 18:9,16 76:17 78:22 81:9 99:14 100:1

**used** 24:23 48:4 51:1

**ushered** 101:3

**usually** 7:8 21:4 61:25 88:14

**V**

**vacation** 89:5

**verbal** 6:25

**verbally** 6:21

**verification** 92:24

**verifying** 93:10,11

**version** 8:23

**very** 14:13 101:8 114:14

**vicinity** 53:24

**videotape** 77:25

**view** 28:16

**visibility** 101:20

**visibly** 75:1

**visual** 109:20

**voicing** 111:17

**vomit** 38:4 40:5

**vomiting** 38:2,9 40:5 45:10

**W**

**Wait** 17:1

**waiting** 27:9

**wake-up** 16:5

**waking** 114:25

**walk** 15:22 29:16 43:17 47:3 48:2 49:25 52:22 59:22 99:1 106:10

**walked** 27:13

**walking** 26:24 49:14 50:15 59:20 108:22 123:24

**walks** 62:10

**walkthroughs** 27:3

**wall** 43:4

**Walton** 15:2,8 25:2,5,8 31:22 32:25 34:9,11,16,23 35:2 40:16 42:3,5,18 51:9 52:4 53:21 56:22, 25 62:22 66:5 72:5 121:24

**want** 5:19 19:7 30:8 32:4,14 36:4 38:19,20 44:2 46:12 48:13 71:15 76:7 77:1 80:7 84:24 91:3 94:2 99:20 104:10 108:9 111:7 114:4

**wanted** 35:14 69:11 78:15 92:16 98:20

**warden** 21:20,22,24 22:2 23:2 70:22 72:22 81:24,25 82:2,4,20, 24 83:1,2 91:17,20

**wardens** 22:5

**Wardlow** 15:14 22:20 23:10,14 73:1,14 79:8 80:9,18 81:6,22 82:1 91:14

**warped** 80:21

**warping** 81:2

**was** 4:3 10:10 11:15 14:5,9,11,15 15:25 16:6,13 19:4,8,10,11,18 20:5,10 21:24 22:1,5,9,11,12,14, 15,17,23 23:14,22,24 24:1,13,18 25:3 27:6 28:20,25 29:1,10,11 30:11 31:13,15,22 32:11 33:11 34:10,17,24 35:2,7,8,12,14,23 36:10,11,14,17,20 37:17,18,24 38:6 39:13,17,18,24 40:17,18 41:5,6 44:13,14,16,18,24 45:1,7, 24 46:6,11,21,24 48:2,3,7,11,16 51:20 53:14,23 54:3,5,8,13,14 55:14,15,17,19,21 57:5,6,11,13, 14,17 58:10,12 59:6,18 60:6,7,14, 18 61:4 62:13 63:10,21,22 64:23 66:21,22,23,24 67:5,24 69:1,4,7,8 70:20 71:1 72:21 74:16,18 76:8 81:6,10,17,22,24 85:3,22,25 86:10,11,13,15 88:2 89:24 92:12 93:19,20,21,22,23 94:13,20,24 95:10 96:8,25 97:10 98:18 100:22 101:17,19 102:7 103:3,4,7,9,18,

21,25 104:2,12 105:2,3,8,11,12 107:10,12,13,22 108:1,2,14,15, 20,21,23 109:19 110:14,17,23 111:19 112:1,5,8 113:15,24 114:9,10,11,13 116:23 117:1,3,8, 11 118:22 119:4,5,9,13,14,18,19, 20,22,24 120:1,3,21,22 121:14, 17,20,21,23,25 122:3,4,6,8

**wash** 117:8

**wasn't** 34:1 38:6,8 48:7,10 54:3 57:5 62:12 71:1 85:6 103:2,6 105:1 109:13 114:11 121:16,17

**watch** 37:3 116:3

**watching** 27:18 28:25

**water** 118:4 121:13

**way** 11:2 18:14,15 19:2,4 50:6,21 56:5,7 62:13 74:11 79:1 87:3 89:5,14 96:9 100:9,12 101:7 103:18,20 104:24 107:16 122:23 123:18

**ways** 106:8

**we** 4:21,24 5:18,19,25 6:1,10,16, 19 7:1 10:25 16:4 20:8,22 21:12 23:20 27:6,7,9,10 32:10,11,12 34:8 39:13 41:15,16,17 47:9 50:3 54:11 58:2,14 61:5 65:20 66:19, 20 67:21 68:11 74:25 79:17 83:17 85:23 87:13 89:12,13 91:2 92:4, 19,21 94:14 95:9 97:21 99:13,15 100:5 102:12,13 105:18 108:3 114:14 116:8 117:16 122:21,23

**we'll** 6:10,14 16:1 118:17

**we're** 4:25 12:18 13:16 32:4 57:3 99:15,21 100:3

**weak** 108:19

**week** 89:6 100:6

**weeks** 102:14

**well** 9:8 18:14 21:4 23:12 28:3 30:6,11 35:7 39:10 40:17 45:19, 21 49:7 51:16 54:7 60:16 74:14, 24 75:4 76:11 78:6,22 84:14 89:7 103:21 104:24 105:9 106:2 114:19 115:11 116:22 118:8

**well-known** 81:10

**went** 4:24 16:3 29:4 33:12,19 34:3 37:1 52:16,17 57:19,22 60:16,17 61:3 62:12,14 63:11 76:17 88:2,12 102:6 104:14

111:25 112:23 115:21,23 120:16

**were** 5:10 11:20,25 14:13 15:24 20:2,8 25:8 28:21 30:14,17 31:6, 8,19,22 32:1,2,15,24 33:2,7,24 34:5 35:15 36:3,5,7 37:17 39:22 40:4,5 41:7,20 45:5,10,11,22,23 46:11,13,18 47:9,25 50:7 51:16, 21,23,25 52:6,12 53:14,17,19,24, 25 54:7,9,10,11,12 56:2,7 57:1,25 58:1,2,5,16,19 59:3,9,11,15,19 60:2,4,8 64:2,3 65:20 66:19 67:1, 8 68:2,12,14,19,21,25 69:14,18 70:8,10,17,21 71:2,3 72:20 76:10, 16,20,22 79:11,23,25 80:10,11 81:12 86:17 88:3,5 91:9 94:16 95:2 96:24 97:24 101:2,3,9,13 102:14,15 103:20 114:5 116:24 119:13 120:5,6,7,11,25 121:2,12, 13,15 122:12

