UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| LEETRAVIS GRIFFIN,<br><br>Plaintiff,<br><br>v.<br><br>RON NEAL, et al.,<br><br>Defendants. | CAUSE NO. 3:24-CV-66-PPS-JEM |

OPINION AND ORDER

LeeTravis Griffin, a prisoner without a lawyer, brings two claims related to a fire that occurred at Indiana State Prison ("ISP") on January 14, 2023. First, he is proceeding against Officer Kevin Cross, Lieutenant Nadine Smith-Robinson, Officer Darnell Crockett, Sergeant Jeniene Walton, Lieutenant Dennis Koen, Case Worker Jacqueline Mayes, and Dr. Christina Chico "in their personal capacity for money damages for denying him medical care for injuries he suffered in a January 2023 fire in violation of the Eighth Amendment[.]" ECF 11 at 11-12. Second, he is proceeding against Commissioner Christina Reagle, Warden Ron Neal, Assistant Warden Dawn Buss, Major Douglas Wardlow, Supervisor of Fire Training Gordon Beecher, and Safety Hazard Manager Deborah Taylor "in their personal capacity for monetary damages for deliberate indifference to the risk of harm posed by a fire that occurred in January 2023 in violation of the Eighth Amendment[.]" *Id.* at 12. For simplicity's sake, I will refer to these defendants collectively as the "state defendants". The state defendants filed a joint motion for summary judgment, which is fully briefed. ECF 131, 139, 140, 145, 146,

163, 164. The remaining defendant, Dr. Chico, filed a separate motion for summary judgment, which is likewise fully briefed. ECF 134, 143, 144, 150, 151, 161.

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

**I. Claims Against the State defendants**

Griffin is proceeding against the state defendants on two claims. First, he is proceeding against one group of state defendants who were physically present for and actively involved in responding to the January 14 fire – Officer Cross, Lt. Smith-Robinson, Officer Crockett, Sgt. Walton, Lt. Koen, and Case Worker Mayes (collectively, the "incident defendants") – for denying him medical care for injuries he suffered during the January 14 fire. ECF 11 at 11-12. Second, he is proceeding against another group of state defendants who are supervisory officials at ISP – Commissioner Reagle, Warden Neal, Assistant Warden Buss, Major Wardlow, Supervisor of Fire Training Beecher, and Safety Hazard Manager Taylor (collectively, the "supervisory defendants") – for deliberate indifference to the risk of fire at ISP. Each claim will be addressed in turn.

*A. Incident Defendants*

Griffin is proceeding against the incident defendants for denying him medical care for injuries he suffered during the January 14 fire. Here are the undisputed facts: During all relevant times, Griffin was living in Cell 358, a single-man cell on the third floor of A Cellhouse (ACH). ECF 132-1 at 13-14. Around 11:00 a.m. on January 14, 2023,

a fire started in cell A252, which was a level below and three cells down from Griffin's cell. *Id.* at 20, 29-30. Griffin began to smell smoke and heard an inmate named Michael Smith state there was a fire in his cell. *Id.* at 29-30. Inmates began yelling that there was a fire and banging on their cell bars, and Griffin began to see flames coming up to the third-floor range. *Id.* at 32. Because of where his cell was located, Griffin could not see anything that occurred on the second floor and could not see who responded to the fire. *Id.* at 30, 33.

At around 10:58 a.m., prison staff heard the fire alarm in ACH go off and inmates yelling, prompting them to respond. ECF 132-11 at 2. Sgt. Walton called a 10-71, which is the signal for a fire in ACH. ECF 132-11 at 2; ECF 106 at 5. Officer Cross grabbed a fire extinguisher from the officer's station, and he and Officer Crockett went to the 200 North range with the fire extinguisher and the keys to the range. ECF 132-3 at 3; ECF 132-11 at 2. Once they were on the 200 range, they realized the location and size of the fire. *Id.* They proceeded to Cell A252, but it was hard to get near the front of the cell to manually unlock the door because of the intensity of the fire. *Id.* Officer Cross used the fire extinguisher, but it was not able to put out the fire. ECF 132-3 at 3. Officer Cross had unknowingly grabbed a water-based fire extinguisher and realized he needed an ABC fire extinguisher instead. ECF 132-3 at 2-3; ECF 132-11 at 2. He went back downstairs and met Lt. Smith-Robinson, who handed him an ABC fire extinguisher by the stairs to the second floor. ECF 132-3 at 3; ECF 132-4 at 2. At approximately 10:59 a.m., Officer Cross returned to Cell A252 with the ABC fire extinguisher and passed it to Officer Crockett, who deployed it to control the fire. ECF 132-11 at 2; ECF 132-3 at 3.