**weren't** 37:20 54:13 104:6

**what** 5:12 7:13,16 9:6,19 10:7,9, 12,13,14 11:25 12:7,9,23 13:5 14:5,8,13 15:23 16:5,8 18:6,20 19:15 20:5,7,13 24:7 25:25 26:19, 23 27:2 28:21,22 29:1 30:5,7,8,9, 10 31:24 32:2,3,5,7,15,16 33:7, 14,16,24 34:1,6 35:6,12,14,20 36:4,24 37:6,23 38:15 39:15 41:11,14 42:7,14,16 43:19 44:11, 17,23 45:11 46:19 47:3,22 48:8, 23 50:15 51:1 52:13,18,21 55:25 57:1,25 58:7 59:17 60:13,18,22 61:6 62:5,8 64:2,5 65:3,5 66:24 67:3 68:1 69:6,11,14 70:10,16,19 73:21 74:13,22,24 75:22,24 76:4, 5,7,12,14,23,25 77:1,10 78:4 79:20 80:15,25 81:16 82:4,10,11, 19 83:4 84:12 86:21,25 87:8 88:13,17,25 89:10 90:8 92:4,17 93:7,25 94:3,15 96:17 102:7 103:6 104:17,22 105:23,24 106:16 107:10 108:5 109:15,16, 22 110:22 111:7,24,25 112:4,8,20 113:23 114:11,12 115:14,15,23, 24 116:13 117:14,21,23,25 118:4 119:14 120:20 121:5,11,15,19,21, 22,24 122:2,3,4,6,8

**what's** 10:22 11:11 29:22 30:1 50:12,17,19 60:5 67:14 75:16,19 89:9 94:9 107:5,9 121:18

**whatever** 6:16 7:10 8:15 26:11 34:8 41:16 51:14 61:4 71:14 78:8 89:19 92:13 94:4,8 106:17 109:14

112:7 117:6 119:3

**wheeled** 105:19

**when** 12:5 16:9 26:14,20 27:6 28:8 30:12,20 32:22 36:25 37:25 38:1,7,15 39:3,21 40:4,23 41:2,3, 7,9,11,23 43:17 47:19 49:1,25 51:15,20 52:3 53:4,17,19,25 55:25 56:2 58:15 60:25 67:3 75:15 76:17,21 77:15 78:6,17,24 81:8 84:10 85:3,12 88:4,15 89:16 91:21 92:21 94:23 98:19 101:2,8, 13 103:9 105:22 107:24 108:1,5 109:5 110:16,17,23 115:1,9 116:5,9 118:21 119:2 121:9

**where** 9:10 11:23 12:21 18:1 24:11 29:10,11,14,21 30:15 31:1, 6,8,17 32:19 33:18 36:23 40:5 41:19 42:23 43:1,14 46:16,18 51:19,20 55:6,8,16,21 60:22 61:24 69:8 70:6,7,10 75:5,6,7 78:4 79:2 89:19 93:14 95:5 97:2,3 105:18 111:8 113:10 114:22

**whether** 50:3 79:12 108:23 112:23 114:9

**which** 6:21 8:20 26:10 31:19 32:20 33:6 34:12,22 50:4 77:15 81:4 91:12 96:4,15 102:19 103:4 105:18 113:2

**while** 11:13,16 14:10,14 36:11 38:2 39:22 40:8,12,15 41:25 42:9 46:23 54:23 58:4 59:3,9,11 66:19 68:7 81:25 82:3 86:25

**white** 44:14 97:14 122:12

**who** 4:15 9:18 10:22 19:9 21:1,4 22:9 27:12 32:11,19 33:11,12,15, 16,19 36:7,11 47:10,15,22 51:7 52:21 53:23 54:4 55:11,14 56:21 59:14 60:20,25 63:20 65:17 74:5 77:19 81:10 83:8,13 85:12 93:18, 23 94:11,18 95:10,14,17,18 96:3, 4,19,25 97:4,8,9,12,14,16,21 98:4,18 99:5 104:21 105:24 107:22 112:5,14,19 113:6,12,18 114:1 120:14,18 122:11,17,20 124:1

**who's** 5:18 49:17 60:22 82:24 89:16,17,18 91:22 96:3,23

**whoever** 96:13 97:7 106:17

**whoever's** 85:17,18

**whole** 37:17,21 57:11,13 101:18 116:9 120:16

**whose** 11:3

**why** 28:19 37:11 53:11 65:8 66:18 81:21 96:9,11 116:19 118:25

**will** 5:4,7,23 6:10,24 26:3,4,8 80:16 95:16 100:15 106:24 115:6

**willing** 93:21 98:7,24 99:2

**wiring** 84:2,5,11,15,16,18

**with** 4:12 9:6,15 10:16 12:16 17:25 19:11 20:2,15 21:18 27:12 28:12 30:10 33:16 36:16,25 40:9, 10,13,15,18 41:3,9,12,19 42:4,7, 12,14,16,21 45:8,21 51:13 53:12 56:15,19 58:17 59:1,2,25 61:9 62:15,18,22,25 63:3,6,7,11,15,17 64:8 66:23 67:6,11,14 69:23 71:6, 10,13,20,24,25 72:4,8,12,16 73:17,21 75:22 76:14 82:4 83:4, 12,16,22,25 84:2,5,7,10,15,16,23 86:19 87:5 88:19 89:22 90:12 93:20 94:15,23 95:2,10 97:9,11 98:22 101:10 103:24 105:3,21,24 106:17,22 107:6,18 108:17 109:10 110:1,4,5,12,20,24 111:5, 13 112:4,15,19 113:5,16,18,21 114:12 115:5 116:7,14 117:21 118:9 119:7,25 121:1,6,18 122:10,22,25 123:2,12,15 124:3