First responders then arrived on the scene, including Lt. Koen. ECF 132-11 at 2; ECF 132-5 at 2. Lt. Koen was able to open the door to Cell A252 as staff continued to try to put out the fire. ECF 132-11 at 2-3; ECF 132-5 at 2. A team of inmate firefighters also arrived on the scene and were able to extinguish the fire. ECF 132-11 at 3.

While the fire was ongoing, Griffin turned on his fan to keep the smoke out of his cell. ECF 132-1 at 34-36. At some point, he began vomiting in his toilet and lost consciousness while on his bed. *Id.* at 40-41. He experienced lightheadedness, shortness of breath, blurriness of sight, and burning of his sinuses, throat, and eyes. *Id.* at 46.

Once the inmate firefighters arrived on the scene and began extinguishing the fire, Captain McCann gave permission to evacuate all the other inmates in ACH to the recreation yard. ECF 132-4 at 2; ECF 132-11 at 3. Cells were unlocked, and correctional officers performed a sweep of each range to ensure all inmates had left the cellhouse. ECF 132-4 at 2. Because Griffin was on the 300 range, which had an electronic locking mechanism, his cell opened automatically when the doors were unlocked at the end of the range, and he was able to physically open his cell door and head down the stairs. ECF 132-1 at 49. Griffin exited ACH through the front door. *Id.* at 52.

While Griffin was leaving the ACH, he stated aloud that he believed he had passed out, was lightheaded, and needed medical attention. ECF 132-1 at 52-54. Griffin did not know who exactly he was talking to at the time, but he was in the "vicinity" of Officer Cross, Officer Crockett, Lt. Smith-Robinson, Sgt. Walton, and Lt. Koen. *Id.* None of those defendants responded or gave any indication they heard what he said, but Griffin testified he would "like to believe that they heard me" because they were in

close proximity. *Id.* at 58. Griffin testified it was "fair" to say he was not sure whether they heard him or not. *Id.* All inmates were evacuated to the gym, while inmates experiencing apparent medical emergencies were taken straight to the medical unit. ECF 132-5 at 3.

Once Griffin arrived at the gym, he spoke to Case Worker Mayes and told her that he was feeling "lightheaded" and "short of breath," and she responded that they were "counting currently." ECF 132-1 at 59. Captain McCormick then told Case Worker Mayes that custody staff were able to handle the situation, and Mayes then left the area. ECF 132-6 at 2. She did not have any further involvement with any inmate, and Griffin did not speak to any other staff while he was in the gym. *Id.*; ECF 132-1 at 60.

Once ACH was cleared and it was determined the cellhouse was safe to return, inmates were sent back to their cells and placed on lockdown. ECF 132-3 at 4; ECF 132-4 at 2; ECF 132-1 at 70. Griffin returned to his cell and did not have any further conversations with any of the incident defendants. ECF 132-1 at 63-64, 72-73. Inmates who requested medical attention but did not appear to be suffering from a medical emergency were secured back in their cells so that staff could perform a triage and coordinate treatment with medical staff. ECF 132-5 at 3.

Once the inmates in ACH were back in their cells, Lt. Smith-Robinson and other custody staff did rounds and performed a count. ECF 132-4 at 2-3. Lt. Smith-Robinson and other staff spoke with numerous inmates and informed medical staff if any of them required assistance. *Id.* at 3. Dr. Chico also came to the prison to assist with triaging ACH after the fire. ECF 135-1 at 2-3. Griffin spoke with Dr. Chico at his cell and told her

that he needed medical attention, but he was not taken to the medical unit that day. ECF 132-1 at 63. He only spoke to Dr. Chico at his cell and did not speak to any of the incident defendants. *Id.* at 63-64. Griffin later attempted to submit a healthcare request form to be seen by medical, but when he requested the form from officers, they would not provide the form. *Id.* at 66. He could not recall which officers he requested healthcare request forms from. *Id.* He was not seen by medical staff on the day of the fire. When he was eventually seen by medical staff, he was focused on receiving treatment for his preexisting conditions and did not request any treatment for his symptoms related to the fire. *Id.* at 67-69.[1] Because neither party disputes these facts, I accept them as undisputed.