**within** 13:21 21:2 27:13 28:2 44:12 70:4,8 73:22 87:5 107:11 109:20,21

**witness** 4:2 98:8,23 100:16

**witnessed** 21:8

**witnesses** 97:22 98:2

**woke** 15:24 16:2

**won't** 26:8 100:21

**word** 7:8 46:21

**words** 51:11 108:18

**work** 10:2,3 13:21,24 24:23,25 66:6 76:18 87:17 89:2 96:1 115:18 116:18,20 117:12,14,22 118:6

**worked** 14:14 65:22 66:8 81:8 90:18 110:16 113:6

**worker** 96:6

**working** 25:8 69:15 74:2,20,23 76:10,16,22 79:11,23 80:11 85:17 89:20

**works** 24:11 89:3 94:12

**worse** 30:25 49:18 66:24 67:8 68:19,25 114:6,13

**would** 7:16 8:2,6,15 9:20 13:18 15:18 16:5,14,19,24 17:3 19:20, 22 20:3 26:1 28:12,15 33:20 38:16 39:20 42:7 48:17,18,19 49:17 50:9 53:22 55:5 56:21,22 61:20 62:3 65:7,16 67:22 73:14 74:10 80:1 82:20,25 83:10,14,19 85:8 86:19,24 87:8,20,21 88:17 89:9 90:8,10 94:6 96:17 97:21 98:23 99:5,7,8,10 104:11 109:15 113:11,22 114:2 116:22,25

**wouldn't** 20:4,8,20 21:9 39:19 40:21 45:15,20 48:8,9,10 49:9 52:19 68:24 75:2 82:22 84:14 87:2 96:11 98:8 101:19 109:2,5

**write** 92:8

**writing** 92:10

**written** 111:22

**wrong** 76:24 88:17 104:19 108:8 111:8 119:5

**wrote** 93:18

**Y**

**y'all** 47:17 53:11 55:10 94:24 95:25

**yard** 55:24

**yeah** 17:4 22:14 27:8 31:9 32:6 45:16 46:15 54:8,22,25 63:10,19 68:21 69:13 91:19 95:22 96:24 122:21

**year** 17:5 103:11

**years** 86:12

**yell** 39:7

**yelled** 40:18

**yelling** 30:4,14,17 33:2 35:16 36:13 39:4,12 40:18,23,25 41:1, 12,14 88:6

**yells** 39:5

**yes** 4:17 5:9 6:3,18 7:3,18 8:10 9:4 10:4 12:20 13:2,11,20 14:18, 23 15:10,21 16:15 17:3,9 18:14 19:3,6,11,13,19,21,24 20:1,12,23 21:21,23,25 22:4,7,19,22,25 23:3, 5,7,9,11,13,16 24:15,20,24 25:4, 6,10,13,15,17,19,22,24 27:17,20, 23 28:9 29:9,24 30:3 31:5,7 32:18 33:1,8 34:19 35:5,17,24 36:22 37:5 38:11 39:1,6 40:2,3 41:13,21 42:2,19 43:9,12,22 44:6,8,10 45:4 48:15,22 49:4,24 50:8,14,23,25 51:6 52:24 53:3 54:16,19 55:13 56:9 57:16,21,24 58:6,18,20 59:13 60:12 61:19,21 63:13,19 64:12,17,21 65:4 66:1,3,7,10 67:13,20 68:4,10,15,17 69:5 70:1, 3,5,9 71:18 73:13,16 74:21 75:12, 14,18,21 76:3,7 77:23 78:20 79:14,19 84:4 85:2,20,22 86:3,5, 10 87:7,23 88:1,7 90:7 92:22 93:1,3,5,9,12,17 95:12,19 96:14 97:1,20,23 98:1 99:17,19,24 100:13 101:6,12,22 102:4,9,18 103:12 104:16,20 107:23 108:13 110:11 112:16,18 113:4,14,20 114:17 119:17 120:10,13 121:4 122:14 123:10,14,17

**yesterday** 10:11 54:3

**yet** 38:8 100:7

**you** 4:7,10,11,15,18,21,22 5:2,3, 4,5,6,7,8,10,11,19,22,23,24 6:4,5, 12,13,15,16,20,22,23,24 7:4,7,12, 14,15,16,19,20,22,24 8:1,2,5,6, 17,22 9:5,6,12,13,15,18,23,24 10:5,7,12,13,14,16,17,22 11:3,6, 9,13,18,20,25 12:3,7,9,12,21 13:12,14,18,21,24 14:1,8,16,17, 19,22 15:3,5,9,14,22,23,24 16:13, 16,17,24 17:7,10,11 18:1,13,15, 17,20 19:9,12 20:2,13,15,18,19, 21,22,24 21:1,13,17,19 22:1,8,12, 20 23:1,2,4,6,10,17,22 24:2,4,7, 11,13,16,18,21 25:5,11,14,16,20 26:1,4,6,16 28:3,12,18,19,21,23 29:2,7,14,18,19,21 30:4,6,9,10,20 31:1,4,6,8,18,19,23,24 32:5,7,12, 13,15,16,19,24 33:2,7,10,11,14, 16,18,19,22,23,24 34:18,20,22 35:1,6,11,15,16,21,25 36:3,5,7, 13,15,18,24 37:3,6,8,17,20,22,23, 25 38:4,9,12,15,16,19,23,25 39:15,16,21,22,25 40:4,5,9,12,15 41:11,14,19,20,22,23 42:3,8,11,