As discussed, Griffin is proceeding against the incident defendants "for denying him medical care for injuries he suffered" during the January 14 fire. ECF 11 at 11-12. The incident defendants argue summary judgment is warranted in their favor on this claim because (1) Griffin did not suffer any objectively serious medical condition, (2) they were not deliberately indifferent to that condition, and (3) they are entitled to qualified immunity.

Under the Eighth Amendment, prison officials have a duty to ensure inmates receive constitutionally adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability for an Eighth Amendment violation, a prisoner must show: (1) his medical need was objectively serious; and (2) the defendants acted with deliberate

[1] It is unclear from the record when Griffin was first seen by medical staff following the January 14 fire. He testified only that he did not see medical staff on the day of the fire.

indifference to that medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the second prong, Griffin must show the incident defendants "acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal quotation marks, brackets, and citations omitted). "Deliberate indifference occupies a space slightly below intent and poses a 'high hurdle and an exacting standard' requiring 'something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Stockton v. Milwaukee County*, 44 F.4th 605, 615 (7th Cir. 2022) (quoting *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020)). The deliberate-indifference inquiry is subjective: the defendant must be aware of facts supporting an inference that a substantial risk of serious harm exists and must actually draw that inference. *See Farmer*, 511 U.S. at 837; *Jackson v. Esser*, 105 F.4th 948, 961 (7th Cir. 2024).

Here, with regard to Officer Cross, Lt. Smith-Robinson, Officer Crockett, Sgt. Walton, and Lt. Koen, there is no evidence that any of them knew Griffin had a serious medical need, much less that they were deliberately indifferent to it. Griffin encountered these defendants while they were assisting in the evacuation of him and the other inmates in ACH to the gym. Griffin testified that, during the evacuation, he stated aloud that he needed medical attention while he was in the "vicinity" of these defendants, but he could not say whether any of them heard him. ECF 132-1 at 53-55, 57-58. These defendants attest they have no recollection of Griffin ever asking them for

medical attention. ECF 132-3 at 4; ECF 132-4 at 3; ECF 132-5 at 3; ECF 132-11 at 3. Griffin further conceded that he did not speak with any of these defendants once he arrived at the gym and did not see any of them again after he was returned to his cell. ECF 132-1 at 60-64. Thus, even construing the evidence in Griffin's favor, the record would permit a jury to find only that he requested medical attention while these defendants were nearby—not that any of them heard the request or otherwise knew he needed medical care. Without evidence that these defendants were aware of Griffin's need for medical attention, no reasonable jury could conclude that they exhibited "a total unconcern" for his welfare "in the face of serious risks" by assisting in his evacuation to the gym without providing him immediate medical treatment. *Stockton*, 44 F.4th at 615.

With regard to Case Worker Mayes, Griffin testified that he spoke with her at the gym and told her he was feeling lightheaded and experiencing shortness of breath, to which she responded, "We counting currently." ECF 132-1 at 59. That was the only conversation Griffin had with Case Worker Mayes at that time, and Case Worker Mayes thereafter left the area after Captain McCormick informed her that custody staff could handle the situation. ECF 132-6 at 2.

Even accepting Griffin's testimony, no reasonable jury could conclude that Case Worker Mayes acted with deliberate indifference. Although Griffin told Case Worker Mayes he was experiencing lightheadedness and shortness of breath, there is no evidence that his condition appeared so severe or urgent that Case Worker Mayes would have understood he required immediate medical intervention rather than medical attention through the ordinary channels available to him. The Eighth

Amendment did not require Case Worker Mayes to interrupt her count to personally secure immediate treatment under these circumstances, particularly where custody staff remained present to address Griffin's needs and he could seek medical attention through the ordinary procedures once the evacuation had concluded. *See Hayes v. Zatecky*, No. 1:21-CV-00630-JPH-KMB, 2023 WL 5722673, at *5 (S.D. Ind. Sept. 5, 2023) ("to the extent Mr. Hayes told these administrators about medical problems when he was not experiencing a medical emergency, the Eighth Amendment did not obligate them to ensure that he received treatment when Mr. Hayes could instead interact with the medical staff through the appropriate channels for him to do so.") (citing *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job.")); *Robertson v. Liedtke*, No. 3:23-CV-514-HAB, 2026 WL 274603, at *4–5 (N.D. Ind. Feb. 2, 2026) (concluding that a nurse did not act with deliberate indifference by declining to interrupt medication pass to provide immediate care for non-emergency medical complaints where the inmate could seek treatment through the ordinary procedures). On this record, Case Worker Mayes's decision to continue with the count rather than immediately act on Griffin's request for medical attention does not satisfy the "high hurdle" of showing "a total unconcern" for Griffin's welfare "in the face of serious risks." *Stockton*, 44 F.4th at 615.