20,24 43:13,16,17,19 44:3,4,11, 19 45:5,9,10,11,18,19,20,22,23 46:5,8,11,13,18,23,24 47:3,10,15, 25 48:2,5,8,9,10,13,19,23 49:1,2, 5,7,8,10,13,14,16,17,18,22,25 50:6,7,9,10,12,15,18,21,24 51:1, 5,7,12,20,21,22 52:3,11,13,14,15, 22,25 53:4,10,13,14,17,19,20,22, 25 54:9,18 55:7,25 56:2,4,7,11,24 57:1,3,8,14,17,19,25 58:1,4,5,7, 15,16,23 59:2,3,5,8,9,11,14,17, 19,24,25 60:2,8,10,13,20,21,25 61:5,9,10,12,13,16,17,20,23 62:3, 5,7,8,14,15,18,19,21,24 63:2,5,6, 9,10,11,14,17,18,20,25 64:3,15, 19,22,25 65:1,3,4,5,8,9,12,14,17, 21 66:4,11,13,15 67:3,11,14,18, 24 68:1,2,5,8,12,13,16,18,19 69:3,13,18 70:6,7,15,16,24 71:5, 7,17,19,20,23,24 72:3,4,7,11,15, 20,21,22,24 73:1,3,5,7,17,21,23, 24 74:6,18,22 75:9,16,19,22,24 76:1,5,6,12,15,19,21 77:2,3,6,10, 15,18,24 78:2,12,14,15,18,19,24 79:5,6,7,8,20 80:8,18,25 81:5,16, 19,21 82:4,11,19 83:5,22,25 84:2, 5,10,11,12,24,25 85:3,8,19,21 86:1,6,8,19,21 87:2,4,5,14,18,19 88:4,5,8,12,15 89:2,5,7,9,10,21 90:3,5,8,17,20,23,25 91:4,7,12,22 92:1,2,4,6,8,10,17,21,23,24 93:6, 10,13,15,23,25 94:3,7,10,17,25 95:2,3,9,10,20 96:1,3,4,7,10,12, 13,15,17,18,19,23,25 97:4,6,7,10, 14,16,19,21,24 98:2,16,17,18,20, 22 99:1,2,3,12,13,14,15,16,20,21, 22 100:1,2,3,6,11,12,15,21,25 101:2,3,7,8,9,13,19 102:1,2,5,7, 24 103:6,14,19,24 104:6,10,14, 17,18,21 105:17,22,25 106:4,5,8, 9,10,13,14,21,23,25 107:1,2,5,9, 15,18,22,24 108:5,7,8,9,19,23 109:1,3,5,6,7,9,14,15,21,22 110:1,4,7,9,19,23 111:2,7,9,10 112:4,13,14,20,23 113:1,6,7,10, 11,12,13,16,18,22,24,25 114:5,8, 10,15,18,22,24 115:5,9,14,16,17, 19,21,23 116:1,2,4,12,15,17,18, 19 117:14,19,21,23 118:1,4,9,15, 21,22,23 119:8,12,13,14,23 120:2,4,5,7,9,11,15,18,20,25 121:1,2,5,6,8,11,14,16,19,21,22, 24 122:1,2,4,5,6,7,8,9,11,12,15, 17,20,22,25 123:2,4,11,12,15,18 124:1,2,6

**you'd** 33:17 82:17

**you're** 5:12 7:7 12:25 14:24 15:6, 11 16:23 21:6 28:4 29:21 31:17 32:19 36:23 39:3,7 40:8,23,24 41:11,12,25 42:9,10,23 43:14 46:16,17 49:1,13,14 50:9,11,15 51:4,19 52:2,23 54:23 56:2,3,6, 10,11 57:8 61:8,22 69:23 75:15 76:2,7,14,15,25 78:16,17 81:7 83:17 86:19 87:20 92:13 93:10 96:12,22 101:23 106:12 115:3,24 121:9

**you've** 6:21 64:18 86:1 90:16 118:10

**younger** 110:23

**your** 4:8,18 5:1,2,6,15,24 6:22 7:8 8:7 11:11,13 12:9,23 14:2,20 16:23 17:17 18:6 19:5 20:5,10 22:16 23:18 26:23 27:2 28:4,22 29:10,14,23 31:18 34:13 35:9,10, 15,23 36:7 37:3 38:19 39:25 40:8, 12,15 42:1,9 43:23 44:3 45:23 46:13 47:5,22 48:16 49:2,13,25 50:6,21 56:6 61:8,11,16 62:7,14, 19,21,24 63:2,12,18 64:2,13 65:1, 9,15 67:11,14,21 68:16 69:3 70:10,15 71:20,23 72:3,7,11,15, 21 73:17 75:13,16 76:8,13 77:21 79:16,20 80:14,22 84:5 86:4 87:5, 8 88:20 90:1,3,5,8 92:5,20,23 93:2,4,6,16 95:13,22 98:17 100:4 101:4,8,10 102:6 103:1 104:9 105:23 106:9 107:9 108:6 109:19, 21 111:5,10,13 112:11,14 115:1 116:18,20 117:18,20 118:2,13 119:11,18

**yours** 19:23

**yourself** 34:20 35:21 92:8 106:11 117:15

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| LEETRAVIS GRIFFIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Cause No. |
| -v- | ) | 3:24-cv-00066-PPS-JEM |
| | ) | |
| RON NEAL, et al., | ) | |
| | ) | |
| Defendants. | ) | |

Job No. 199859

I, LEETRAVIS DELSHAWN GRIFFIN, state that I have read the foregoing transcript of the testimony given by me at my deposition on June 10, 2025, and that said transcript constitutes a true and correct record of the testimony given by me at said deposition except as I have so indicated on the errata sheets provided herein.

LEETRAVIS DELSHAWN GRIFFIN

STEWART RICHARDSON & ASSOCIATES
Registered Professional Reporters
One Indiana Square, Suite 2425
Indianapolis, IN 46204
(800) 869-0873

NO CHANGES JUL 15 2025

**PLEASE DO NOT MARK ON DEPOSITION PAGES. MAKE ALL CORRECTIONS ON THIS FORM.**

StewartRichardson
DEPOSITION SERVICES

One Indiana Square
Suite 2425
Indianapolis, IN 46204
317.237.3773
Fax: 317.237.3767

RE: Indiana Rules of Procedure, Trial 30(E) and/or Federal rules of Civil Procedure

After having read my deposition, I wish to make the following changes:

PAGE_______________ LINE_______________
CHANGE_______________
TO_______________
REASON FOR CHANGE_______________

PAGE_______________ LINE_______________
CHANGE_______________
TO_______________
REASON FOR CHANGE_______________

PAGE_______________ LINE_______________
CHANGE_______________
TO_______________
REASON FOR CHANGE_______________

PAGE_______________ LINE_______________
CHANGE_______________
TO_______________
REASON FOR CHANGE_______________

PAGE_______________ LINE_______________
CHANGE_______________
TO_______________
REASON FOR CHANGE_______________

PAGE_______________ LINE_______________
CHANGE_______________
TO_______________
REASON FOR CHANGE_______________

☐ **Please check for no changes**

_______________
(Signature of deponent)

233943
ISP 2024-48

# NOTICE OF TORT CLAIM

TO:

Tort Claim Administrator
Indiana Department of Corrections
302 West Washington Street
Indianapolis, IN 46204

Attorney General of Indiana
Ind. Gov. Center S., 5th Floor
302 West Washington Street
Indianapolis, IN 46204-2770

## STATEMENT OF FACTS

### I. Claimant

(Provide your name, current residence, and residence at the time your loss occurred.)