In his response, Griffin raises two arguments that must be addressed. First, contrary to his deposition testimony, he now asserts that he "expressly told each individual incident defendant that I had lost consciousness, had difficulty breathing, was experiencing severe pain and burning sensations in my eyes, nasal cavity, throat,

and chest, and was violently vomiting," but that they nevertheless refused to facilitate his access to medical care. ECF 145-1 at 18-19. This account cannot be reconciled with Griffin's deposition testimony. At his deposition, Griffin testified that: (1) as to Officer Cross, Lt. Smith-Robinson, Officer Crockett, Sgt. Walton, and Lt. Koen, he merely stated that he needed medical attention while he was in their "vicinity" and could not say whether any one of them specifically heard him; and (2) as to Case Worker Mayes, he told her only that he was feeling "lightheaded" and "short of breath" while she was conducting a count at the gym. ECF 132-1 at 52-55, 57-59. Griffin may not create a genuine dispute of material fact by offering a later account that directly contradicts his earlier sworn deposition testimony without explaining the discrepancy. *See James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020) (explaining that the sham-affidavit rule "prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony"). Accordingly, Griffin's later assertion that he specifically described these additional and more severe symptoms to each defendant does not create a genuine factual dispute.

Second, Griffin argues that, even if the incident defendants were not "specifically or individually made aware of my serious medical need," they nevertheless knew he required medical attention because they were aware that he had been exposed to smoke. ECF 145-1 at 19-20. But general knowledge that Griffin had been exposed to smoke does not establish that any particular defendant knew he faced a serious medical risk requiring additional intervention. The undisputed evidence shows that the defendants evacuated Griffin and the other inmates in ACH to the gym, sent inmates

exhibiting emergency medical needs to the medical unit, returned the remaining inmates to ACH once it was cleared, and then arranged for inmates to be triaged in their cells to identify those requesting medical attention. After Griffin returned to his cell, he spoke with Dr. Chico but did not see or speak with any of the incident defendants.

Thus, the record does not show that the incident defendants ignored a known risk to Griffin's health. On the contrary, they participated in an evacuation and triage process designed both to identify inmates requiring emergency treatment and to provide a means for the remaining inmates to request medical attention. Absent evidence that any of these defendants knew Griffin personally required additional or immediate medical care, no reasonable jury could conclude that they exhibited "a total unconcern" for his welfare "in the face of serious risks." *Stockton*, 44 F.4th at 615.

Accordingly, there is no evidence that Officer Cross, Lt. Smith-Robinson, Officer Crockett, Sgt. Walton, or Lt. Koen knew Griffin had a serious medical need, much less that they were deliberately indifferent to it. And although Griffin testified that he informed Case Worker Mayes that he was experiencing lightheadedness and shortness of breath, her decision not to secure immediate medical care did not demonstrate "a total unconcern" for his welfare, particularly where other procedures were in place to identify inmates requiring medical attention. Summary judgment is therefore warranted in favor of the incident defendants on this claim.[2]

[2] Because the undisputed facts show the incident defendants were not deliberately indifferent to Griffin's serious medical need, I do not reach their alternative arguments that Griffin did not have an objectively serious medical need or that they are entitled to qualified immunity.

*B. Supervisory Defendants*

Griffin is proceeding against the supervisory defendants on a deliberate-indifference claim based on the risk of harm posed by the January 2023 fire. At the outset, there is no evidence that any of these defendants were present for or personally involved in responding to the January 14 fire. Rather, Griffin's claim concerns their conduct before the fire: he contends that they knew conditions in ACH created a substantial risk of serious harm in the event of a fire but failed to take reasonable measures to address that risk. *See* ECF 145-1 at 21 ("To be clear, I am not claiming that Supervisory Defendants are liable because they approved, condoned, or turned a blind eye to the actions taken by Incident Defendants on January 14, 2023. Rather, I am asserting an independent theory of deliberate indifference as to the Supervisory Defendants. Specifically, that they were aware of dangerous conditions in [ACH] and the substantial risk these conditions posed in an event of a fire, but that they failed to take reasonable action in response to this risk.").