LEETRAVIS GRIFIN

INDIANA STATE PRISON, 1PARK ROW

MICHIGAN CITY, IN 46360

### II. Events

(Provide a short and plain statement of the facts on which your claim is based. Be sure to include the circumstances which brought about your loss and the time and place your loss occurred.)

On July 12th, 2018, while in Indiana State Prison, I sent a request for healthcare form#6854, because something was wrong with my throat. I complained that it was often hard to swallow, extreme cotton mouth, my vocal cords were easily fatigued, I had bad breath, sometimes I coughed up what appeared to be puss balls, and I had bumps at the base of my tongue. I was assessed on July 18th, 2018, never given a diagnosis, and was told to stay hydrated.

On March 24th, 2021, I sent a request for healthcare form#053526 I again was complaining about my throat and how a lump had developed to the right side of my throat. On April 8th, 2021 I was assessed by Nurse Laughlin, who noted hard bump to right side of trachea. Nurse Laughlin also noted that she discussed it with Dr. Marthakis, who stated for me to be referred to the provider for a follow-up (an e-mail notification was sent to Chris Wardlow to schedule). On April 13, 2021, I was assessed by Nancy B, Marthakis, MD, who after asking a few general questions and doing a hand to neck physical examination. Dr. Marthakis explained that my problem could be my thyroid and that my FT4 was slightly low when last I had blood work done. In Dr. Marthakis' patient plan she ordered more lab work (bloodwork) to check – CBC WITH DIFF, COMPREHENSIVE METABOLIC PANEL, SED RATE (ESR), T3 TOTAL (TRIIODOTHRONINE), T4, FREE (THYROXINE), TSH, AND VITAMINE B12. A follow-up

Def's Ex 7
Witness Griffin
Date 6/10/25 JSS

EXHIBIT A

was scheduled for 6 weeks. On June 7th, 2021 I was assessed by Diane Thews, APN who could not preform her duties because the lab work (bloodwork) ordered by Dr. Marthakis had not been completed. Diane Thews, APN incorrectly noted that I told her the lump had decreased. When in fact I told her it had become knot like. Diane Thews, APN ordered a follow-up for after the lab work (bloodwork) was completed.

On July 1st, 2021 I was assessed by Dr. Marthakis after requesting to go over the labs that were to help address the problem with my throat. Dr. Marthakis falsely noted that I told her the problem was resolving itself and not worsening. Dr. Marthakis prescribed a vitamin B12 supplement, although the lab work (bloodwork) had not been completed. The lab work (bloodwork) ordered by Dr: Marthakis had not been completed until September 30th, 2021 by Susan E. Jones. On October 6th, 2021 I was assessed by Dr. Marthakis once again complaining about the problem with my neck. Dr. Marthakis did an aggressive physical examination and falsely noted no appreciable neck mass palpated. She noted, falsely, that we discussed the "BENIGN" findings of physical and lab work (bloodwork). I filed a grievance#133700, on October 6th, 2021 for failing to address my medical request. In the response to my grievance, grievance manager Joseph Wallen stated that Sherri Fritter, RN stated the lump was benign, not dangerous, and would not spread. Grievance Manager Wallen said, that appeared to satisfy my requested relief.

I didn't appeal the decision.

Instead on December 12th, 2021 I sent a request for healthcare form#6857, to be seen because those "BENIGN' finding were never communicated to me. I also demanded that x-rays be taken and a biopsy be done before the medical staff came to any conclusions.

On January 1st, 2022, I filed a second grievance#137066 to address the lack of care I received for the problem with my throat/neck. In response to my grievance Sherri Fritter, RN stated that "The Nurse" documented no abnormalities palpated in neck. I appealed the grievance. Executive Assistant Mark Newkirk for Warden Neal denied the appeal. The level 2(final stage of appeal process) –formal appeal was also denied. I then sent a complaint to the D.O.C. Ombudsman Bureau to complain about the lack of medical care, and in response sent Mat 26th, 2022, Charlene A. Burkett, Director of Ombudsman Bureau said the grievance appropriately addressed the matter.

On February 1st, 2024 I was assessed by Dr. Marthakis after I sent a request for healthcare form#65734 to be seen for the same reoccurring throat issue but was told it would have to wait, because I was having a medical emergency, dealing with my chest. There was never a follow-up, yet when I received a copy of my medical request it had for me to gargle salt water, as is that would help a problem I've complained about over five years.

**III. Witnesses**

(Provide the names of all persons involved, if known.)

1. LEETRAVIS GRIFFIN, One Park Row, Michigan City, IN 46360

2. DEANNA J. LAUGHLIN, RN , One Park Row, Michigan City, IN 46360

3. NANCY B. MARTHAKIS, MD One Park Row, Michigan City, IN 46360

4. DIANE THEWS, APN One Park Row, Michigan City, IN 46360

5. SUSAN E. JONES, MA One Park Row, Michigan City, IN 46360

6. SHERRI FRITTER, RN One Park Row, Michigan City, IN 46360

7. JOSEPH WALLEN, GRIEVANCE MANAGER One Park Row, Michigan City, IN 46360

8. MARK NEWKIRK, EXECUTIVE ASSISTANT FOR WARDEN NEAL, One Park Row, Michigan City, IN 46360
9. CHARLENE A. BURKETT DIRECTOR OF OMBUDSMAN BUREAU Indiana Government Center South, 402 West Washington Street, Room W479, Indianapolis, IN 46204
10.

## IV. Losses

(State the extent of your loss.)

1. CONTINUED PAIN AND SUFFERING

2. LACK OF DIANOSIS

3. DELAY IN POSSIBLE TREATMENT

## V. Damages Sought

(List the amount of damages you are seeking.)

1. A complete, independent, medical evaluation by an ***OTOLARYNGOLOGIST—A***

***medical specialty concerned esp. with the ear nose and throat*** to determine the current state of my health, and whatever treatment the independent physician deems necessary.

2. One hundred thousand Dollars ($100,000.00) for pain and suffering.

3.

Executed on this 10 day of May, 2024.