The supervisory defendants submit affidavits from ISP Safety Hazard Manager Taylor and Warden Neal describing the fire-prevention and response measures in place at ISP at the time of the January 14 fire. They attest to the following facts:

ISP maintains its own on-site inmate fire department, whose members receive statewide firefighter certification and training through the State Fire Marshal, allowing the facility to respond to fires more quickly than if it had to wait for an outside fire department. ECF 132-7 at 2. ISP also equips its fire department with the latest firefighting and smoke-control equipment, including foam backpack fire-suppression

systems and smoke-evacuation systems. *Id.* All fire alarms were operational at the time of the January 14 fire, several had been newly installed or refurbished, and the dampers and exhaust systems in the cellhouses were regularly repaired and replaced as needed to ensure they remained operational. *Id.*

ISP had also implemented additional fire-safety measures following a 2017 fire. It purchased additional water and ABC fire extinguishers, which were placed at officers' stations and on the endcaps of each cell range; reduced the amount of property inmates could keep in their cells; and replaced plastic property boxes with more fire-resistant steel boxes. ECF 132-7 at 2-3. The housing units themselves are primarily constructed of steel and concrete, and ISP uses fire-retardant mattresses. *Id.* at 4. In 2019, ISP also upgraded all of its fire hydrants. *Id.*

These measures were supplemented by regular inspection, training, and emergency-planning procedures. The ISP Fire Department conducted bimonthly inspections of all fire extinguishers, and there were no reports of inoperable or empty extinguishers in ACH leading up to the January 14 fire. ECF 132-7 at 4; ECF 132-8 at 2. The Safety Hazard Manager and ISP Fire Department also conducted four fire drills per year for each building. *Id*. Finally, ISP maintained a Fire Plan setting out staff procedures for fire prevention and evacuation, and all staff received training on the plan and were required to complete a questionnaire testing their knowledge of those procedures. ECF 132-7 at 4-5; ECF 132-8 at 2.

All supervisory defendants attest they were unaware of any infrastructural issues or conditions at ISP that created a fire risk or threatened the lives of inmates

living in ACH. ECF 132-2 at 1; ECF 132-7 at 6; ECF 132-8 at 4; ECF 132-9 at 3; ECF 132-10 at 2. The January 14 fire was investigated by both the State Fire Marshal and ISP's Internal Affairs Division, and neither party was able to determine the cause of the fire. ECF 132-7 at 7.

In his response, Griffin lists twenty-five conditions he contends made ACH unsafe and created a substantial risk of harm in the event of a fire: (1) no inmate firefighters were housed in ACH; (2) fire signals were not called promptly; (3) staff did not promptly release inmate firefighters to respond to fires; (4) electrical outlets were not grounded; (5) the smoke-ventilation exhaust system was inoperable; (6) fire extinguishers were either inoperable or insufficient in number; (7) staff were inadequately trained; (8) automatic smoke alarms were inoperable; (9) the paint was flammable; (10) staff training was deficient; (11) cells lacked emergency call buttons; (12) staff did not perform timely security checks; (13) cells had double-locking manual doors; (14) most fire extinguishers were water-based rather than ABC extinguishers; (15) staff cheated on fire-preparation questionnaires; (16) staff conducted sham fire drills; (17) there was no automated fire-suppression system; (18) the smoke-ventilation exhaust systems were not operational; (19) smoke detectors were positioned too high; (20) there were widespread problems with electrical outlets; (21) too few fire drills were conducted; (22) inmates were not provided storage containers with lids or covers; (23) staff failed to comply with recommendations made after the 2017 fire; (24) fire-safety equipment was not meaningfully inspected; and (25) staff were not properly questioned regarding their knowledge of fire-safety procedures. ECF 145-1 at 22-23.