**Respectfully Submitted,**

LEETRAVIS GRIFFIN, Claimant

USDC IN/ND case 3:24-cv-00066-PPS-JEM document 100 filed 04/29/25 page 1 of 5
SCANNED at ISP and Emailed on 4.29.25 by BB - 5 pages
(date) (initials) (num)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| LeeTravis Griffin, Plaintiff,<br><br>v.<br><br>RON NEAL, *et al.*, Defendants. | Cause No. 3:24-cv-66-PPS-JEM |

**PLAINTIFF'S RESPONSE TO STATE DEFENDANTS' FIRST SET OF INTERROGATORIES TO PLAINTIFF**

Plaintiff, *pro se*, pursuant to *Fed. R. Civ. P. 26* and *33*, hereby respond to *State Defendants' First Set of Interrogatories to Plaintiff* (ECF 84) with the following.

***Reservation of Rights and Non-waiver***

By responding to State Defendants' request (ECF 84), I do not waive the right to object to the use of the following responses at any time, on any ground in this or in any other proceeding. My responses are limited to the information and knowledge currently known to me and does not constitute a waiver of my right to introduce additional information at trial. By responding to State Defendants' request (ECF 84), I do not waive:

a. Any objection as to competency, relevancy, materiality, privilege, and evidence admissibility of these responses or their subject matter, for any purpose, in this action or in any other proceeding;

b. My right to object to the use of any responses, or their subject matter, in this action or in any other proceeding;

c. The at any time to revise, correct, add to, modify, or clarify any of these responses;

Def's Ex 2
Witness Griffin
Date 6/10/25 JSS



EXHIBIT A

d. My right to object to further discovery relating to subject matter encompassed within both this request (ECF 84) and any other discovery propounded by State Defendants, or any Defendant, to me or a non-party in this action; and

e. The right to supplement my objections in the event additional litigation preparation results in discovery of grounds for additional objections.

These responses and any subsequent responses are made solely for the purpose of this action. No representations of relevancy or materiality are made with respect to any response herein. All appropriate objections to the use of this information at any hearing or trial or for any other purpose are reserved and may be interposed at the time of any hearing or trial or any other time. These responses will be supplemented or amended in accordance with the rules.

**RESPONSES TO STATE DEFENDANTS' FIRST SET OF INTERROGATORIES**

1. **INTERROGATORY NO. 1**: Please state your full name, IDOC number, the Indiana Department of Correctional Facility where you are currently incarcerated, and current housing unit, range, and cell number, that you are assigned to.

   **ANSWER**: OBJECTION. This information is readily available to Defendant and in fact is displayed in the Certificate of Service (ECF 84 at 14). Notwithstanding, LeeTravis Griffin, DOC# 233943, Indiana State Prison at 4358.

2. **INTERROGATORY NO. 2**: Identify all persons who assisted you in answering these Interrogatories and the Request for Production of Documents. If you have been receiving assistance from any other inmate:

   **ANSWER**: OBJECTION. After I previously disclosed a person who helped me IDOC staff retaliated against them. Therefore, I will not be disclosing the identity of anyone else who helps me in abundance of caution and safety and security of those who help me.



EXHIBIT A

3. **INTERROGATORY NO. 3**: Identify every individual who is expected to testify at trial or a hearing, or to provide a sworn written statement, and with respect to each individual,

   **ANSWER**: OBJECTION. Discovery is still ongoing. I expect every Defendant and every person who was in ACH on the day of the fire and Mike's family to testify.

4. **INTERROGATORY NO. 4**: Besides this lawsuit, have you ever been a party to a state or federal civil court proceeding (excluding this lawsuit) as either a plaintiff, petitioner, defendant or respondent since being incarcerated and under the custody of the Indiana Department of Correction? If so, state:

   **ANSWER**: OBJECTION. I cannot recall. Defendants have access to mycase.in.gov and Pacer to collect this information far more easily than I can.

5. **INTERROGATORY NO. 5**: For every time you have been arrested or charged with a criminal offense, state:

   **ANSWER**: OBJECTION. I cannot recall. Defendants have access to mycase.in.gov and Pacer to collect this information far more easily than I can.

6. **INTERROGATORY NO. 6**: Please describe and calculate the total damages Plaintiff is seeking in this lawsuit and identify what documents Plaintiff used in determining the total damages.

   **ANSWER**: OBJECTION. The total damages I am seeking are described in my complaint. Discovery is still ongoing, as such I do not have possession of any documents responsive to this Request. Also an expert may be consulted in the future to determine health care cost and the impact on my quality of life.

7. **INTERROGATORY NO. 7**: Identify all the documents you intend to use at the trial in this case or in support of any brief in this matter.

**ANSWER:** OBJECTION. This Request is unduly burdensome as State Defendants have easier access to these documents than I do. Discovery is still ongoing, as such no documents exist to my knowledge that are responsive to this Request.

**Verification**

I LuTravis Griffin, swear or affirm under the penalties of perjury that the above and foregoing representations and answers are true and correct to the best of my knowledge and belief.

4/29/25
Date

[signature]
Plaintiff (Signature)

Respectfully,

[signature]
Plaintiff, *pro se*
c/o 1 Park Row
Michigan City, Indiana 46360



EXHIBIT A

**CERTIFICATE OF SERVICE**[1]

I, the undersigned, hereby certify that the foregoing document was filed with the United States District Court and served upon all parties of record by depositing the same into the custody of IDOC staff to be e-filed this 29 day of ~~May~~ April 2025.

Plaintiff

[1] Pursuant to Houston, the date I provided the foregoing document to IDOC staff to mail to the Court, is the date it shall be deemed filed. Houston v. Lack, 487 U.S. 266 (1988).



EXHIBIT A

OFFICE OF THE ATTORNEY GENERAL
STATE OF INDIANA

302 W. WASHINGTON ST. IGCS 5TH FLOOR
INDIANAPOLIS, IN 46204-2770

**TODD ROKITA**
ATTORNEY GENERAL

June 6, 2025

**VIA MAIL**

LeeTravis Griffin
DOC #233943
Indiana State Prison
1 Park Row St.
Michigan City, IN 46360

**Re:** ***Griffin v. Neal, et al.,***
***Case No. 3:24-cv-00066-PPS-JEM***
***<u>State Defendants Rule 37 letter</u>***

Dear Mr. Griffin,

Please consider this Rule 37 letter as Defendants' attempt to resolve a discovery dispute regarding Plaintiff's responses to Defendants' first set of Requests for Production and Interrogatories (ECF 100 and ECF 102).