In support of these arguments, Griffin merely states that he "has provided a panoply of evidence," yet only has citations for four of the listed conditions. And those sparse citations are largely lacking, or even contradict his assertions. For example, for his contention that there was no operational smoke ventilation exhaust systems, he cites *Jenkins v. Bass*, 2025 WL 1916106 (N.D. Ind. July 10, 2025), *reconsideration denied*, 2025 WL 2982380 (N.D. Ind. Oct. 23, 2025). He states that this case, which was also about a fire in the prison, made the supervisory defendants aware that the exhaust system was inoperable. ECF 145-1, 23. But that is not what the case, which granted summary judgment to the moving defendants, stated. *Jenkins*¸ 2025 WL 1916106 at *4. Much the opposite, that opinion stated that the smoke was cleared "*using exhaust fans* and other fans brought to the unit." *Id.* at *2. At the summary judgment stage, I may disregard unsupported factual contentions and need not scour the record for any possible evidence that might be relevant to Griffin's contentions here. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 572 (7th Cir. 2017) (holding that a court need not "scour the record in search of evidence to defeat a motion for summary judgment.").

Regardless, the question is not whether ISP could have done more; it is whether the supervisory defendants were deliberately indifferent to a substantial risk of serious harm. Deliberate indifference requires more than negligence or even objective recklessness. *Stockton*, 44 F.4th at 615. An official who takes reasonable measures to address a known risk is not deliberately indifferent merely because additional precautions were available or the measures taken ultimately proved insufficient. *See Farmer*, 511 U.S. at 844 (an official who responds reasonably to a known substantial risk

cannot be held liable under the Eighth Amendment even if the harm is not ultimately averted); *Hunter v. Mueske*, 73 F.4th 561, 566 (7th Cir. 2023) (an official is not liable where the measures taken were "reasonably calculated" to address the risk, even though they ultimately failed to prevent the injury); *Bagola v. Kindt*, 131 F.3d 632, 647-48 (7th Cir. 1997) (officials who took reasonable steps to prevent harm were not deliberately indifferent even though they may have acted negligently or failed to eliminate the risk as quickly as possible). Thus, Griffin cannot establish deliberate indifference simply by identifying additional fire-safety measures that ISP could have implemented.

Here, the undisputed evidence shows that the supervisory defendants took numerous steps "reasonably calculated" to address the risk posed by a fire. *See id.* Before the January 14 fire, ISP had: (1) established an on-site inmate fire department whose members received statewide firefighter certification; (2) repaired and replaced dampers, exhaust systems, fire alarms, and fire extinguishers as needed; (3) purchased updated firefighting equipment, including foam backpack fire-suppression systems and smoke-evacuation systems; (4) purchased additional water and ABC fire extinguishers; (5) reduced the amount of property inmates could keep in their cells; (6) replaced plastic property boxes with more fire-resistant steel boxes; (7) upgraded its fire hydrants; (8) regularly inspected its fire extinguishers; (9) conducted fire drills four times per year; (10) implemented a Fire Plan governing fire prevention and evacuation; and (11) trained and tested staff on that plan.

Griffin lists various ways in which he believes these precautions were inadequate or could have been implemented more effectively. But, as I noted above, the Eighth Amendment does not require the supervisory defendants to eliminate every conceivable fire hazard or adopt every additional precaution that might have reduced the risk further. The undisputed evidence instead shows a substantial system of fire-prevention, firefighting, evacuation, inspection, and training measures directed at the very risk Griffin contends the defendants ignored. That those measures did not prevent Griffin from suffering injury during the January 14 fire does not itself permit a reasonable jury to conclude that the supervisory defendants exhibited "a total unconcern" for his safety. Summary judgment is therefore warranted in favor of the supervisory defendants on this claim.

Accordingly, for these reasons, summary judgment is warranted in favor of all state defendants on both of Griffin's claims.

**II. Claims Against Dr. Chico**

Griffin is proceeding against Dr. Chico on an Eighth Amendment claim that she was deliberately indifferent to his need for medical care following the January 14 fire. ECF 11 at 11-12. Dr. Chico moves for summary judgment, arguing that the evidence does not permit a reasonable jury to find that she was deliberately indifferent to any serious medical need. ECF 134; ECF 137.

Dr. Chico provides an affidavit in which she attests to the following facts: During all relevant times, Dr. Chico worked at ISP as a psychologist providing mental health services to inmates. ECF 135-1 at 1. She was not scheduled to work on January 14, 2023,

but was called after the fire in ACH and asked to come to the prison to check on the inmates' mental health. *Id.* at 2. By the time she arrived, the fire had been extinguished. *Id.* Dr. Chico spent the next four or five hours walking each range of ACH and checking on each inmate, including Griffin. *Id.* She reminded inmates that she was available for mental health counseling, and several inmates who requested follow-up mental health treatment were scheduled for appointments. *Id.*