As a general matter, your objections to these discovery requests are boilerplate and lack specific support, and they are thus waived. When responding to discovery requests, an "objecting party must show with specificity that the request is improper." *McGrath v. Everest Nat. Ins. Co.*, 625 F. Supp. 2d 660, 670 (N.D. Ind. 2008). "'[G]eneral objections' made without elaboration, whether placed in a separate section or repeated by rote in response to each requested category, are not 'objections' at all—and will not be considered." *Novelty, Inc. v. Mountain View Mktg., Inc.*, 265 F.R.D. 370, 375 (S.D. Ind. 2009), *clarified on denial of reconsideration*, No. 107CV01229SEBJMS, 2010 WL 11561280 (S.D. Ind. Jan. 29, 2010).

Aside from the unsupported boilerplate objections, your responses to several of the interrogatories are evasive, incomplete, and insufficient. With this in mind, we request that you correct and/or supplement the deficient responses that are identified below.

Def's Ex 4
Witness Griffin
Date 6/10/25 SS

EXHIBIT A

## I. Responses to Defendants' Interrogatories

### a. Interrogatory No. 2

This interrogatory sought information about individuals who assisted you in answering interrogatories or requests for production. Your response to this request is evasive and incomplete. (*See* ECF 100 at 2). "[A]n evasive or incomplete disclosure, answer, or response is to be treated as a failure to disclose, answer, or respond." *U.S. ex rel. Lusby v. Rolls-Royce Corp.*, No. 1:03-CV-680-SEB-WGH, 2011 WL 4387293, at *2 (S.D. Ind. Sept. 20, 2011) (citing Fed. R. Civ. P. 37(a)(4)).

Further, your response fails to provide relevant information that is within the scope of discoverable information under Federal Rules of Civil Procedure 26(b) and 33. *See* Fed. R. Civ. P. 26(b) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case"). Information about anyone who assisted you in responding to discovery requests is relevant for the purpose of identifying any other potential witnesses or anyone who may have additional responsive documents. In the discovery phase, relevance "is a low bar to meet." *Hobbs v. Am. Com. Barge Line LLC*, No. 4:22-CV-00063-TWP-KMB, 2023 WL 6276068, at *4 (S.D. Ind. Sept. 26, 2023). Thus, your incomplete response and boilerplate objection to Interrogatory No. 2 are improper. Please supplement your interrogatory response to Interrogatory No. 2.

### b. Interrogatory No. 3

This interrogatory sought the identities of any person that you intend to call to testify at trial or a hearing or provide a sworn statement. (ECF 100 at 3). Your response to this request is vague and incomplete. The rules governing discovery entitle a party to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Defendants are entitled to know the identity of any witnesses you may use in your case, and this information is highly relevant to this matter. "The Court does not view [an interrogatory request for anticipated testimony] as unduly burdensome. Indeed, asking such a question in written discovery may obviate the need for depositions of each and every witness." *Overton v. Hicks*, No. 11-06-CV-1513-DFH-JMS, 2007 WL 2473799, at *2 (S.D. Ind. Aug. 27, 2007).

To the extent you are unable to produce a full list of witnesses at this time, you are still under a duty to respond to the interrogatory with the information you presently have and supplement your response as more information becomes available. *Exec. Mgmt. Servs., Inc. v. Fifth Third Bank*, No. 1:13-CV-00582-WTL, 2014 WL 5529895, at *12 (S.D. Ind. Nov. 3, 2014) ("Even if [a party] argues that it cannot produce a full list of responsive names at this time, its

duty is to answer the interrogatory with the information it presently has and then supplement that response if more information becomes available."). A vague statement that you will call "every Defendant and every person who was in ACH on the day of the fire" (ECF 100 at 3) is not a sufficient response to this request. *See McDaniel v. Elgin*, No. 2:09-CV-119, 2011 WL 2729485, at *4 (N.D. Ind. July 13, 2011) (finding discovery responses "clearly insufficient" where discovery request asked to identify specific events of harassment, and plaintiff made vague statements that he was harassed "each and every day").

If a party fails to disclose information required under the Federal rules, they are not "permitted to use as evidence at a trial…any witness or information not so disclosed" unless the failure is harmless. *David v. Caterpillar, Inc.*, 324 F.3d 851, 856–57 (7th Cir. 2003). Withholding the identity of potential witnesses is not harmless. Consequently, if you fail to respond to this request, Defendants will move to exclude any witness not identified from any future proceedings. The court has made clear that "the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of [the rules] was either justified or harmless." *Id.*

The boilerplate objection and incomplete answer to Interrogatory No. 3 are improper. Thus, please supplement your response to Interrogatory No. 3.

**c. Interrogatory No. 5**

This interrogatory sought information regarding your prior arrests or criminal offenses. Your answer to this response is incomplete and evasive. It is unreasonable to state that you "cannot recall" the criminal offense(s) underlying your current incarceration. (ECF 100 at 3). "[A]n evasive or incomplete disclosure, answer, or response is to be treated as a failure to disclose, answer, or respond." *U.S. ex rel. Lusby v. Rolls-Royce Corp.*, No. 1:03-CV-680-SEB-WGH, 2011 WL 4387293, at *2 (S.D. Ind. Sept. 20, 2011) (citing Fed. R. Civ. P. 37(a)(4)).

Further, the information sought by this request may be relevant to this litigation. Federal Rule of Evidence 609 permits evidence of prior criminal convictions to attack witness credibility. *Altobello v. Borden Confectionary Prods., Inc.*, 872 F.2d 215, 216 (7th Cir. 1989). Specifically, evidence of a witness's prior felony, or evidence of other lower-level offenses involving dishonesty, is admissible under Rule 609(a). *Id.* Additionally, Federal Rule of Evidence 404(b) permits evidence of other crimes, wrongs, or acts to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *United States v. Garcia-Avila*, 737 F.3d 484, 490 (7th Cir. 2013) (citing Fed. R. Evid. 404(b)(2)).