Because Dr. Chico is a psychologist rather than a medical doctor, she did not evaluate inmates for specific medical treatment during these rounds. ECF 135-1 at 2. If an inmate requested medical care, however, Dr. Chico attests that she recorded the inmate's cell location on a list and provided the list to custody staff so the inmate could be taken to the medical unit. *Id.* at 2-3. She did not have authority to personally escort inmates to the medical unit. *Id.* at 3. Dr. Chico does not specifically recall whether Griffin requested medical care when she spoke with him, but she attests that, if he did, she would have included his cell location on the list provided to custody staff. *Id.* She further attests that she observed no inmate displaying obvious signs of a medical emergency and believed that inmates who requested medical treatment would be taken to the medical unit. *Id.* After completing her rounds and providing her list of cell locations to custody staff, Dr. Chico left the prison. *Id.*

In his response, Griffin states that, when Dr. Chico saw him during her rounds, he told her that he had lost consciousness during the fire, was having difficulty breathing, and was experiencing severe pain in his eyes, sinuses, throat, and chest. ECF 143-1 at 3. He asserts he was not taken to the medical unit despite reporting these

symptoms, and argues Dr. Chico was therefore deliberately indifferent for several reasons.

*First*, Griffin argues that Dr. Chico acted with deliberate indifference by providing the list of inmates requesting medical attention to custody staff rather than directly to medical staff. ECF 143-1 at 9. That conduct does not permit a reasonable inference of deliberate indifference. Dr. Chico attests that she provided the list to custody staff so that those inmates could be taken to the medical unit for evaluation. Even if Griffin believes it would have been preferable for Dr. Chico to communicate directly with medical staff, the Eighth Amendment did not require her to personally undertake every step necessary to secure treatment where she reasonably referred the matter to other prison employees responsible for arranging access to the medical unit. *See Burks*, 555 F.3d at 595 ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job."). On this record, the evidence does not come close to showing that Dr. Chico exhibited "a total unconcern" for Griffin's welfare.

*Second*, Griffin argues that Dr. Chico "failed to notify medical staff (or any other staff for that matter) of my need for medical attention, and instead rushed back home to continue enjoying her day off and entertaining her house guests." ECF 143-1 at 3. Dr. Chico, however, attests that "[a]ll offender requests for medical treatment that were made to me were recorded and delivered to custody staff." ECF 135-1 at 3. Griffin has no personal knowledge of what Dr. Chico did after leaving his cell and therefore cannot contradict her testimony based on his own observations. He nevertheless argues that the circumstantial evidence creates a genuine dispute as to whether Dr. Chico actually

provided the list of inmates requesting medical attention to custody staff. ECF 143-1 at 10-11.

Griffin argues that the incident defendants' attestations that they were unaware of his request for medical attention create a factual dispute as to whether Dr. Chico ever provided the list of cell locations to custody staff. ECF 143-1 at 10. But Dr. Chico does not identify which member of custody staff received the list, and there is no evidence that she provided (or was expected to provide) the list to any of the incident defendants specifically. The fact that those defendants were unaware of Griffin's request therefore does not contradict Dr. Chico's testimony that she provided the list to custody staff; she could have provided it to another employee who is not a defendant in this case.

Griffin also argues that the fact custody staff did not ultimately send him for medical treatment creates a genuine dispute as to whether Dr. Chico actually provided the list of cell locations to custody staff. Similar arguments were recently addressed by the Seventh Circuit in *Taylor v. Reagle*, No. 25-2338, 2026 WL 1951623 (7th Cir. July 6, 2026), and *Barghouti v. Hansen*, No. 24-2610, 2026 WL 2169044 (7th Cir. July 28, 2026). Although both are nonprecedential dispositions, they are persuasive because they address similar attempts to infer from a plaintiff's subsequent failure to receive treatment that a defendant never relayed his request for medical assistance.

In *Taylor*, the district court determined that defendant Sergeant Williams was not deliberately indifferent to Taylor's serious medical need after crediting Sgt. Williams's testimony that he telephoned medical staff and relayed Taylor's complaints. On appeal, Taylor argued that Sgt. Williams's testimony was contradicted by Taylor's own sworn

statements and the absence of an entry documenting the call in the relevant logbook. The Seventh Circuit affirmed, concluding that "neither Taylor's statements nor the lack of entry in the logbook create a genuine dispute of fact." *Id.* at *2. Because Taylor lacked personal knowledge of whether Sgt. Williams contacted medical staff, he could not genuinely dispute Sgt. Williams's sworn testimony that he had done so. *Id.* (citing *Payne*, 337 F.3d at 772). Nor did the absence of a logbook entry, "without more," permit a reasonable inference that the call never occurred. *Id.* (*citing Estate of Biegert ex rel. Biegert v. Molitor*, 968 F.3d 693, 701 (7th Cir. 2020)).