Under these rules, evidence of your previous criminal charges is relevant. Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it

would be without the evidence; and (b) the fact is of consequence in determining the action.") Thus, the boilerplate objection and incomplete answer to Interrogatory No. 5 are improper. Please supplement your response to interrogatory No. 5 to include a complete answer.

**d. Interrogatory No. 6**

This interrogatory sought information regarding the total damages you are seeking in this lawsuit. Your response to this request is evasive and incomplete because it merely refers to the damages described in your complaint. "[A]n evasive or incomplete disclosure, answer, or response is to be treated as a failure to disclose, answer, or respond." *U.S. ex rel. Lusby v. Rolls-Royce Corp.*, No. 1:03-CV-680-SEB-WGH, 2011 WL 4387293, at *2 (S.D. Ind. Sept. 20, 2011) (citing Fed. R. Civ. P. 37(a)(4)). Your response to this interrogatory cannot refer back to your complaint or other documents you have already produced. *See Est. of Daniels by Stover v. City of Indianapolis*, No. 120CV02280JRSMJD, 2021 WL 4844145, at *16 (S.D. Ind. Oct. 18, 2021) (granting motion to compel where party "ignored the requirements of Rule 33(b)" by referring to previously produced documents as a response to an interrogatory).

Defendants are entitled to know the specific damages you are seeking in this action. Any documents relied on in calculating that amount are relevant under the rules. Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.") The boilerplate objection and incomplete answer to Interrogatory No. 6 are improper.

**e. Interrogatory No. 7**

This interrogatory asked you to identify all documents you intend to use at trial or in support of any brief in this matter. (*See* ECF 100 at 4). Your response to this request is vague and incomplete. The rules governing discovery entitles a party to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Defendants are entitled to know all documents you may use in support of your case; this is well within the scope of Federal Rule of Civil Procedure 33(a)(2).

If a party fails to disclose information required under the Federal rules, they are not "permitted to use as evidence at a trial…any witness or information not so disclosed" unless the failure is harmless. *David v. Caterpillar, Inc.*, 324 F.3d 851, 856–57 (7th Cir. 2003). Withholding documents that you intend to use to support your case at trial or in support of any briefs is not harmless. Consequently, if you fail to respond to this request, Defendants will move to exclude any document not identified from any future proceedings. The court has made clear that "the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of [the rules] was either justified or harmless." *Id.*

The boilerplate objection and incomplete answer to Interrogatory No. 7 are improper. You are required to supplement your response to Interrogatory No. 7 to include and list the documents you are aware of to date.

## II. Responses to Requests for Production

### a. General Duty to Supplement Responses

Regarding all of your responses to Defendants' requests for production, be advised that you are under a continuing duty to supplement your responses. Under Rule 26(e), a party who has responded to a request for production must supplement its response "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." *Hunting Energy Servs., Inc. v. Kavadas*, No. 3:15-CV-228 JD, 2018 WL 4539818, at *6 (N.D. Ind. Sept. 20, 2018) (citing Fed. R. Civ. P. 26(e)(1)(A)). Rule 37(c) authorizes sanctions if "a party fails to provide information or identify a witness as required by Rule 26(a) or (e)." Fed. R. Civ. P. 37(c)(1). "[A] party who fails to produce a document during discovery is prohibited from introducing it at trial…a sanction that is 'automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless.'" *Barnett v. Menard, Inc.*, 851 F. App'x 619, 623 (7th Cir. 2021) (citations omitted). Thus, if you fail to produce documents during discovery, State Defendants will request those documents be excluded in future proceedings.

### b. Access to and Possession of Records or Documents

In response to the Defendants' Request for Production Nos. 3, 4, 5, 6, 7, 8, and 9, you respond, in part, that the "State Defendants have easier access to these documents than I do." (ECF 102.) As was stated in the Defendants' request for production, you are reminded that, by filing this lawsuit, you have an obligation to search for and produce documents responsive to each request for production that you have the legal right to obtain or review. *See Kokak LLC v. Auto-Owners Ins. Co.*, No. 2:18-CV-177, 2019 WL 4439868, at *3 (N.D. Ind. Sept. 17, 2019). This obligation is separate and apart from the Defendants' asserted access to the material sought. The Defendants do not know and cannot know what document you intend to prove your case, which they are entitled to discover through this proceeding.

Importantly, that a request seeks documents that the Defendants may have easier access to and is asserted to be overly burdensome as a result "is not a proper objection" and would be summarily overruled. *See Manassa v. Nat'l Collegiate Athletic Ass'n*, No. 120-CV-03172-RLY-MJD, 2022 WL 2292833, at *10 (S.D. Ind. June 23, 2022).

Similarly, that you supposedly attached documents to your complaint (stated in response to Requests Nos. 7, 8, and 9) is insufficient to meet your discovery obligations. This claim that you, for example, submitted "medical request to IDOC medical staff" and attached them to your complaint does not account for follow-up care, if any, of any asserted medical condition.

You must affirmatively search for and produce documents responsive to each request that you have in your actual possession or that you have the right to obtain via a request. You must supplement each request identified. Your objections are likely to be overruled. Under Rule 34, you are still required to produce documents that are within your possession, custody, or control. You cannot merely rely on your objection that "State Defendants have easier access to these documents" than you do. (ECF 102 at 4). Please supplement your requests accordingly.

**c. Request for Production No. 7, 8, and 9**

This request sought production of documents related to any medical treatment you received relating to your allegations in this case. Your response states that any request returned to you is attached to your Complaint. After reviewing your Complaint (ECF 8), there are no documents attached related to any medical treatment you received or health care request forms. To the extent you do have any medical documents, including health care request forms, you intend to rely on to support your claims, you must produce any document in your possession that are related to medical treatment or health care request forms you received relating to the allegations in this case.

This request sought production of documents related to any injuries you have suffered relating to your allegations in this case. (ECF 102 at 4). Your response states that any request returned to you is attached to your Complaint (ECF 8). After reviewing your Complaint, there are no documents attached. Please confirm that you have no documents to support your injuries if that is the case.

Please supplement your interrogatory responses and request for production of documents by **June 27, 2025**. If you fail to supplement your responses, I will seek court intervention, and all other available relief.

Sincerely,
*/s/ Gustavo A. Jimenez*
Gustavo A. Jimenez
Deputy Attorney General



EXHIBIT A