Similarly, in *Barghouti*, the plaintiff argued that correctional officers had lied when they testified that they contacted medical staff about his complaints. 2026 WL 2169044, at *3. The Seventh Circuit rejected that argument because there was no record evidence contradicting the officers' accounts, explaining that "[m]ere speculation cannot defeat a motion for summary judgment." *Id.* Although the court expressed concern that Barghouti had waited as long as a day and a half for medical attention, that delay did not establish that the officers had failed to contact medical staff because "the record does not indicate why the delay occurred or who was responsible, much less whether the delay was the result of deliberate indifference." *Id.*; *see also Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) ("[T]he plaintiff must show that the defendant's actions or inaction caused the delay in his treatment.").

The same reasoning applies here. Griffin has no personal knowledge of what Dr. Chico did after leaving his cell and relies on the fact that he was not subsequently taken to the medical unit to infer that she must not have delivered the list to custody staff. But

the fact that Griffin ultimately did not receive medical attention on the day of the fire does not reveal where the process broke down, much less permit a reasonable jury to attribute that failure to Dr. Chico. *See Barghouti*, 2026 WL 2169044, at *3; *Walker*, 940 F.3d at 964. There is no evidence contradicting Dr. Chico's sworn testimony that she recorded all requests for medical treatment and delivered them to custody staff. On this record, concluding that she failed to do so merely because Griffin was not ultimately taken to the medical unit would rest on speculation rather than a reasonable inference from the evidence. *See Taylor*, 2026 WL 1951623, at *2; *Biegert*, 968 F.3d at 701; *Payne*, 337 F.3d at 772.

Moreover, even if a reasonable jury could infer that Dr. Chico failed to provide Griffin's cell location to custody staff, there is no evidence that any such omission amounted to deliberate indifference rather than negligence. Nothing in the record suggests that Dr. Chico intentionally withheld Griffin's cell location, deliberately omitted it from the list, or otherwise consciously chose to prevent him from receiving medical care. Thus, even assuming some breakdown attributable to Dr. Chico occurred, the record would permit only speculation as to whether that breakdown was inadvertent or reflected the culpable state of mind required for an Eighth Amendment violation.

*Third*, to the extent Griffin's claim rests on a delay in receiving medical care, he has not produced verifying medical evidence that the delay itself caused him additional harm. *See Barnes v. Wexford Health Sources, Inc.*, 177 F.4th 825, 833 (7th Cir. 2026) ("In cases such as this one—where the plaintiff alleges the defendant delayed, rather than

denied, medical treatment—we have required that the plaintiff present 'verifying medical evidence' that the delay, and not the underlying condition, caused some harm."). Griffin testified that, when he eventually saw medical staff, he sought treatment focused on his preexisting medical conditions, and there is no evidence that he received or required any treatment for injuries caused by the January 14 fire. Thus, there is no evidence from which a reasonable jury could find that any delay attributable to Dr. Chico exacerbated Griffin's condition or otherwise caused him additional harm. *See Barnes*, 177 F.4th at 833; *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009).

Accordingly, even accepting Griffin's testimony that he informed Dr. Chico of symptoms requiring medical attention, there is no nonspeculative evidence that Dr. Chico consciously disregarded that need. The only competent evidence addressing what Dr. Chico did after speaking with the inmates shows that she recorded requests for medical care and provided the resulting list to custody staff, and Griffin has produced no evidence from which a reasonable jury could find either that she failed to do so in his case or, even if she did, that the omission was anything more than negligent. Summary judgment is therefore warranted in Dr. Chico's favor. Summary judgment is therefore warranted in Dr. Chico's favor.

For these reasons, the court:

(1) GRANTS the state defendants' motion for summary judgment (ECF 131);

(2) GRANTS Dr. Chico's motion for summary judgment (ECF 134); and

(3) DIRECTS the clerk to enter judgment in favor of the defendants and against LeeTravis Griffin and to close this case.

**SO ORDERED**.

ENTERED: September 11, 2026.

/s/Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT